**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, CITY OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAI'I, STATE OF ILLINOIS, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN, CITY OF CHICAGO, and COOK COUNTY, ILLINOIS,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, *in his official capacity as Secretary of the United States Department of Health and Human Services*; and UNITED STATES OF AMERICA,<br><br>                    Defendants. | CIVIL ACTION NO.<br><br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**INTRODUCTION**

1.      This lawsuit challenges a U.S. Department of Health and Human Services

regulation that – in an unprecedented and unlawful expansion of nearly thirty federal statutory

1

provisions – would compel the Plaintiff States and local jurisdictions to grant to individual health providers the categorical right to deny lawful and medically necessary treatment, services, and information to patients, based on the provider's own personal views. *Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 84 Fed. Reg. 23,170 (May 21, 2019) (the "Final Rule"). This change to put providers above patients comes at a dangerous price: it will undermine the Plaintiffs' ability to administer their health care systems and deliver patient care effectively and efficiently.

2.      In violation of clear constitutional and statutory limits, the Final Rule seeks to coerce the Plaintiffs to comply with the Department's overbroad application of federal law by subjecting the Plaintiffs to termination, withholding, or denial of potentially all federal health care funds if the Department determines, in its sole discretion, that the Plaintiffs, their agencies, or any of their sub-recipients have failed to comply with the Final Rule or any of the related statutory provisions. 84 Fed. Reg. at 23,271-72 (to be codified at 45 C.F.R. § 88.7). For the Plaintiffs, this financial exposure could amount to hundreds of billions of dollars each year.

3.      The requirements that Defendants seek to impose through this Final Rule are invalid. The Final Rule far exceeds in scope and substance the underlying federal health care statutes it purports to implement; conflicts with federal statutes regarding access to health care, informed consent, the provision of emergency medical services, and religious accommodations; violates constitutional safeguards that assign the spending power to Congress and prohibit the Executive Branch from coercing states to implement preferred federal policies; and violates the Establishment Clause by imposing a categorical requirement that Plaintiffs accommodate the religious objections of their employees, whatever the cost.

2

4.      The Final Rule harms Plaintiffs by undermining Plaintiffs' carefully-balanced health care policies and laws; imposing severe constraints on the operation of Plaintiffs' health care institutions that will dramatically undermine their effectiveness and burden their operations; and threatening Plaintiffs' right to billions of dollars in federal health care funds needed to assure the health and safety of Plaintiffs' residents and communities.

5.      Plaintiffs' health care institutions operate to protect the health and welfare of their residents, yet the Final Rule undermines their efficient delivery of care and creates irrational, untenable, and potentially cruel situations.  For example, the Final Rule would prohibit Plaintiffs' institutions from inquiring, pre-hire, whether a candidate for a nursing position had a religious objection to administering a measles vaccination, regardless of whether such a duty was a core element of the position needed during an outbreak of the disease.  Or if a woman arrives at the emergency room of one of Plaintiffs' institutions presenting with a ruptured ectopic pregnancy, the Final Rule would permit a wide swath of employees – from receptionists to nurses to doctors to pharmacists to anesthesiologists – to refuse to assist that patient in real time, and without any advance notice, no matter the intense medical risk to the patient.  And despite existing efforts of Plaintiffs' institutions to balance the beliefs of their staff with their mission to provide patient care, the Final Rule would similarly permit a doctor or medical resident – again, without notice – to refuse to remove a feeding tube from a comatose patient at the moment the procedure is set to occur, even if the patient's loved ones were present to witness the objection.

6.      Communities of color and other vulnerable populations will bear a disproportionate burden of the harms caused by the Final Rule.  Patients reliant on federal funding for the provision of health care are disproportionately non-white compared to the overall

3

population.  And women and LGBTQI individuals who are already stigmatized in obtaining

access to health care will be further hindered in obtaining the lawful medical services they need.

7.      Plaintiffs the State of New York, the City of New York, the State of Colorado, the

State of Connecticut, the State of Delaware, the District of Columbia, the State of Hawaiʻi, the

State of Illinois, the State of Maryland, the Commonwealth of Massachusetts, the State of

Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New

Mexico, the State of Oregon, the Commonwealth of Pennsylvania, the State of Rhode Island, the

State of Vermont, the Commonwealth of Virginia, the State of Wisconsin, the City of Chicago,

and the County of Cook therefore bring this action to vacate the Final Rule and enjoin its

implementation because it exceeds and is contrary to Defendants' statutory jurisdiction,

authority, and limitations in violation of the Administrative Procedure Act ("APA"), 5 U.S.C.

§ 706(2)(C); is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with

law under the APA, 5 U.S.C. § 706(2)(A); is unconstitutionally vague and coercive in violation

of the Spending Clause, U.S. Const. art. I, sec. 8, cl. 1; violates the constitutional separation of

powers; and violates the Establishment Clause of the First Amendment to the U.S. Constitution.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

2201(a).  Jurisdiction is also proper under the judicial review provisions of the Administrative

Procedure Act, 5 U.S.C. § 702.

9.      Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and

706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

10.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1).

Defendants are United States agencies or officers sued in their official capacities.  Plaintiffs the

State of New York and the City of New York are residents of this judicial district, and a

substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Southern District of New York.

## PARTIES

11.     Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

12.     Plaintiff the City of New York is a municipal corporation organized pursuant to the laws of the State of New York.  New York City is a political subdivision of the State and derives its powers through the New York State Constitution, New York State laws, and the New York City Charter.  New York City is the largest city in the United States by population.

13.     Plaintiff the State of Colorado is a sovereign state of the United States of America.  The State of Colorado brings this action by and through its Attorney General, Philip J. Weiser.  The Attorney General has authority to represent the state, its departments, and its agencies, and "shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party."  Colo. Rev. Stat. § 24-31-101.

14.     Plaintiff the State of Connecticut, acting by and through its Attorney General, William Tong, brings this action as the chief civil legal officer of the State, and at the request of Governor Ned Lamont.  Attorney General Tong is empowered to bring this action on behalf of the State of Connecticut and the Governor under Conn. Gen. Stat. § 3-124 et seq.

15.     Plaintiff the State of Delaware is represented by and through its Attorney General Kathleen Jennings, and is a sovereign state of the United States of America.  Attorney General Jennings is Delaware's chief law enforcement officer, *see* Del. Const., art. III, and is authorized to pursue this action under 29 Del. Code § 2504.

16.     Plaintiff the District of Columbia (the "District") is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government.  The District brings this case through the Attorney General for the District of Columbia, who is the chief legal officer for the District and possesses all powers afforded the Attorney General by the common and statutory law of the District.  The Attorney General is responsible for upholding the public interest and has the authority to file civil actions in order to protect the public interest.  D.C. Code § 1-301.81.

17.     Plaintiff the State of Hawaiʻi, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is the State of Hawaiʻi's chief law enforcement officer and is authorized to pursue this action pursuant to Hawaiʻi Revised Statutes §§ 26-7 and 28-1.

18.     Plaintiff the State of Illinois, represented by and through its Attorney General, Kwame Raoul, is a sovereign state of the United States of America.  The Attorney General is the chief legal officer of the State, Ill. Const. 1970, art. V, § 15, and is authorized to pursue this action under 15 ILCS 205/4.

19.     Plaintiff the State of Maryland is a sovereign state of the United States of America.  Maryland is represented by and through its chief legal officer, Attorney General Brian E. Frosh.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

20.     Plaintiff the Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is authorized to pursue this action under Mass. Gen. Laws ch. 12, §§ 3 and 10.

21.     Plaintiff the State of Michigan, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is the State of Michigan's chief law enforcement officer and is authorized to pursue this action pursuant to Mich. Comp. Laws § 14.28.

22.     Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is Minnesota's chief legal officer and is authorized to pursue this action on behalf of the State.  Minn. Stat. § 8.01.

23.     Plaintiff the State of Nevada, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Aaron D. Ford is the chief legal officer of the State of Nevada and has the authority to commence actions in federal court to protect the interests of Nevada.  Nev. Rev. Stat. § 228.170.  Governor Stephen F. Sisolak is the chief executive officer of the State of Nevada.  The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  Nev. Const., art. 5, § 1.

24.     Plaintiff the State of New Jersey, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is New Jersey's chief legal officer and is authorized to pursue this action on behalf of the State.  *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

25.     Plaintiff the State of New Mexico, represented by and through its Attorney General Hector Balderas, is a sovereign state of the United States of America.  The Attorney

General is authorized to bring an action on behalf of New Mexico in any court when, in his judgment, the interests of the State so require, N.M. Stat. Ann. § 8-5-2.

26.     Plaintiff the State of Oregon, acting by and through the Attorney General of Oregon, Ellen F. Rosenblum, is a sovereign state of the United States of America.  The Attorney General is the chief law officer of Oregon and is empowered to bring this action on behalf of the State of Oregon, the Governor, and the affected state agencies under Or. Rev. Stat. §§ 180.060, 180.210, and 180.220.

27.     Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth."  Pa. Const. art. IV, § 4.1.  Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority under 71 Pa. Stat. § 732-204.

28.     Plaintiff the State of Rhode Island has the authority to initiate this action by and through its Attorney General, Peter F. Neronha.  The Attorney General is a constitutional officer of the State, is vested with all of its common law powers, and has broad discretion to bring actions for the benefit of the State.  *See* R.I. Const. art. 9, § 12; R. I. Gen. Laws § 42-9-6; *see also State v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428, 470-74 (R.I. 2008).

29.     Plaintiff the State of Vermont, represented by and through its Attorney General, Thomas J. Donovan, is a sovereign state in the United States of America.  The Attorney General is the state's chief law enforcement officer and is authorized to pursue this action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 and 157.

30.     Plaintiff the Commonwealth of Virginia brings this action by and through its Attorney General, Mark R. Herring.  The Attorney General has the authority to represent the

Commonwealth, its departments, and its agencies in "all civil litigation in which any of them are interested."  Va. Code Ann. § 2.2-507(A).

31.     Plaintiff the State of Wisconsin, represented by and through its Attorney General, Joshua L. Kaul, is a sovereign state of the United States of America.  The Attorney General appears in this action at the request of the Governor to represent the interests of the State of Wisconsin pursuant to Wis. Stat. § 165.25(1m).

32.     Plaintiff the City of Chicago is a municipal corporation and home-rule unit organized and existing under the constitution and laws of the State of Illinois.  Chicago is the third largest city in the United States by population.

33.     Plaintiff the County of Cook, Illinois ("Cook County"), is the second most populous county in the United States, with a populace of over five million people.  Cook County is represented by its State's Attorney, Kimberly M. Foxx, whose powers and duties include commencing and prosecuting all actions, civil and criminal, in which Cook County or its citizens might be concerned.  55 ILCS 5/3-9005.  It is governed by its Board of Commissioners and Chief Elected Officer, Toni Preckwinkle (the "County Board").  The County Board serves as the Board of Public Health for Cook County, owning and operating Cook County Health & Hospitals System ("CCH").

34.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the Final Rule harms their sovereign, quasi-sovereign, economic, and proprietary interests and will continue to cause injury unless and until the Final Rule is vacated.

35.     Defendant United States Department of Health and Human Services ("HHS" or "the Department") is a cabinet agency within the executive branch of the United States

government, and is an agency within the meaning of 5 U.S.C. § 552(f).  HHS promulgated the Final Rule and is responsible for its enforcement.

36.     Defendant Alex M. Azar II is the Secretary of HHS and is sued in his official capacity.

37.     Defendant the United States of America is sued as allowed by 5 U.S.C. § 702.

## ALLEGATIONS

**I.     Federal statutory background.**

38.     In the Final Rule, HHS claims to interpret and implement nearly thirty federal statutory provisions concerning refusals to provide health care services due to religious objections, several of which concern behavior by state and local governments.  84 Fed. Reg. at 23,170-74, 23,263-69 (to be codified at 45 C.F.R. § 88.3).  The most relevant of these statutes relate to abortion and sterilization; assisted suicide, euthanasia, and mercy killing; and counseling and referral, as described below.

**A.     Federal statutes related to abortion and sterilization.**

39.     The Final Rule states that it implements a number of statutes that principally concern objections to abortion and sterilization.  84 Fed. Reg. at 23,264-66 (to be codified at 45 C.F.R. §§ 88.3(a), (b), (c), (f)).

40.     The Church Amendments, codified at 42 U.S.C. § 300a-7, prohibit government entities that receive certain federal funds from discriminating against physicians or health care personnel because they performed or assisted in the performance of any sterilization procedure or abortion or refused to do so because of religious beliefs or moral convictions.  42 U.S.C. § 300a-7(c)(1).

41.     The Church Amendments also prohibit the use of federal funds to require any individual to perform or assist in the performance of any sterilization procedure or abortion, if contrary to that individual's religious beliefs or moral convictions.  *Id.* § 300a-7(b)(1).

42.     The Coats-Snowe Amendment, codified at 42 U.S.C. § 238n, prohibits state and local governments that receive federal funds from discriminating against "health care entities," defined to include physicians and participants in a health profession training program, on the ground that they refuse to be trained or provide training in the performance of abortion.  42 U.S.C. §§ 238n(a), (c)(2).

43.     The Weldon Amendment is an appropriations rider that has been included in each HHS appropriations statute enacted since 2004.  *E.g.*, Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, § 507(d), 132 Stat. 2981, 3118 (Sept. 28, 2018).  The Weldon Amendment provides that none of the funds appropriated in the Act may be made available to any state or local government if it discriminates against any institutional or individual health care entity "on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  *Id.* § 507(d)(1), 132 Stat. at 3118.

44.     Section 1303 of the Affordable Care Act ("ACA") permits states to exclude abortion coverage from qualified health plans; provides that health plans are not required to cover abortion services as part of their essential health benefits; and prohibits health plans from discriminating against providers because of their unwillingness to provide or refer for abortions. 42 U.S.C. §§ 18023(a)(1), (b)(1)(A), (b)(4).

**B.      Federal statutes related to assisted suicide.**

45.      The Final Rule also states that it implements several statutes concerning objections to assisted suicide, euthanasia, or mercy killing.  84 Fed. Reg. at 23,266-67 (to be codified at 45 C.F.R. §§ 88.3(e), (i)).

46.      Section 1553 of the ACA proscribes state and local governments that receive federal funding under the ACA from discriminating against a health care entity on the basis that the entity "does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing."  42 U.S.C. § 18113(a).

47.      In addition, the Assisted Suicide Funding Restriction Act of 1997 provides that the advanced directives requirements applicable to state-administered Medicaid programs, codified at 42 U.S.C. § 1396a(w), do not require a provider, organization, or its employees "to inform or counsel any individual regarding any right to obtain an item or service furnished for the purpose of causing, or the purpose of assisting in causing, the death of the individual, such as by assisted suicide, euthanasia, or mercy killing . . . ."  42 U.S.C. § 14406.

**C.      Federal statutes related to counseling and referral.**

48.      The Department states in the Final Rule that it is implementing a number of federal statutory provisions related to health care counseling or referral.  84 Fed. Reg. at 23,266-67 (to be codified at 45 C.F.R. § 88.3(h)).

49.      As applicable to the Plaintiffs, the statute related to state-administered Medicaid programs, 42 U.S.C. § 1396u-2(b)(3)(B), provides that Medicaid managed care organizations are not required "to provide, reimburse for, or provide coverage of, a counseling or referral service if the organization objects to the provision of such service on moral or religious grounds," so long as this policy is communicated to prospective enrollees.  *Id.*

12

**D.      Other statutes that the Final Rule purports to implement.**

50.      The Final Rule states that it implements a range of disparate additional statutes

that relate in some way to religious refusals to provide care.  84 Fed. Reg. at 23,267-69 (to be

codified at 45 C.F.R. §§ 88.3(j) – 88.3(q)).

51.      The ACA's individual mandate, 26 U.S.C. § 5000A, includes an exemption for

individuals whose religious beliefs prohibit accepting the benefits of private or public insurance.

26 U.S.C. § 5000A(d)(2)(A)(i); *see* 26 U.S.C. § 1402(g)(1).

52.      Seven statutory provisions concern specific exemptions from various

requirements for "religious nonmedical health care providers."  *See* 42 U.S.C. § 1320a-1(h)

(exemption from limitation on use for capital expenditures); *id.* § 1320c-11 (exemption from

requirements for quality improvement organizations); *id.* §§ 1395i-5, 1395x(e), 1395x(y)(1)

(eligibility for nonmedical Medicare services); *id.* § 1396a(a) (exemption from Medicaid

requirements for medical criteria and standards); *id.* § 1397j-1(b) (exemption from requirements

to Elder Justice Block Grants to states).

53.      The Final Rule also states that it implements statutes involving the Department's

grants and research conducted in consultation with the Department of Labor and related to

occupational safety and health, *see* 29 U.S.C. § 669(a)(5); as well as statutes concerning early

intervention and suicide assessments for youth, *see* 42 U.S.C. §§ 290bb-36(f), 5106i(a).

**II.      The "Protecting Statutory Conscience Rights in Health Care; Delegations of Authority" rule.**

54.      On May 4, 2017, the President signed an Executive Order entitled "Promoting

Free Speech and Religious Liberty."  Exec. Order No. 13,798, 82 Fed. Reg. 21,675 (May 8,

2017).  Among other things, this Executive Order directed the Attorney General to issue

"Religious Liberty Guidance . . . interpreting religious liberty protections in Federal law."  *Id.*

55.    On October 6, 2017, as directed by Executive Order 13,798, the Attorney General issued a memorandum "to guide all administrative agencies and executive departments in the execution of federal law."  Memorandum from the Attorney General to All Executive Departments and Agencies, *Federal Law Protections for Religious Liberty* 1 (Oct. 6, 2017), at https://www.justice.gov/opa/press-release/file/1001891/download.

56.    The Attorney General's religious liberty guidance identified several statutory provisions that the Department purports to implement in the Final Rule – including the Church Amendments, the Coats-Snowe Amendment, and the Weldon Amendment – as intended to "root out public and private discrimination based on religion."  *Federal Law Protections for Religious Liberty* 8a, 16a-17a.

**A.    The 2018 proposed rulemaking.**

57.    Pursuant to Executive Order 13,798 and the Attorney General's religious liberty guidance, in January 2018, HHS published in the Federal Register a Notice of Proposed Rulemaking regarding refusals to provide health care services based on religious, moral, ethical, or other objections.  *Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 83 Fed. Reg. 3880, 3881, 3923 (proposed Jan. 26, 2018) (the "Proposed Rule") ("Pursuant to the President's Executive Order and Executive Branch policy, and in keeping with the Attorney General's religious liberty guidance, HHS proposes this rule to enhance the awareness and enforcement of Federal health care conscience and associated anti-discrimination laws, to further conscience and religious freedom, and to protect the rights of individuals and entities to abstain from certain activities related to health care services without discrimination or retaliation.").

58.    The Proposed Rule described broad and unconditional rights for health care personnel to refuse to provide health care services on the basis of "religious, moral, ethical, or other reasons." *Id.* at 3923.

59.    The Proposed Rule intended to enforce these refusal rights by withholding, denying, or terminating all federal health care funds provided by the Department in the event the Department determined that there "appear[ed] to be a failure or threatened failure to comply" with the Proposed Rule or related statutes. *Id.* at 3931.

60.    In assessing the likely costs of the Proposed Rule, the Department failed to include or account for the substantial monetary and nonmonetary costs of the health consequences and patient burdens resulting from increased likelihood of denials of medical services and care.

61.    HHS received over 72,000 comments on the Proposed Rule. *See* Final Rule, 84 Fed. Reg. at 23,180 & n.41.

62.    Nineteen States and the District of Columbia commented in opposition to the Proposed Rule and identified the shortcomings that are the subject of this challenge.[1]

63.    Plaintiff the City of New York also commented on the Proposed Rule, explaining that the proposal would harm patients, result in discrimination against vulnerable populations, and impose costly administrative burdens on the City's health care system.[2]

---

[1] *See* Comment Letter from the Attorneys General of New York, *et al.* (Mar. 27, 2018), at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70188; *see also* Comment Letter from N.Y. State Dep't of Fin. Servs. (Mar. 21, 2018), at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-51681; Comment Letter from the Attorney General of California (Mar. 27, 2018), at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70182.

[2] *See* Comment Letter from N.Y. City Dep't of Health & Mental Hygiene, *et al.* (Mar. 27, 2018), at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71028.

64.     Prominent professional health care organizations and health care providers also submitted comments opposing the Proposed Rule, including the American Medical Association, the Association of American Medical Colleges, Planned Parenthood Federation of America, the American College of Obstetricians and Gynecologists, the American Academy of Pediatrics, and the American Academy of Physician Assistants.[3]

### B.     The Final Rule.

65.     President Trump announced the Final Rule at a White House event on May 2, 2019.  The President proclaimed that the Final Rule provided "new protections of conscience rights for physicians, pharmacists, nurses, teachers, students, and faith-based charities."[4]

66.     Following President Trump's White House event, the Department released the Final Rule on May 2, 2019, and published it in the Federal Register on May 21, 2019.  84 Fed. Reg. at 23,170, 23-272.

67.     The Final Rule is scheduled to take effect on July 22, 2019.  84 Fed. Reg. at 23,170.

68.     The Final Rule states that its purpose is to "provide for the implementation and enforcement of the Federal conscience and anti-discrimination laws" identified in the Rule, in order to "protect the rights of individuals, entities, and health care entities to refuse to perform, assist in the performance of, or undergo certain health care services or research activities to

---

[3] *See, e.g.*, Comment Letter from Am. Med. Ass'n (Mar. 27, 2018), at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70564; Comment Letter from Ass'n of Am. Med. Colleges (Mar. 26, 2018), at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-67592; Comment Letter from Planned Parenthood Fed'n of Am. (Mar. 27, 2018), at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71810; Comment Letter from Am. Coll. of Obstetricians & Gynecologists (Mar. 27, 2018), at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70647; Comment Letter from Am. Acad. of Pediatrics (Mar. 27, 2018), at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71048; Comment Letter from Am. Acad. of Physician Assistants (Mar. 26, 2018), at https://www.regulations.gov/document?D=HHS-OCR-2018-0002-65085.

[4] President Donald J. Trump, Remarks at the National Day of Prayer Service (May 2, 2019), at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-day-prayer-service/.

which they may object for religious, moral, ethical, or other reasons." 84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.1).

69.     To effectuate this purpose, the Department purports to rely on nearly thirty different statutory provisions, none of which provide HHS with explicit authority to issue legislative rules implementing or interpreting provisions concerning refusals to provide health care services due to religious or moral objections.

70.     As described below, the Department has attempted to accomplish this purpose by (1) redefining key statutory terms far beyond their plain text, in order to cover a broader range of conduct and entities than Congress enacted; (2) assigning to itself an extraordinarily broad and coercive enforcement power that would allow the Department to terminate billions of dollars in federal health care funds to the Plaintiffs if the Department decides that Plaintiffs have failed to comply with the Final Rule or any of the nearly thirty statutes it implements; and (3) ignoring or expressly claiming to abrogate contrary federal law, including patient protections in the Affordable Care Act, the Emergency Medical Treatment and Labor Act, and Title VII of the Civil Rights Act of 1964.

### 1.     The Final Rule's definitions of statutory terms.

71.     The Final Rule defines "assist in the performance" to mean "to take an action that has a specific, reasonable, and articulable connection to furthering a procedure," which "may include counseling, referral, . . . or otherwise making arrangements for the procedure . . . depending on whether aid is provided by such actions." 84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.2).

72.     Under this definition, simply scheduling a medical appointment would constitute "assistance," *id.* at 23,186-87; and recipients of federal funds would be required to guess which routine procedures or referrals – such as driving an individual with an ectopic pregnancy to the

hospital – "may" constitute "assistance" that requires additional steps to accommodate workers or protect patients, *id.* at 23,188.  The Final Rule does not identify a statutory basis for adopting a definition this broad and vague.

73.    The Final Rule contains a lengthy definition of "discriminate or discrimination" that, among other requirements, provides that employers will need a "persuasive justification" to ask an employee if they are willing to perform an essential job function to which they might morally object; cannot create an accommodation that excludes a staff member from their "field[] of practice"; and must depend on an employee's willingness to accept an accommodation to avoid discrimination, regardless of the reasonableness of such accommodation.  84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.2).

74.    This definition of "discrimination" would appear to require that Plaintiffs' health care entities hire someone who cannot deliver health care services that are critical to the health care entity's mission, or risk sanction.  The Final Rule's definition of "discrimination" also would prohibit Plaintiffs' health care entities from transferring an employee to another area of a health care entity or a different shift even if the employee's beliefs categorically preclude the employee from performing the essential functions of the initial position.

75.    In addition, the Final Rule defines "health care entity" to extend far beyond physicians and health care professionals, including as well any "health care personnel," pharmacists, pharmacies, medical laboratories, and research facilities; and, for purposes of the Weldon Amendment, also including health insurance issuers, health insurance plans, and plan sponsors or third-party administrators.  84 Fed. Reg. at 23,264 (to be codified at 45 C.F.R. § 88.2).

76.     This definition is far broader than the definition of "health care entity" contained in both the Coats-Snowe Amendment, *see* 42 U.S.C. § 238n(c)(2); and the Weldon Amendment, *see* Pub. L. No. 115-245, § 507(d)(2), 132 Stat. at 3118.

77.     The Final Rule's definition of "health care entity" would expand the applicable statutes far beyond their plain meaning, to permit objections by human resources analysts, customer service representatives, data entry clerks, and numerous others who believe that analyzing benefits, answering a benefits-related question, or entering a particular pre-authorization for an objected-to procedure, for example, is inconsistent with their personal beliefs.

78.     The Final Rule defines "referral or refer for" to mean "the provision of information in oral, written, or electronic form . . . where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure."  84 Fed. Reg. at 23,264 (to be codified at 45 C.F.R. § 88.2).

79.     When read together, the Final Rule's definitions present an unreasonable and unworkable situation for Plaintiffs, both as direct providers of health care and as regulators and grantors of others who provide health care within Plaintiffs' jurisdictions.  An ambulance driver in a private, sub-contracted fleet, a customer service representative at an insurance company's hotline, and a hospital pharmacist all share the right, under the Final Rule, not to be asked prior to hiring whether they can execute the core functions of their jobs without objection.  Once hired, all three have no duty to voluntarily disclose to their employers any religious or moral objection to any aspect of their work.  All three may object at any time to a task requested by their employers, without advance notice and regardless of the costs to patient health.  And should their

19

employers subsequently seek to accommodate an expressed objection, all three have the categorical right to reject the accommodation as not "effective" – and without any consequence to their employment.

### 2.   The Final Rule's funding termination scheme.

80.   The Final Rule authorizes the Department to withhold, deny, suspend, or terminate billions of dollars in federal health care funds to the Plaintiffs if the Department determines that in its view "there is a failure to comply" with any provision of the Final Rule or the statutes it implements.  *See* 84 Fed. Reg. at 23,271-72 (to be codified at 45 C.F.R. § 88.7(i)).

81.   The Final Rule states that determinations of noncompliance may "be resolved by informal means," but expressly authorizes the Department to terminate a recipient's federal funds even during the pendency of good-faith voluntary compliance efforts.  *Id.* at 23,271-72 (to be codified at 45 C.F.R. § 88.7(i)(2)).

82.   The Final Rule's enforcement scheme disregards that Congress in the relevant statutes conditioned funding from specific sources to specific and disparate requirements and prohibitions.  *Compare, e.g.*, 42 U.S.C. § 300a-7(c)(1) (Church Amendment restrictions that apply to specific statutory funding sources), *with id.* § 300a-7(c)(2) (Church Amendment restrictions that apply only to "grant[s] or contract[s] for biomedical or behavioral research).

83.   The Department responded to comments during the rulemaking process regarding the astonishing overbreadth of the fund-termination threat by asserting in the preamble to the Final Rule that "[t]he only funding streams threatened by a violation of the Federal conscience and anti-discrimination laws are the funding streams that such statutes directly implicate."  *Id.* at 23,223.  But the final regulatory text contains no description at all of the funds a recipient stands to lose if the Department determines that the recipient has not complied with the Final Rule.  *See id.* at 23,271-72 (to be codified at 45 C.F.R. § 88.7(i)).  Forcing Plaintiffs to guess which federal

funds are at risk – from among the nearly thirty statutes Defendants are claiming to implement with the Final Rule – is not consistent with constitutional and statutory requirements regarding separation of powers or grantmaking conditions that may attach to the use of federal funds.

84.     In addition, the Department's implementation of the Weldon Amendment in particular would place at risk not only Plaintiffs' receipt of all federal funds from HHS, but also Plaintiffs' receipt of *all* federal funds from the Department of Labor and Department of Education as well, including funds entirely unrelated to health care.  *See* Departments of Labor, HHS, Education, and Related Agencies Appropriations Act, Pub. L. No. 115-245, §§ 3, 507(d), 132 Stat. at 2981, 3118, 3122; 84 Fed. Reg. at 23,172, 23,265-66, 23,272 (to be codified at 45 C.F.R. §§ 88.3(c), 88.7(i)(3)(i), (iii)).  The Department cited no statutory support for its purported authority to create a regulatory enforcement mechanism to terminate funds originating from the Department of Labor and the Department of Education.

85.     The Final Rule also appears to give the Department authority to terminate congressionally-appropriated funding in its discretion.  *See* 84 Fed. Reg. at 23,271-72 (to be codified at 45 C.F.R. § 88.7).

86.     The process for the Department to follow in order to effect compliance with the Final Rule is described only by cursory reference to three disparate administrative procedures, each identified by way of non-exclusive example, providing insufficient notice to Plaintiffs of their rights and responsibilities in an administrative process that could cost Plaintiffs billions of dollars in health care resources.  *See* 84 Fed. Reg. at 23,272 (to be codified at 45 C.F.R. § 88.7(i)(3)) ("[C]ompliance . . . may be effected . . . pursuant to statutes and regulations which govern the administration of contracts (*e.g.*, Federal Acquisition Regulation), grants (*e.g.*, 45 CFR Part 75) and CMS funding arrangements (*e.g.*, the Social Security Act).").

87.     The Final Rule authorizes the Department to commence a compliance review or investigation of any of the Plaintiffs if the Department "suspect[s]," based on any source, noncompliance with the Final Rule or any of the underlying statutes.  84 Fed. Reg. at 23,271 (to be codified at 45 C.F.R. §§ 88.7(c), (d)).

88.     The Department also claims the right in any investigation to require the Plaintiffs to waive any rights to doctor or patient privacy or confidentiality.  *Id.* at 23,270-71 (to be codified at 45 C.F.R. § 88.6(c)).

### 3.     The Final Rule's interaction with federal law.

89.     The Final Rule either ignores or expressly disclaims compliance with contrary federal law.

90.     Section 1554 of the Affordable Care Act prohibits the Secretary of Health and Human Services from promulgating any regulation that "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates principles of informed consent and the ethical standards of health care professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs."  42 U.S.C. § 18114.

91.     The Final Rule is contrary to each of the limitations on HHS's rulemaking authority that Congress imposed through Section 1554 of the ACA.  And the Department's assertion in the Final Rule that Section 1554 only applies to regulations that themselves implement the ACA, 84 Fed. Reg. at 23,224, is contrary to both the text and judicial application of that statute.  42 U.S.C. § 18114; *see Oregon v. Azar*, No. 19-cv-317, 2019 WL 1897475, at

22

*12 (D. Or. Apr. 29, 2019); *California v. Azar*, No. 19-cv-1184, 2019 WL 1877392, at *21-22 (N.D. Cal. Apr. 26, 2019).

92.     The Medicaid and Medicare statutes that the Final Rule states it is interpreting, *see* 84 Fed. Reg. at 23,263, 23,266-67 (to be codified at 45 C.F.R. § 88.3(h)), provide that with regard to informed consent, those statutes shall not "be construed to affect disclosure requirements under State law."  42 U.S.C. § 1396u-2(b)(3)(B) (Medicaid managed care organization); *see also* 42 U.S.C. § 1395w-22(j)(3)(C) (Medicare+Choice).  But the Final Rule seeks to and would interfere with the enforcement of State and local disclosure requirements on just this issue, as described further in ¶¶ 108-09 below.

93.     The Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, requires hospitals to provide emergency care.  EMTALA defines the term "emergency medical condition" to include "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy . . . ."  42 U.S.C. § 1395dd(e)(1)(A).

94.     The Final Rule acknowledges EMTALA, noting only that "where EMTALA might apply in a particular case, the Department would apply both EMTALA and the relevant law under this rule harmoniously to the extent possible."  84 Fed. Reg. at 23,188.  But the Final Rule contains no provisions that specify how the statutory mandate to provide emergency care will be protected when, in the Department's view, that mandate conflicts with the categorical refusal-of-care rights that the Final Rule confers on employees.  *Id.* at 23,263.

95.     Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment based on religious beliefs, 42 U.S.C. § 2000e-2(a); and balances protection of religious beliefs against employers' needs by providing that employers are not obligated to accommodate employees' religious beliefs to the extent that such an accommodation would cause "undue hardship" on the employer.  *Id.* § 2000e(j).

96.     The Final Rule expressly provides that it does not incorporate *any* assessment of undue hardship or other burden on employers.  84 Fed. Reg. at 23,190-91.  And the Final Rule does not address how the Department will determine if Plaintiffs have engaged in "discrimination" in instances where an employee's absolute refusal right conflicts with Title VII's balancing test.

### 4.     The Final Rule's Regulatory Impact Analysis.

97.     The Final Rule includes a Regulatory Impact Analysis purporting to quantify the costs and benefits of the Final Rule.  84 Fed. Reg. at 23,226.

98.     The cost-benefit analysis in the Final Rule expressly refuses to quantify the impact of the Final Rule on access to care, the effect the Final Rule will have on refusals to refer for services, or the effect on patients who delay or forego health care.  *Id.* at 23,250-54.

99.     Despite expressly declining to assess the true costs of the Final Rule on patient care, the Department concluded without evidence both that the Final Rule would likely enhance access to care, *see id.* at 23,182; and that the Final Rule should be implemented "without regard to whether data exists on the competing contentions about its effect on access to services."  *Id.*

## III.   The Final Rule harms Plaintiffs.

100.    The Final Rule harms Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests.

24

A.      **The Final Rule interferes with Plaintiffs' effective administration and enforcement of their own laws.**

101.    Each of the Plaintiffs has enacted laws and policies that carefully balance central health care concerns with other – sometimes competing – needs, including protecting employees' religious beliefs and respecting employers' business needs.  The Final Rule upsets the carefully crafted, longstanding balances struck in Plaintiffs' statutes and regulations, and harms the Plaintiffs' interests in enforcing their own laws.

102.    The Final Rule explicitly purports to preempt conflicting state laws.  *Id.* at 23,226 ("To the extent State or local laws or standards conflict with the Federal laws that are the subject of this rule, the Federal conscience and antidiscrimination laws preempt such laws and standards with respect to funded entities and activities . . . .  With respect to States, States can decline to accept Federal funds that are conditioned on respecting Federal conscience rights and protections."); *id.* at 23,272 (to be codified at 45 C.F.R. § 88.8) ("Nothing in this part shall be construed to preempt any Federal, State, or local law that is equally or more protective of religious freedom and moral convictions.")

103.    As set forth in the paragraphs that follow, the Final Rule interferes with and would undermine the enforcement of Plaintiffs' laws and regulations that include provisions concerning (1) access to emergency and medically necessary care; (2) prohibitions on abandoning patients in medical need; (3) a patient's right to receive information and ask questions about recommended treatments so they can make well-considered choices about care (that is, informed consent); (4) access to lawful prescriptions; (5) how best to balance accommodation of employees' religious or moral beliefs with employers' obligations to patients, their business, and other employees; (6) women's access to comprehensive reproductive health care and related services; and (7) required insurance coverage for contraception and abortion.

       **1.**     **The Final Rule interferes with Plaintiffs' laws regarding the provision of emergency and medically necessary care.**

104.    Many of the Plaintiffs have laws requiring the provision of emergency and medically necessary care that would be hindered by the Final Rule.  For example:

    a.  Colorado requires information about emergency contraception to be provided to survivors of sexual assault.  *See* Colo. Rev. Stat. § 25-3-110(2).

    b.  Connecticut law provides that emergency treatment to a victim of sexual assault includes the provision of emergency contraception to the victim of sexual assault at the facility upon the request of such victim.  *See* Conn. Gen. Stat. § 19a-112e(b)(3).

    c.  The law in the District of Columbia requires hospitals that provide emergency care to inform victims of sexual assault of the option to be provided emergency contraception for the prevention of pregnancy, and to immediately provide emergency contraception if the victim requests it and if the requested treatment is not medically contraindicated.  D.C. Code § 7-2123.  Hospitals are also required to provide the necessary care and treatment to meet the needs of patients.  D.C. Mun. Regs. Tit. 22-B, § 2024.

    d.  Delaware law mandates that health care professionals who decline to comply with an individual instruction or health-care directive or decision for reasons of conscience provide continued care to a patient, including life sustaining care, until a transfer can be accomplished.  *See* 16 Del. Code § 2508(e)-(g).

    e.  Hawaiʻi law requires any hospital at which a female sexual assault victim presents for emergency services to provide medically and factually accurate and unbiased information about emergency contraception, and where indicated, offer and

26

dispense emergency contraception to female assault victims who request it.  No hospital is required to dispense emergency contraception to a female assault victim who has been determined to be pregnant.  *See* Haw. Rev. Stat. § 321-512. Hawaiʻi requires certain emergency services be rendered to *any* ill or injured person who requests treatment at a hospital which has an emergency service department.  *See* Haw. Admin. R. § 11-93-10.  Hospitals in Hawaiʻi shall not deny admission to any individual on account of race, color, religion, ancestry, or national origin.  *See* Haw. Admin. R. § 11-93-13(b).  Each individual admitted to a hospital in Hawaiʻi shall be treated with consideration, respect, and full recognition of dignity and individuality, including privacy in treatment and in care.  *See* Haw. Admin. R. § 11-93-26.

f.   Illinois law requires the provision of emergency medical care, and provides that individuals with conscience objections are not relieved of their obligations to provide emergency medical care.  *See* 210 ILCS 70/1; 210 ILCS 80/1; 745 ILCS 70/6; Ill. Adm. Code 545.35.

g.   Massachusetts law requires the provision of emergency care, including the provision of emergency contraception to the survivors of sexual assault.  *See* Mass. Gen. Laws ch. 111, § 70E.  Hospitals and other health care facilities open to the public are prohibited from refusing care, or otherwise discriminating against patients, on the basis of characteristics including sexual orientation and gender identity.  *See* Mass. Gen. Laws ch. 272, § 98.

h.   Minnesota law states that it shall be the standard of care for all hospitals that provide emergency care to, at a minimum, provide female sexual assault victims

with medically and factually accurate and unbiased written and oral information

about emergency contraception, orally inform female sexual assault victims of the

option to be provided with emergency contraception, and immediately provide

emergency contraception to each sexual assault victim who requests it provided it

is not medically contraindicated and is ordered by a legal prescriber.  Minn. Stat.

§ 145.4712.

i.   Nevada law requires the provision of emergency medical care, which can require

procedures to which a health professional may object, including abortions.  *See*

Nev. Rev. Stat. §§ 439B.410, 632.475(3).

j.   New Jersey law requires that emergency health care facilities provide emergency

care to sexual assault victims, which includes "orally inform[ing] each sexual

assault victim of her option to be provided emergency contraception at the health

care facility."  N.J. Stat. Ann. § 26:2H-12.6c(b).

k.   New Mexico law requires a hospital that provides emergency care to sexual

assault survivors to provide medically and factually accurate and objective written

and oral information about emergency contraception, to inform each survivor of

her option to be provided emergency contraception at the hospital, and to provide

emergency contraception for those who request it.  N.M. Stat. Ann. § 24-10D-3.

l.   New York state law requires the provision of emergency medical care, which can

require abortions or other procedures to which a health care professional may

object.  *See* N.Y. Pub. Health Law § 2805-b.  New York law also requires that

mandatory emergency care include the provision of emergency contraception to

survivors of sexual assault.  *See* N.Y. Pub. Health Law § 2805-p.

m.  New York City law requires that all agency contracts with hospitals provide for prompt counseling about, and on-site administration of, emergency contraception for rape survivors.  N.Y.C. Admin. Code § 6-125(b).

n.  Oregon law requires health plans to cover the provision of emergency care without preauthorization.  ORS § 743A.012.

o.  Pennsylvania has established a comprehensive emergency medical services system, recognizing that "[e]mergency medical services are an essential public service."  35 Pa. Cons. Stat. pt. VI ch. 81.  As part of this system, Pennsylvania law requires that mandatory emergency care include the provision of emergency contraception to survivors of sexual assault.  28 Pa. Code § 117.53.

p.  Rhode Island requires every health-care facility that has an emergency medical-care unit, including free-standing emergency rooms, to provide "prompt, life-saving, medical-care treatment in an emergency, and a sexual-assault examination for victims of sexual assault, without discrimination on account of economic status or source of payment, and without delaying treatment for the purpose of a prior discussion of the source of payment unless the delay can be imposed without material risk to the health of the person."  R.I. Gen. Laws § 23-17-26(a).

q.  The Commonwealth of Virginia requires all health carriers "providing individual or group health insurance coverage" who provide "any benefits with respect to services in an emergency department of a hospital" to provide such coverage "[w]ithout the need for any prior authorization determination, regardless of whether the emergency services are provided on an in-network or out-of-network basis."  Va. Code Ann. § 38.2-3445.  The Commonwealth likewise requires

physicians administering anesthesia to "[r]emain physically present or immediately available, as appropriate, to manage complications and emergencies until discharge criteria have been met."  18 Va. Admin. Code 85-20-320.

r.   Wisconsin law provides that "[n]o hospital providing emergency services may refuse treatment to any sick or injured person."  Wis. Stat. § 256.30(2). Wisconsin law also requires a hospital that provides emergency services to provide emergency contraception to a victim of sexual assault.  Wis. Stat. § 50.375.

105.   The Final Rule does not address its effect on state laws mandating emergency treatment, and would substantially interfere with these laws.

### 2.   The Final Rule interferes with Plaintiffs' laws that prohibit abandoning a patient in medical need.

106.   Many of the Plaintiffs have laws and regulations prohibiting health care professionals from abandoning a patient in medical need without first arranging for the patient's care, including:

a.   Colorado Medical Board policy requires providers to provide 15 to 30 days of emergency coverage while a patient obtains a new provider.  *See* Colo. Rev. Stat. § 12-36-117(1)(u); Colo. Med. Bd. Pol. 40-2.

b.   Connecticut law prohibits health care professionals who are unwilling to comply with a patient's advance directives or living will from abandoning a patient in medical need without first arranging for the patient's care by another provider. *See* Conn. Gen. Stat. § 19a-580a.

c.   Delaware law mandates that health care professionals who decline to comply with an individual instruction or health-care directive or decision for reasons of

conscience provide continued care to a patient, including life sustaining care, until a transfer can be accomplished.  *See* 16 Del. C. § 2508(e)-(g).

d.  In the District of Columbia, regulated professionals, including doctors, nurses and pharmacists, can be disciplined, including by having their licenses revoked, for abandoning patients.  D.C. Code § 3-1205.14(a)(30); *see also* D.C. Mun. Regs. tit. 29, § 563 (same with respect to emergency medical services agencies and providers).

e.  Hawai'i laws include provisions for discipline of physicians for conduct or practice contrary to recognized standards of ethics of the medical profession, including the American Medical Association's standards requiring providing care to patients in emergencies.  *See* Haw. Rev. Stat. § 453-8.  Hawai'i laws also include provisions for discipline of nurses for unprofessional conduct, including abandoning a patient.  *See* Haw. Rev. Stat. § 457-12; Haw. Admin. R. § 16-89-60.

f.  Illinois law provides that abandoning a patient is grounds for disciplinary action, including license revocation.  225 ILCS 60/22(A)(16).

g.  Maryland law prohibits a physician and other health care providers from abandoning a patient.  *E.g.*, Md. Code Ann., Health Occ. § 14-404(a)(6).

h.  In Massachusetts, health care providers are prohibited from abandoning a patient in need of medical care and may be disciplined, including by the suspension or revocation of their license, for failing to provide proper care.  *See, e.g.*, 244 CMR § 9.03(15) (nurses); 243 CMR §§ 1.03(4)(A)(3), 2.07(10)(a)-(b) (physicians).

i.  In Michigan, a physician cannot abandon a patient under his or her care.  *See Fortner v Koch*, 272 Mich. 273, 280 (1936).

j.  Nevada law prohibits a physician working in an emergency situation from transferring a patient to another facility unless certain conditions are met.  *See* Nev. Rev. Stat. § 439B.410.

k.  New Jersey law requires an "appropriate, respectful and timely transfer of care" and "assur[ance] that the patient is not abandoned or treated disrespectfully," among other patient protections, if a health care professional declines to participate in withdrawing or withholding life-sustaining measures "in accordance with . . . sincerely held personal or professional convictions."  *See* N.J. Stat. Ann. § 26:2H-62(b), (c).

l.  New Mexico physicians may suffer a loss of license for abandoning a patient in medical need.  *See* N.M. Stat. Ann. § 61-6-15(D)(24).

m.  New York regulations prohibit health professionals from "abandoning or neglecting a patient or client under and in need of immediate professional care, without making reasonable arrangements for the continuation of such care."  8 NYCRR § 29.2.

n.  Pennsylvania law prohibits certain health care professionals from abandoning their patients.  35 Pa. Cons. Stat. § 8121(a)(4) (emergency medical services providers); 28 Pa. Code § 21.18(b)(7) (registered nurses); 49 Pa. Code § 16.61(a)(17) (physicians); 49 Pa. Code § 21.148(b)(7) (licensed practical nurses).

o.  Rhode Island law provides that abandoning a patient is grounds for disciplinary action, including license revocation.  R.I. Gen. Laws §§ 5-37-5.1 and 5-37-6.3.

p.   Vermont law provides that a doctor is prohibited from abandoning a patient and may face misconduct proceedings for doing so.  *See* Vt. Stat. Ann. tit. 26, § 1354(a).  Additionally, a hospital patient in Vermont has a right to one attending physician who is primarily responsible for coordinating that patient's care, and whose identity is known to the patient.  *See* Vt. Stat. Ann. tit. 18, § 1852(a)(2), (9).  The patient also "has the right to expect reasonable continuity of care."  *Id.* § 1852(a)(11).

q.   The Commonwealth of Virginia prohibits medical practitioners from "terminat[ing] the relationship or mak[ing] his [or her] services unavailable without documented notice to the patient that allows for a reasonable time to obtain the services of another practitioner."  18 Va. Admin. Code 85-20-28.

r.   Wisconsin law provides that patient abandonment is a form of unprofessional conduct subject to various penalties, including revocation of a doctor's medical license.  *See* Wis. Stat. § 448.02(3)(c).  Patient abandonment occurs when further treatment is medically indicated and the physician fails to give the patient at least 30 days' notice about the withdrawal of care, or fails to provide for emergency care during the period between giving notice of intent to withdraw, and the date on which the patient-physician relationship ends.  *See* Wis. Admin. Code § Med. 10.03(2)(o).

107.   The Final Rule would interfere with these laws by allowing health care professionals to refuse to provide services to a patient or to refer that patient to a health care professional willing to do so.

33

### 3. The Final Rule dramatically undermines Plaintiffs' laws regarding informed consent.

108. Many of the Plaintiffs have enacted and implemented legislation regarding informed consent – that is, the patient's right to receive information and ask questions about recommended treatments so they can make well-considered choices about care – including:

a. Colorado requires a broad range of facilities to ensure patients are provided informed consent, which include informing patients about the availability of alternative procedures. *See* Colo. Rev. Stat. § 25-3-102(1)(c), 6 Colo. Code Regs. 1011-1 §§ 6.102(3)(c), 6.104(1)(g); *see also* Colo. Rev. Stat. § 25-1-121(4).

b. Connecticut law requires healthcare providers to give patients all facts material to their care so as to ensure that patients can make their own informed medical decisions. *See Logan v. Greenwich Hosp. Ass'n*, 191 Conn. 282, 288 (1983). Additionally, informed consent is required for administration of AIDS vaccine, *see* Conn. Gen. Stat. § 19a-591a; treatment with an investigational drug, biological product, or device, *see* Conn. Gen. Stat. § 20-14q; medication, psychosurgery or shock therapy for the treatment of psychiatric disabilities, *see* Conn. Gen. Stat. § 17a-543; and sterilization, *see* Conn. Gen. Stat. § 45a-699a. Moreover, some facilities are required by regulation as well as the standards of practice to secure informed consent. *See, e.g.*, Conn. Agencies Regs. § 19-13-D3(d)(8) (short term acute care hospitals); Conn. Agencies Regs. § 19a-116-1(c) (abortion services in outpatient clinics); Conn. Agencies Regs. § 19-13-D56(e) (outpatient surgery facilities); Conn. Agencies Regs. § 19a-495-6e(f) (inpatient hospice facilities).

c.  Delaware law requires that patients receive sufficient information to make informed medical decisions.  *See* 18 Del. C. § 6852.

d.  The law in the District of Columbia recognizes the duty of physicians to inform patients of the consequences of a proposed treatment that stems from the right of every competent adult to determine what shall be done with his or her own body. *See Miller-McGee v. Washington Hosp. Ctr.*, 920 A.2d 430, 439 (D.C. 2007) (citing *Crain v. Allison*, 443 A.2d 558, 563-64 (D.C. 1982); *Canterbury v. Spence*, 464 F.2d 772, 780 (D.C. Cir. 1972)).  Each patient in every hospital in the District of Columbia has the right to be informed in advance about care and treatment and to make informed decisions regarding care and to receive information necessary to make decisions.  D.C. Mun. Regs., tit. 22-B § 2022.  In addition, hospitals must provide medically and factually accurate written information developed by the Department of Health regarding emergency contraception for the prevention of pregnancy due to sexual assault, and must orally inform sexual assault victims about the option to be provided emergency contraception.  D.C. Code §§ 7-2122 & 7-2123.

e.  Hawai'i mandates that certain information must be provided to a patient prior to obtaining consent to a proposed medical or surgical treatment or a diagnostic or therapeutic procedure, including "[t]he recognized alternative treatments or procedures, including the option of not providing these treatments or procedures," the "recognized material risks of serious complications or mortality associated with" the proposed procedure, alternative treatments or procedures, and not undergoing any treatment or procedure, and the benefits of alternative treatments

or procedures.  Haw. Rev. Stat. § 671-3(b)(4)-(6); *see also* Haw. Admin. R. § 16-85-25.

f.  Illinois law requires health care providers to give patients information concerning their condition and proposed treatment, 410 ILCS 50/3, and requires that health care providers conducting HIV testing to first obtain informed consent from individuals undergoing testing. 410 ILCS 305/3.

g.  Maryland law requires that patients give informed consent before any nonemergency care is provided, including "the benefits and risks of the care, alternatives to the care, and the benefits and risks of alternatives to the care." 2019 Md. Laws ch. 285 (to be codified at Md. Code Ann., Health-Gen. § 19-342); *see also Sard v. Hardy*, 281 Md. 432 (1977).  Informed consent is separately statutorily required for HIV testing, Md. Code Ann. Health-Gen. § 18-336, and for treatment using an investigational drug, biological product, or device, Md. Code Ann., Health-Gen § 21-2B-01.

h.  Massachusetts law mandates informed consent for patients.  Mass. Gen. Laws ch. 111, § 70E.  Patients must be provided all significant medical information material to their decision whether to undergo a procedure, including information concerning "the available alternatives, including their risks and benefits." *Harnish v. Children's Hosp. Med. Ctr.*, 387 Mass. 152, 156 (1982).

i.  Michigan requires informed consent, which "requires a physician to warn a patient of the risks and consequences of a medical procedure." *Lucas v. Awaad*, 299 Mich. App. 345, 361 (2013).

j.  Minnesota law mandates that physicians give patients "complete and current information concerning their diagnosis, treatment, alternatives, risks, and prognosis as required by the physician's legal duty to disclose[,]" which "shall include the likely medical or major psychological results of the treatment and its alternatives."  Minn. Stat. § 144.651, subd. 9.

k.  Nevada law mandates informed consent for patients, which ensures that patients can make their own informed medical decisions based on what a reasonable practitioner in the same field of practice would disclose.  *See Beattie v. Thomas*, 99 Nev. 579, 584, 668 P.2d 268, 271 (Nev. 1983).

l.  New Jersey law requires that patients admitted to a general hospital "receive from the physician information necessary to give informed consent prior to the start of any procedure or treatment," and that a patient "be advised of any medically significant alternatives for care or treatment."  N.J. Stat. Ann. § 26:2H-12.8(d).

m.  Under New Mexico law, a physician's failure to obtain informed consent constitutes negligence.  *Gerety v. Demers*, 92 N.M. 396, 589, 589 P.2d 180 (N.M. 1978).

n.  New York law mandates informed consent for patients, which ensures that patients can make their own informed medical decisions.  N.Y. Pub. Health L. § 2805-d.

o.  Oregon law requires that a physician or physician assistant explain, among other things, that there may be alternative procedures or methods of treatment to a procedure or treatment.  *See* ORS 677.097.

p.  Pennsylvania mandates informed consent for certain procedures, including the performance of surgery.  40 Pa. Stat. and Cons. Stat. § 1303.504.

q.  Rhode Island mandates informed written consent for patients electing abortion procedures.  R.I. Gen. Laws § 23-4.7-2.

r.  Vermont protects patients' rights to informed consent in multiple contexts.  *See* Vt. Stat. Ann. tit. 12, § 1909(d) ("A patient shall be entitled to a reasonable answer to any specific question about foreseeable risks and benefits, and a medical practitioner shall not withhold any requested information."); Vt. Stat. Ann. tit. 18, § 1871 (providing a "right to be informed of all evidence based-options" for palliative care and "all available options" for terminal care); *id.* § 1852(a)(4) (hospital patient has "right to receive from the patient's physician information necessary to give informed consent prior to the start of any procedure or treatment . . . [w]here medically significant alternatives for care or treatment exist, or where the patient requests information concerning medical alternatives, the patient has the right to such information"); *id.* § 1852(a)(8) (hospital patient "has the right to expect that within its capacity a hospital shall respond reasonably to the request of a patient for services").

s.  The Commonwealth of Virginia requires physicians to obtain informed consent prior to providing certain procedures, except where the patient is incapable of providing such consent and "a delay in treatment might adversely affect recovery."  *See e.g.*, Virginia Code Ann. §§ 54.1-2970, 2971; 18 Va. Admin. Code 85-20-28.

t.   Wisconsin law imposes a duty on physicians to inform their patients about the

availability of treatments and procedures and their risks and benefits so patients

can make informed, voluntary decisions about their medical care.  *See* Wis. Stat.

§ 448.30.  In the specific case of emergency contraception, a hospital must

provide a sexual assault victim "medically and factually accurate and unbiased

written and oral information about emergency contraception and its use and

efficacy" so that she can make an informed decision.  Wis. Stat. § 50.375(2)(a).

109.   The Final Rule does not require that a patient be informed that a health care

provider is refusing to counsel them about, or refer them to, certain health care services, which

severely undermines Plaintiffs' ability to monitor compliance with and enforce their own laws

regarding informed consent.

### 4.   The Final Rule interferes with Plaintiffs' laws requiring pharmacies to fill lawful prescriptions.

110.   Several of the Plaintiffs have enacted laws requiring pharmacies to fill lawful

prescriptions, including:

a.   Colorado law provides that pharmacies that do not have emergency contraception

in stock must place a conspicuous notice stating "Plan B Emergency

Contraception Not Available."  Colo. Rev. Stat. § 25-3-110(4).  In addition, the

state's emergency contraception law already contains protections for those who

refuse to provide information "on the basis of religious or moral beliefs."  *Id.*

§ 25-3-110(3)(a).

b.   Connecticut law provides that pharmacies that permit refusal to dispense

contraception are prohibited from participating in the Connecticut State employee

health plan.  *See* Formal Opinion of the Attorney General to the Hon. Nancy

Wyman (Formal Opinion 2006-004, Mar. 2, 2006), available at
https://portal.ct.gov/AG/Opinions/2006-Formal-Opinions/Honorable-Nancy-
Wyman-Comptroller-Formal-Opinion-2006004-Attorney-General-State-of-
Connecticut (last visited May 20, 2019).

c. Delaware regulations mandate that pharmacies "[e]stablish procedures within
operation that maintain standard of practice as it relates to the dispensing of
pharmaceuticals and refusal to dispense pharmaceuticals based on the religious,
moral, or ethical beliefs of the dispensing pharmacist.  These procedures shall
include proper supervision of supportive personnel and delegation of authority to
another pharmacist when not on duty."  24 Del. Admin. Code § 2500-3.1.2.4.

d. Under Maryland law, a pharmacist may only refuse to fulfill a prescription based
on "professional judgment, experience, knowledge, or available reference
materials."  Md. Code. Ann., Health Occ. § 12-501.

e. Minnesota regulations state it is unprofessional conduct for a pharmacist or
pharmacy to "refus[e] to compound or dispense prescription drug orders that may
reasonably be expected to be compounded or dispensed in pharmacies by
pharmacists," with an exception for abortions.  Minn. R. 6800.2250, subpt. 1.

f. Nevada law requires pharmacists to fill prescriptions unless they reasonably
believe in their professional judgment that it would be unlawful, imminently
harmful to the medical health of the patient, fraudulent, or not for a legitimate
medical purpose.  *See* Nev. Admin. Code § 639.753(1).  Nevada law has specific
requirements for pharmacists to fill contraception prescriptions.  *See* Nev. Rev.
Stat. § 639.28075.

g.  New Jersey law requires pharmacy practice sites to "fill lawful prescriptions for prescription drugs or devices[,]" even if an employee of the practice objects to filling the prescription based upon "sincerely held moral, philosophical, or religious beliefs."  N.J. Stat. Ann. § 45:14-67.1(a).

h.  Pennsylvania law allows a pharmacist to decline to fill or refill prescriptions based on a religious, moral, or ethical belief, but recognizes that "the pharmacist has a professional obligation to take steps to avoid the possibility of abandoning or neglecting a patient."  49 Pa. Code § 27.103(a).

i.  Under Wisconsin law, "a pharmacy shall dispense lawfully prescribed contraceptive drugs and devices and shall deliver contraceptive drugs and devices restricted to distribution by a pharmacy to a patient without delay."  Wis. Stat. § 450.095(2).

111.  The Final Rule would potentially preempt or interfere with these laws and allow individual pharmacists or pharmacies to refuse to provide or dispense lawful prescriptions.  *See* 84 Fed. Reg. at 23,196, 23,264 (to be codified at 45 C.F.R. § 88.2).

> **5.  The Final Rule hinders Plaintiffs' administration and enforcement of their laws regarding the accommodation of religious objections in the workplace and in the provision of health care.**

112.  Many of the Plaintiffs have enacted carefully-crafted laws designed to balance accommodation of employees' religious or moral beliefs with employers' obligations to patients, their business, and other employees.  For example:

a.  The City of Chicago has enacted laws respecting religious objections in the workplace while balancing the needs of employers.  Under the City's Human Rights Ordinance, employers are required "to make all reasonable efforts to accommodate the religious beliefs, observances, and practices of employees or

prospective employees unless the employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  Chicago Mun. Code § 2-160-050.

b.  Delaware requires health care providers or institutions that decline to comply with an individual instruction or health-care decision on the basis of conscience to promptly inform the patient and to continue providing care, including life-sustaining care, to the patient until a transfer can be effected.  *See* 16 Del. C. § 2508(e)-(g).  Institutional denials must be based on a prior written policy that was communicated to the patient.  *See id.*

c.  The District of Columbia provides an exemption for churches and other religious nonprofit entities from the statutory requirement to cover contraceptives in health insurance plans, and requires any employers claiming the exemption to provide notice to its employees.  D.C. Code § 31-3834.04(a).  District law also prohibits discrimination in employment based on a person's actual or perceived religion, however actions that may have a discriminatory effect are not unlawful if they are not intentionally devised or operated to discriminate based on religion and can be justified by business necessity.  *See* D.C. Code §§ 2-1401.03, 2-1401.11, 2-1401.31.

d.  Hawai'i law prohibits discriminatory employment practices, including on the basis of religion.  *See* Haw. Rev. Stat. § 378-2.  This law, however, may not prohibit or prevent employers from "the establishment and maintenance of bona fide occupational qualifications reasonably necessary to the normal operation of a

42

particular business or enterprise" that "have a substantial relationship to the functions and responsibilities of prospective or continued employment," or from "refusing to hire, refer, or discharge any individual for reasons relating to the ability of the individual to perform the work in question." Haw. Rev. Stat. § 378-3(2)-(3). Hawaiʻi allows religious employers to provide their employees a health plan without coverage for contraceptive services if the employers provide written notice of the contraceptive services the employer refuses to cover for religious reasons and written information describing how enrollees may directly access contraceptive services in an expeditious manner. *See* Haw. Rev. Stat. § 432:10A-116.7.

e. Maryland law prohibits employers from discriminating against any individual with respect to that individual's religion, except when providing a notice or advertisement indicating a bona fide occupational qualification for employment. *See* Md. Code Ann., State Gov't § 20-606 (West). Additionally, Maryland law provides that a person may not be required "to perform or participate in, or refer to any source for, any medical procedure that results in artificial insemination, sterilization, or termination of pregnancy," except insofar as "the failure to refer a patient to a source for any medical procedure that results in sterilization or termination of pregnancy" would be the cause of death or serious physical injury or serious long-lasting injury to the patient or otherwise contrary to the standards of medical care. Md. Code. Ann., Health Gen. § 20-214.

f. Massachusetts law requires employers to make reasonable accommodations "to an employee's or prospective employee's religious observance or practice," but

43

does not require accommodations that cause an "undue hardship."  Mass. Gen.
Laws ch. 151B § 4(1A).

g.  Minnesota law states that it is an unfair employment practice for an employer to
discriminate against a person with respect to hiring, tenure, compensation, terms,
upgrading, conditions facilities or privileges of employment, and to refuse to hire
or maintain a system of employment which unreasonably excludes a person
seeking employment, except when based on a bona fide occupational
qualification.  Minn. Stat. § 363A.08, subd. 2.

h.  New Jersey carefully balances conscience protection with patients' right to care.
Under New Jersey's conscience law, no person, hospital, or health care facility
shall be "required to perform or assist in the performance of an abortion or
sterilization."  N.J. Stat. Ann. § 2A:65A-1, -2.  This law is not applicable to non-
sectarian non-profit hospitals.  *Doe v. Bridgeton*, 366 A.2d 641, 647 (N.J. 1976).
New Jersey law also permits "a private, religiously-affiliated health care
institution" to "develop institutional policies and practices defining circumstances
in which it will decline to participate in withholding or withdrawing of specified
measures utilized to sustain life."  N.J. Stat. Ann. § 26:2H-65(b).  Such policies
must be in writing and must be communicated to patients or their health care
representatives "prior to or upon admission, or as soon after admission as is
practicable."  *Id*.  "If the institutional policies and practices appear to conflict with
the legal rights of a patient wishing to forego health care, the health care
institution shall attempt to resolve the conflict" and must ensure that the patient
"is not abandoned or treated disrespectfully."  *Id.*

i.   New Mexico prohibits employers, unless based on a bona fide occupational

qualification, from discriminating in employment on the basis of religion. N.M.

Stat. Ann. § 28-1-7(A)-(C).  Likewise, New Mexico prohibits any person in a

public accommodation from distinguishing directly or indirectly in offering or

refusing to offer services, facilities, or goods on the basis of religious affiliation.

N.M. Stat. Ann. § 28-1-7(F).  Further, the State's Religious Freedom Restoration

Act prohibits the State from burdening the free exercise of religion, unless a

restriction is of general applicability, does not discriminate among religions, and

survives strict scrutiny.  N.M. Stat. Ann. § 28-22-3.

j.   New York state law applies a careful balancing test to the accommodation of

religious beliefs in the workplace, prohibiting employers from imposing any

employment conditions that would require an individual to forego a sincerely held

practice of his or her religion "unless, after engaging in a bona fide effort, the

employer demonstrates that it is unable to reasonably accommodate the

employee's or prospective employee's sincerely held religious observance or

practice without undue hardship on the conduct of the employer's business."

N.Y. Exec. L. § 296(10).

k.   New York City has enacted laws respecting religious objections that balance

competing interests.  In the context of employment, the City Human Rights Law

prohibits employers from imposing "upon a person as a condition of obtaining or

retaining employment any terms or conditions, compliance with which would

require such person to violate, or forego a practice of, such person's creed or

religion" and requires the employer to make reasonable accommodation to the

religious needs of such person.  N.Y.C. Admin. Code § 8-107(3)(a).  Employers

are required to "engage in a cooperative dialogue within a reasonable time with a

person who has requested [a religious] accommodation."  *Id.* § 8-107(28).

l.  Oregon protects health care providers who decline to participate in physician-

assisted dying while balancing the rights of patients to receive care.  ORS

127.885.  In the area of reproductive health, Oregon law allows individuals to

decline to dispense contraception or participate in abortion procedures, provided

the individuals provide advance notice to the institution.  ORS 435.225; ORS

435.485(2).  Likewise, individuals are not required to provide advice on

terminating pregnancies if they advise the patient they will decline to provide

such advice.  ORS 435.485(1).  Oregon law also allows institutions to deny

admission to individuals for the purpose of terminating a pregnancy, again with

the requirement that an institution adopt a policy and inform patients of that

policy.  ORS 435.475.

m.  With regard to lawful objections to assisting in the performance of an abortion or

sterilization, Pennsylvania requires employers to "make reasonable

accommodations to the needs of their employe[e]s," unless such accommodations

would constitute "undue hardship to the conduct of the employer's business."  16

Pa. Code § 51.44(b).  "Such undue hardship, for example, may exist where the

employe[e]'s needed work cannot be performed by another employe[e] of

substantially similar qualifications in the situation where and at the time when the

person refuses to perform or participate in the performance of abortion or

sterilization procedures or where the employe[e] refuses to perform his normally assigned duties incident to employment." *Id.* § 51.44(c).

n.  Rhode Island regulation under the Department of Health permits a licensed pharmacist to "decline to dispense a drug or device, pursuant to an order or prescription, on ethical, moral, or religious grounds only if the licensed pharmacist has previously notified the pharmacy owner, in writing, of the device(s), drug or class of drugs to which he or she objects, and the pharmacy owner can, without creating undue hardship, provide a reasonable accommodation of the licensed pharmacist's objection.  The licensed pharmacy owner shall establish protocols to ensure that the patient has timely access to the prescribed drug or device despite the licensed pharmacist's refusal to dispense the prescription or order.  For the purpose of this section, 'reasonable accommodation' shall mean the pharmacy owner has demonstrated that they explored any available reasonable alternative means of accommodating the licensed pharmacist's ethical, moral, or religious objections, including the possibilities of excusing the licensed pharmacist from those duties or permitting those duties to be performed by another person, but is unable to reasonably accommodate the ethical, moral, or religious objections without undue hardship on the conduct of the pharmacy owner's business."  216-RICR-40-15-1.15.2.

o.  Vermont law prohibits discriminatory employment practices, including on the basis of religion, except where required by "a bona fide occupational qualification."  Vt. Stat. Ann. tit. 21 § 495(a).

p.  The Commonwealth of Virginia has pre-existing laws permitting any person "who

shall state in writing an objection to any abortion or all abortions on personal,

ethical, moral or religious grounds" to be exempted from "procedures which will

result in such abortion."  Va. Code § 38.2-3445.  The Commonwealth likewise

allows genetic counselors to opt out of "counseling that conflicts with their

deeply-held moral or religious beliefs" and protects such objectors from liability

"provided [the counselor] informs the patient that he [or she] will not participate

in such counseling and offers to direct the patient to the online directory of

licensed generic counselors maintained by the Board."  Va. Code Ann. § 54.1-

2957.21.

q.  Wisconsin law balances the interests of objectors, patients, and medical facilities.

Specifically, Wisconsin law provides conscience protection for persons who

object to abortion or sterilization on "moral or religious grounds."  But a person

who objects must state "in writing his or her objection to the performance of or

providing assistance to such a procedure . . . shall not be required to participate in

such medical procedure."  Wis. Stat. § 253.09(1).  Such a refusal shall not be the

basis for any damages claim or any disciplinary or recriminatory action against

such person.  *Id.*; *see also* Wis. Stat. §§ 441.06(6); 448.03(5).  Further, no

hospital, school, or employer may discriminate against any person with respect to

admission, hiring, retention, or other condition of student or employee status on

the basis of the person's "refus[al] to recommend, aid or perform" abortion or

sterilization.  Wis. Stat. § 253.09(3).

113.    The Final Rule interferes with these laws by requiring the absolute accommodation of all employees with religious objections, without considering the needs of employers or patients.

114.    By elevating an objector's rights over the rights of patients and employers, the Final Rule will cause substantial harm to the Plaintiffs' interest in enforcing their employment accommodation laws and in improving patient health outcomes.

> **6.    The Final Rule interferes with Plaintiffs' laws protecting women's access to comprehensive reproductive health care and related services.**

115.    A number of the Plaintiffs have enacted laws that protect women's access to contraception, abortion, and other reproductive health care services, including laws that accommodate religious objections to the provision of such services by requiring adequate notice of such objections.  For example:

a.    Colorado law protects women's access to contraception, requiring health plans to provide coverage for contraception under specific circumstances.  Colo. Rev. Stat. §§ 10-16-104(3)(a), -104.2.  Access to birth control procedures, supplies, and information must also be provided to minors under specific circumstances.  Colo. Rev. Stat. § 13-22-105.

b.    Connecticut law protects women's access to contraception.  Specifically, Connecticut law provides that "[t]he decision to terminate a pregnancy prior to the viability of the fetus shall be solely that of the pregnant woman in consultation with her physician."  Conn. Gen. Stat. § 19a-602(a).  Connecticut law also allows an individual to refuse to assist in a non-emergency abortion.  Conn. Agencies Regs. § 19-13-D54.

c.   The District of Columbia does not restrict the right to abortion and District law establishes the right of patients younger than 18 to consent to abortion care without parental involvement.  *See* D.C. Mun. Regs. tit. 22-B, § 22-B600.

d.   Hawai'i  law protects women's access to abortions.  Specifically, Hawai'i law provides that "[t]he State shall not deny or interfere with a female's right to choose or obtain an abortion of a nonviable fetus or an abortion that is necessary to protect the life or health of the female.  Haw. Rev. Stat. § 453-16(c).  Hawai'i law also allows an individual or hospital to refuse to participate in an abortion and such individual or hospital will not be liable for a refusal.  Haw. Rev. Stat. § 453-16(e).

e.   Illinois law requires certain agencies to deliver specified services either directly on-site or by referral, including contraception and other reproductive health care services. 77 Ill. Adm. Code 635.90.

f.   Massachusetts law protects women's access to abortion and contraception, including emergency contraception.  *See, e.g.*, Mass Gen. Laws ch. 112, §§ 12L-M, ch. 272 § 21A.  Massachusetts law also provides specific conscience protections for health care workers that are limited to religious or moral objections to abortion and sterilization, including the right to refuse to participate in scheduled  medical procedures that result in abortion or sterilization after providing written notice of an objection.  *See* Mass. Gen. Law ch. 112, § 12I.

g.   Nevada law makes it unlawful to require an employee's participation in the induction or performance of an abortion outside of medical emergency situations

upon filing of a written statement indicating a moral, ethical, or religious basis for refusal to participate.  *See* Nev. Rev. Stat. § 632.475(3).

h.  New Mexico enacted the Family Planning Act, N.M. Stat. Ann. §§ 24-8-1 through 24-8-8, to protect access to family planning services including contraceptive procedures, diagnosis, treatment, and supplies.  The legislature found it "desirable that family planning services be readily accessible to all who want and need them" and that "dissemination of information about family planning by the state and its local government units is consistent with public policy."  N.M. Stat. Ann. § 24-8-3.  The State makes its family planning services available with public funds to the extent that public funds are available, including to medically indigent persons at no cost. N.M. Stat. Ann.  24-8-7.  New Mexico requires payment for medically necessary abortions with public funds for indigent women, as its Equal Rights Amendment to the state constitution, N.M. Const., art. II, § 18, provides greater protection against gender discrimination than does federal law.  *New Mexico Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, 126 N.M. 788, 975 P.2d 841 (N.M. 1998).

i.  New York state law, in order to facilitate staffing and scheduling practices that accommodate conscience and religious beliefs, provides that an individual may refuse to assist in a non-emergency abortion as long as the individual notifies the responsible hospital or other institution in advance.  N.Y. Civ. Rights L. § 79-I.

j.  Under Oregon law a public body, or an officer, agent, or employee of a public body, may not deprive a consenting individual of the right to obtain and use safe

methods of contraception, nor interfere with or restrict those rights by regulating access to benefits, services or information.  ORS 435.200.

k.   Pennsylvania law allows hospitals and health care facilities to decline to provide abortions or sterilizations on moral, religious or professional grounds as long as the facility provides a written ethical policy.  43 Pa. Stat. Ann. § 955.2; 16 Pa. Code §§ 51.31–51.33.  Pennsylvania law likewise allows individuals to refuse to assist in the performance of abortion or sterilization procedures on moral, religious or professional grounds as long as they notify the responsible hospital or institution in advance.  43 Pa. Stat. Ann. § 955.2; 16 Pa. Code §§ 51.41–51.44.  Such individuals may be subject to disciplinary action, however, if their expression of refusal "constitutes an overt act which disrupts hospital procedures, operations, or services or which endangers the health or safety of any patient." 16 Pa. Code § 51.42(a).  Pennsylvania also allows hospitals to refuse to provide emergency contraception to sexual assault victims for religious or moral reasons as long as they provide 30 days written notice to the Pennsylvania Department of Health.  28 Pa. Code § 117.57.

l.   Rhode Island requires a physician or anyone who works in a healthcare facility to give written notice of objection in performing abortions or sterilization procedures.  *See* RIGL § 23-17-11.

m.   The Commonwealth of Virginia requires insurers who otherwise provide prescription drug coverage to offer coverage for "any prescribed drug or device approved by the United States Food and Drug Administration for use as a contraceptive."  Va. Code Ann. § 38.2-3407.5:1.

116.    The Final Rule would undermine these laws and constitutional requirements by allowing an individual or health care entity to refuse to provide contraception or assist in an abortion without adequate notice to the responsible hospital or other appropriate institution.

**7.    The Final Rule interferes with Plaintiffs' laws that require insurance coverage for contraception and abortion.**

117.    A number of the Plaintiffs have enacted statutes or regulations requiring insurance providers to offer coverage for contraception and abortion.

a.    Connecticut has "Contraceptive Equity Laws" that require insurers to provide coverage for contraception. *See* Conn. Gen. Stat. §§ 38a-503e(a), 38a-530e(a). Healthcare facilities that may find such procedures objectionable are permitted to comply with these requirements by contracting with one or more independent providers. *See* Conn. Gen. Stat. § 19a-112e(c).

b.    Delaware requires health insurance plans to cover over-the-counter contraceptives without any cost-sharing, including emergency contraceptives. *See* Del. Senate Bill No. 151, *An act to amend Title 18, Title 29, and Title 31 of the Delaware Code Relating to Insurance Coverage of Contraceptives*, 149th General Assembly.

c.    The District of Columbia requires individual and group health plans to cover all FDA-approved contraceptive drugs, devices, products and services for women without cost-sharing. D.C. Code § 31-3834.03. District law also permits pharmacists to prescribe as well as dispense prescription methods of contraception for up to a 12-month supply at one time for women who do not face serious risks from contraception. D.C. Code § 31-3834.01. The provision requires individual

53

and group health plans to cover a full-year supply of prescription contraceptives.
*Id.*

d.  Hawai'i law requires that all employer groups, mutual benefit societies, and
    health maintenance organizations, provide coverage for contraceptive services or
    supplies for the subscriber or any dependent of the subscriber who is covered by
    the policy.  Employer groups, mutual benefit societies, and health maintenance
    organizations that provide contraceptive services or supplies, or prescription drug
    coverage, shall not exclude any prescription contraceptive supplies or impose any
    unusual copayment charge, or waiting requirements for such supplies.  *See* Haw.
    Rev. Stat. §§ 431:10A-116.6; 432:1-604.5; 432D-23.

e.  Illinois law requires insurers to provide coverage for contraception. 215 ILCS
    5/356z.4.

f.  Maryland has "Contraceptive Equity Laws" governing access to broad
    contraceptive coverage.  *See* Md. Code Ann., Ins. §§ 15-826 to 826.2.
    Maryland's essential health benefits requires non-grandfathered individual and
    small group plans to cover abortion services.  *See*
    https://insurance.maryland.gov/Insurer/Documents/bulletins/15-33_2017-ACA-
    Rate-Form-Filing-Deadlines-and-Substitution-Rules.pdf.

g.  Massachusetts requires most commercial insurance plans to provide no-cost
    coverage for women's contraceptive care and services, including sterilization and
    emergency contraception.  *See* Mass. Gen. Law ch. 175, § 47W; Mass. Gen. Law
    ch. 176A § 8W; Mass Gen. Law ch. 176B § 4W; Mass. Gen. Law ch. 176G § 4O.

h.  Nevada requires insurers to provide coverage for contraception, except for those affiliated with a religious organization who object on religious grounds.  *See* Nev. Rev. Stat. §§ 689A.0418, 689B.0378, 689C.1676, 695A.1865, 695B.1919, 695C.1696.

i.  New Jersey law requires that certain health insurers, health service corporations, and employee health benefits plans that cover outpatient prescription drugs also provide coverage for female contraceptives.  *See e.g.*, N.J. Stat. Ann. § 17B:27A-19.15; N.J. Stat. Ann. § 17B:26-2.1y; N.J. Stat. Ann. § 52:14-17.29j; N.J. Stat. Ann. § 17:48F-13.2; N.J. Stat. Ann. § 17:48E-35.29.  The laws allow for limited exemptions for religious employers, requiring written notice of exemption for prospective enrollees.  *See e.g.*, N.J. Stat. Ann. § 17B:27A-19.15; N.J. Stat. Ann. § 17B:26-2.1y; N.J. Stat. Ann. § 17:48F-13.2; N.J. Stat. Ann. § 17:48E-35.29.

j.  New Mexico in its 2019 legislative session amended group health coverage requirements under the Health Care Purchasing Act to require coverage, at a minimum, for at least one product or form of contraception in each of the contraceptive method categories identified by the federal Food and Drug Administration, a sufficient number and assortment of oral contraceptive pills, and clinical services related to the provision or use of contraception.  H. B. 89 (2019), chaptered at Chapter 263, Sec. 9 (signed Apr. 4, 2019).

k.  New York requires all fully insured insurance policies that provide hospital, surgical, or medical expense coverage to cover medically necessary abortions without copayments, coinsurance, or annual deductibles.  *See* 11 N.Y.C.R.R. 52.16.  New York's recently-enacted Comprehensive Contraception Coverage

Act, which will go into effect in January 2020, will require group health insurance companies to cover doctor-prescribed F.D.A. approved contraceptive devices as well as voluntary sterilization procedures for women.  N.Y. Ins. Law § 3221(1)(16) (eff. Jan. 1, 2010).

l.   Oregon law requires health plans to cover the provision of reproductive health care, including contraception and abortion.  ORS 743A.067.

m.  Rhode Island requires health plans to provide coverage for F.D.A. approved contraceptive drugs and devices requiring a prescription (except RU 486).  R.I. Gen. Laws §§ 27-18-57; 27-19-48; 27-41-59.

n.   Vermont law requires reproductive health equity in insurance coverage, such that a health insurance plan must provide coverage for contraceptive drugs and services to the same extent that plan provides coverage for any drugs or services. Vt. Stat. Ann. tit. 8, § 4099c.

o.   The Commonwealth of Virginia requires insurers who otherwise provide prescription drug coverage to offer coverage for "any prescribed drug or device approved by the United States Food and Drug Administration for use as a contraceptive."  Va. Code Ann. § 38.2-3407.5:1.

118.   The Final Rule interferes with Plaintiffs' ability to enforce their laws requiring insurance coverage for contraception and abortion-related services by, among other things, defining the group of individuals and entities authorized to exercise conscience objections to include not only health care professionals but also sponsors of health insurance plans.

**B.    The Final Rule harms Plaintiffs' health care institutions.**

119.    Many of the Plaintiffs – including Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Massachusetts, New York, New York City, Oregon, Virginia, and Cook County – own and operate health care institutions, including teaching hospitals and medical education centers.

120.    In addition, a number of the Plaintiffs – including Hawaiʻi, Pennsylvania, and Vermont – subcontract or sub-grant HHS funds to private health care institutions within their states.

121.    These health care institutions provide a range of services to Plaintiffs' diverse populations, including emergency care, long-term care, and primary and preventative care.

122.    The Final Rule places a number of new and stringent limitations upon the ability of Plaintiffs' institutions to inquire about whether members of their staff object to "performing, referring for, participating in, or assisting in the performance of" particular services or activities. First, the Final Rule does not permit any inquiry into prospective staff members' religious or moral objections prior to their hiring, whether or not such objections would materially impact the prospective employee's ability to fulfill their job obligations.  *See* 84 Fed. Reg. at 23,263 (to be codified at 85 C.F.R. § 88.2).

123.    Second, post-hiring, Plaintiffs' health institutions may inquire about staff members' objections no more frequently than "once per calendar year," absent a "persuasive justification" which is not specified or defined in the Final Rule.  *Id.*

124.    Third, beyond annual post-hire inquiries initiated by Plaintiffs' institutions, the Final Rule places no duty – and appears to prohibit the Plaintiffs from imposing a duty – on staff members to disclose known religious or moral objections to participating in a service or activity. *See id.*

125.    Fourth, to the extent Plaintiffs' institutions learn of a religious or moral objection by a staff member, any accommodation offered to that individual must be "voluntarily accept[ed]" by the staff member and must be "effective" – a term undefined in the Final Rule – in order for Plaintiffs to avoid "engag[ing] in discriminatory action."  *Id.*

126.    Fifth, any effort Plaintiffs make to continue providing any objected-to service, program, or treatment using alternate staff would itself be impermissible under the Final Rule if that effort "require[s] *any* additional action" by the objecting individual, *id.* (emphasis added); or if it "exclude[s] protected [persons] from fields of practice."  *Id.*

127.    Alone and in combination, these severe and unrealistic constraints on the operation of Plaintiffs' institutions will dramatically undermine their effectiveness and efficiency, leading to significantly increased costs, worse health outcomes, and greatly increased risk of catastrophic error.

128.    Plaintiffs' institutions currently rely on sufficient notice of staff members' religious or moral objections in order effectively to staff and run their various departments.  For example, emergency care departments within these institutions must be able to plan and staff for urgent situations in which the absence of a single staff member could threaten the health, safety, and life of patients in distress.  The Final Rule's new limitations upon the notice a health institution may seek concerning staff members' religious or moral objections undermines the ability of Plaintiffs' institutions to staff their operations effectively, and as a result, threatens patient care and public health.

129.    As a result of this threat, Plaintiffs' institutions must preemptively plan to increase staff, in order to avoid any such risks of patient harm.  In some instances, this will take the form of double-staffing emergency rooms, end-of-life care, and other departments in which

the risk of an objection without sufficient notice to Plaintiffs' institutions would have devastating consequences for patients.

130.     The cost of this parallel staffing will be unduly burdensome to the Plaintiffs.  For example, New York City will be forced to increase expenditures on salaries to ensure there is sufficient staff to comply with objections under the Final Rule.  As shown below, in the 2018 fiscal year, New York City Health + Hospitals ("H+H") – the City's municipal hospital system and the largest public health care system in the United States – directly employed 35,860 full-time and part-time staff, 8,433 affiliate and temporary staff persons, and 700 staff persons who provided hourly services.  The salaries for these workers amounted to over $4.1 billion in fiscal year 2018.  The cost of hiring additional employees to establish the parallel staff needed to comply with the Final Rule would therefore be significant.

| FY18 | H+H (Full Time & Part Time Staff) | Affiliate | Allowances | Overtime | Temporary Staffing | FY18 Total |
|---|---|---|---|---|---|---|
| Full Time Equivalent (FTEs) | 35,860 | 5,657 | 700 | 2,144 | 2,776 | 47,138 |
| Health + Hospital Corp ($ in 000s) | $2,588,661 | $1,208,964 | $51,931 | $155,881 | $155,529 | $4,160,966 |

131.     This burden on Plaintiffs is especially pronounced in areas within the Plaintiffs' states in which there are few other health care providers, such as rural areas, and in areas in which other providers are more likely to be religious and have objections of their own to the provision of certain types of care.

132.     The Final Rule also harms Plaintiffs' health institutions by undermining longstanding efforts by those institutions to build trust with the patient communities they serve.

As set forth above, the Final Rule drastically limits the ability of Plaintiffs' institutions to seek advance notice of their staff members' religious or moral objections, and to plan for and accommodate such objections accordingly.  The likelihood that Plaintiffs' health institutions may not know of staff members' objections in advance, which may then be expressed at the time of a needed procedure and potentially in front of a patient, jeopardizes the trust of patients that these institutions have worked for years to develop.

       **C.**     **The Final Rule harms Plaintiffs by threatening billions of dollars in congressionally-appropriated health care funds.**

133.    Given the threat posed by the enforcement provisions of the Final Rule that the Department may withhold, deny, suspend, or terminate billions of dollars in federal health care funds to the Plaintiffs in the Department's discretion, the Plaintiffs face the "Hobson's choice" of either (1) implementing costly changes to their laws, regulations, and policies, thereby threatening effective patient care and efficient administration of their health care systems; or (2) risking the loss of all of the federal funds they rely on to provide that care.

134.    The amount of federal funding at risk runs to the hundreds of billions of dollars when considering appropriated funds from the Department alone.

135.    According to publicly available information on the Department's Tracking Accountability in Government Grants System ("TAGGS"), collectively, the Plaintiffs received nearly $200 billion in federal health care funding in the 2018 fiscal year that the Final Rule threatens should the Department determine, in its discretion, that any of the Plaintiffs are not complying with the Final Rule or any of the statutes it implements.

136.    The City of Chicago's Department of Public Health (CDPH) receives almost $90 million in annual federal health care funding from the Department, including over $89 million in federal grants and $311,701 in Medicaid reimbursement in 2018.  These grants include

approximately $6.5 million for HPV and other vaccine coverage; $9.25 million for maternal and child health, $40 million for HIV prevention and treatment, $3.4 million for sexually transmitted disease and teen pregnancy prevention; and over $19 million for bioterrorism and ebola preparedness and response.

    a.   CDPH uses these funds to provide a wide array of health services and programs to its residents, including operating thirteen clinics throughout the City that provide free vaccinations, mental-health services, and testing and treatment for sexually transmitted diseases.  While CDPH offers free healthcare to all of its residents, the majority of its patients are non-white and medically vulnerable populations.  In addition to operating its own clinics, CDPH uses the federal health care grants it receives to help partner with many community-based health centers that offer additional medical services and health education programs.  These delegates operate clinics that, for example, provide care for the needs of woman and children, and primary care for people living with HIV/AIDS.

    b.   This funding is crucial for CDPH's operations: 75% of CDPH's total budget of nearly $177 million comes from federal sources, and 50% of CDPH's total budget comes directly from the Department.

137.   According to TAGGS, Colorado received nearly $6.4 billion in federal funds from the Department in federal fiscal year 2018 for entities identified as being at the state level in the TAGGS system.  The Colorado Department of Health Care Policy and Financing, responsible for administering Medicaid and Children's Health Insurance Program in Colorado, account for $5.31 billion of those expenditures.  Colorado uses these funds, in concert with state funds, to provide health care coverage to its members.  As of the end of April 2019, there were

1.24 million Coloradoans enrolled in these programs.  For state fiscal year 2019-20, the Colorado Medicaid Department's budget will be $10.66 billion, which includes $6.04 billion in federal funds.  This represents 33.35% of the Colorado budget for that fiscal year.

138.    According to TAGGS, Connecticut received nearly $5.5 billion in health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.

139.    Cook County, through CCH, provides healthcare services to vulnerable Cook County residents and received more than $500 million in Department funds in 2018.  This figure includes reimbursement for direct medical services as well as grant funding.  These funds are used to provide healthcare services to more than 300,000 Cook County residents, more than 65% of whom are uninsured or underinsured and would otherwise lack meaningful access to medical care.

140.    According to TAGGS, Delaware received over $1.7 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.  Delaware receives funds for its participation in Medicaid and the Children's Health Insurance Program, which it uses to provide a full range of health services to over 240,000 citizens of the State.  Delaware also receives Title X funding, including $1,100,000 for the 2019 federal fiscal year in Title X family planning service grants.  Title X family planning clinics play a critical role in ensuring access to a broad range of family planning and preventative health services.

141.    According to TAGGS, the District of Columbia received over $2.6 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.

142.   According to TAGGS, Hawai'i received over $2 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.

143.   According to TAGGS, Illinois received over $15 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.  In December 2018, the Department's Office for Civil Rights sent a questionnaire to Illinois inquiring about federal health care funding that Illinois receives from the Department in the context of religious objections.

144.   According to TAGGS, Maryland received over $8.6 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities as identified as being at the state level in the TAGGS system.

145.   According to TAGGS, Massachusetts received over $12.4 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities as identified as being at the state level in the TAGGS system.

146.   According to TAGGS, Michigan received more than $14.5 billion in health care funding from the Department in the 2018 federal fiscal year for entities as identified as being at the state level in the TAGGS system.

147.   According to TAGGS, Minnesota received over $9.4 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.

148.   According to TAGGS, Nevada received over $2.6 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.  Nevada expects to spend over $6.7 billion on federal

reimbursement for medical services through its two year budget, with significant additional Department monies for additional services.  Nevada uses these funds to provide numerous services to its citizens that are wholly unrelated to what the Final Rule regulates.  These programs serve more than one million Nevadans.  Medicaid funding alone amounts to 20% of Nevada's two year budget.

149.    According to TAGGS, New Jersey received $11.8 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.  Federal health care funds in New Jersey include over $7 billion in Department funding for Medicaid and the Children's Health Insurance Program.  New Jersey uses these funds to provide a full range of health services to citizens of the State.  For example:

a.    Through Medicaid and the Children's Health Insurance Program alone, New Jersey serves over 1.7 million people in the State.

b.    New Jersey also received around $30.7 million in funding in the 2018 federal fiscal year under the Older Americans Act, which allows older adults to live with independence and dignity in community settings.

c.    New Jersey received approximately $850.9 million to support individuals with disabilities in the 2018 federal fiscal year.  These funds allowed New Jersey to provide services, education, or residential placement for nearly 25,000 adults through more than 200 agencies across the State.

d.    Federal funding also supports disease prevention, public health programs, opioid addiction treatment, federally-qualified health centers, and emergency programs throughout the State of New Jersey.

64

150.     According to TAGGS, New Mexico received over $4.7 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities as identified as being at the state level in the TAGGS system.

151.     According to TAGGS, New York received over $46.9 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities as identified as being at the state level in the TAGGS system.

152.     New York City relies on billions of dollars in federal health care funding from the Department.

    a.   H+H alone receives approximately $3.4 billion in federal health care funding that is threatened should the Department determine that New York City's laws, rules, or policies do not comply with the Final Rule or related statutes.  Specifically, H+H receives: $5,933,864 for CHIP; $1,153,400,144 for Medicaid; $29,459,286 in federal grants related to HIV/AIDS, STD Treatment and Prevention, Substance Abuse Treatment, Public Health and Prevention, Immunization, Biomedical and Behavioral Research; $112,799,439 in other grants; $521,003,737 for DSH (disproportionate share hospitals); $457,229,525 for UPL (upper payment limit); and $1,114,354,374 for Medicare.  This funding allows H+H to serve around one million patients annually.

    b.   The NYC Department of Health and Mental Hygiene – one of the largest public health agencies in the world – receives over $330 million in federal health care funding from the Department.  It uses this money to operate clinics and programs that provide vaccinations, tuberculosis testing and treatment, and services for sexually transmitted diseases and reproductive health.

153.    According to TAGGS, Oregon (including the Oregon Health Authority ("OHA") and the Oregon Department of Human Services) received over $8.1 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system, including:

      a.  $5 billion in funding for Oregon's Medicaid program (Oregon Health Plan) and the Children's Health Insurance Program combined, providing health coverage to over 970,000 Oregon residents, over 400,000 of whom are children;

      b.  Over $300 million in funding for public health and prevention programs used for infectious disease screening and prevention, nutrition outreach and education, and reduction and prevention of tobacco, alcohol, and opioid abuse; and

      c.  Federal grants for health care research and health care delivery.  Other state institutions of higher learning also receive HHS grants for biomedical research and education.

      d.  The Oregon Department of Human Services received $966 million in Medicaid Funds.  Sixty-six percent of those funds represent services for older Americans ($638 million), serving 275,000 clients over the course of fiscal year 2018.

154.    According to TAGGS, Pennsylvania received over $21.8 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.

155.    According to TAGGS, Rhode Island received over $2.1 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.  Rhode Island receives an annual amount of federal funding totaling approximately $7,054,232 for programs for arthritis, asthma, cancer registry,

breast and cervical cancer, comprehensive cancer, colorectal cancer, diabetes, heart disease and stroke, and screening for heart disease.  The Rhode Island Department of Health was awarded $2,725,000 in Title X funds for family planning program services for project period April 1, 2016 through August 31, 2018.  The number of clients served by Title X service sites in 2018 was 29,098.

156.    According to TAGGS, Vermont received over $1.2 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.  The Vermont Department of Health has received approximately $780,000 in Title X grants each year over the past ten years, with minor fluctuations.  The Vermont Department of Health is the sole Title X grantee for the State of Vermont.

157.    According to TAGGS, Virginia received over $6.7 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.

158.    According to TAGGS, Wisconsin received over $6.7 billion in federal health care funding from the Department in the 2018 federal fiscal year for entities identified as being at the state level in the TAGGS system.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Administrative Procedure Act – Exceeds Statutory Authority)

159.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

160.     Under the Administrative Procedure Act, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

161.     Defendants may only exercise authority conferred by statute.  *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

162.     The Final Rule exceeds Defendants' authority under the statutes it purports to implement because the Final Rule legislates and implements excessively broad definitions of statutory text, including "assist in the performance," "health care entity," and "discriminate or discrimination."  84 Fed. Reg. at 23,263-64.

163.     In addition, the Final Rule establishes an extraordinarily broad enforcement scheme that would authorize the Department to withhold, deny, suspend, or terminate billions of dollars in federal health care funds to the Plaintiffs if in Defendants' determination there is a failure to comply with the Final Rule or any of the underlying statutes.  84 Fed. Reg. at 23,271-72.  This enforcement scheme is not authorized by the relevant federal statutes.

164.     The Final Rule also establishes an enforcement scheme that would authorize the Department to withhold or suspend all federal financial assistance from the Department of Labor and Department of Education to the Plaintiffs if in Defendants' determination there is a failure to comply with the Final Rule or the Weldon Amendment.  *Id.*  This enforcement scheme is not authorized by the relevant federal statutes.

165.     The Final Rule is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA.  5 U.S.C. § 706(2)(C).

166.     Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## SECOND CLAIM FOR RELIEF

### (Administrative Procedure Act – Not in Accordance with Law)

167.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

168.    Under the APA, a court must set "aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

169.    The Final Rule violates Section 1554 of the Affordable Care Act, which prohibits the Department from implementing any regulation that "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates principles of informed consent and the ethical standards of health care professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs."  42 U.S.C. § 18114.

170.    The Final Rule conflicts with the Medicaid and Medicare statutes it purports to implement, which provide that with regard to informed consent, those statutes shall not "be construed to affect disclosure requirements under State law."  42 U.S.C. § 1396u-2(b)(3)(B) (Medicaid managed care organization); *see also* 42 U.S.C. § 1395w-22(j)(3)(C) (Medicare+Choice).

171.    The Final Rule violates the Emergency Medical Treatment and Labor Act ("EMTALA"), which requires hospitals to provide emergency care.  42 U.S.C. § 1395dd.

172.    The Final Rule conflicts with Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment based on religious beliefs, and further provides that employers are not obligated to accommodate employees' religious beliefs where the accommodation would cause "undue hardship" on the employer.  42 U.S.C. § 2000e(j)

173.    The Final Rule is therefore "not in accordance with law" as required by the APA. 5 U.S.C. § 706(2)(A).

174.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## THIRD CLAIM FOR RELIEF

### (Administrative Procedure Act – Arbitrary and Capricious)

175.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

176.    The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

177.    The Final Rule is arbitrary and capricious because Defendants' justification for its decision runs counter to the evidence before the agency, relies on factors Congress did not intend the agency to consider, and disregards material facts and evidence, including nationally recognized standards of care for medical professionals.

178.    The Final Rule is arbitrary and capricious because its definitions of "assist in the performance," "discriminate or discrimination," "health care entity," and "referral or refer for," taken together, arbitrarily require Plaintiffs to guess whether routine procedures and services would require additional steps to accommodate workers or protect patients, and unreasonably ignore evidence in the rulemkaing record that these definitions create an unworkable situation for Plaintiffs and other health care providers and regulators.

179.    The Final Rule is arbitrary and capricious because the Department conducted and relied on a flawed cost-benefit analysis, citing benefits the Final Rule would confer without any evidentiary basis, and failing adequately to account for the true costs the Final Rule will impose, including the significant costs to Plaintiffs and to the public health and safety of their residents.

180.    The Final Rule is arbitrary and capricious because it fails to consider important aspects of the problem, including the Rule's interference with the administration of EMTALA and Title VII.

181.    The Final Rule is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA.  5 U.S.C. § 706(2)(A).

182.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## FOURTH CLAIM FOR RELIEF

### (U.S. Constitution art. I, § 8, cl. 1 – Spending Clause)

183.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

184.    The Spending Clause of the Constitution does not permit the Department to "exert a power akin to undue influence" over the Plaintiffs by attaching conditions to federal funds that are "so coercive as to pass the point at which pressure turns into compulsion."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578-88 (2012) (op. of Roberts, C.J.) (citations omitted).

185.    The Department's threat to withhold, deny, suspend, or terminate billions of dollars in federal health care funds to the Plaintiffs – as well as *all* funds appropriated under the Departments of Labor, HHS, Education, and Related Agencies Appropriations Act, Pub. L. No. 115-245, Div. B, including funds entirely unrelated to health care – is unconstitutionally coercive and violates the Spending Clause.

186.    The Spending Clause also requires that any conditions attached to the receipt of federal funds must be unambiguous and clearly stated in advance, so that states and local governments considering acceptance of those funds can do so knowingly and voluntarily. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

187.    The Final Rule is unconstitutionally vague and ambiguous, and attaches new after-the-fact conditions to Plaintiffs' receipt of federal funds, in violation of the Spending Clause.

188.    The Spending Clause further requires that conditions placed on federal funds be reasonably related to the purposes of the federal programs at issue. *Id.* at 213.

189.    The Final Rule unconstitutionally imposes conditions on Plaintiffs' receipt of federal funds that have no nexus to the purposes of those federal funding programs.

190.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## FIFTH CLAIM FOR RELIEF

### (U.S. Constitution – Separation of Powers)

191.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

192.    The Constitution vests the spending power in Congress, not the Executive Branch. U.S. Const. art. I, § 8, cl. 1.

193.    Congress may delegate some discretion to the Executive Branch to decide how to spend appropriated funds, but that discretion is cabined by the scope of the delegation. *City of Arlington*, 569 U.S. at 297.

194.   The Executive Branch cannot amend or cancel appropriations that Congress has duly enacted.  *Clinton v. City of New York*, 524 U.S. 417, 439 (1998); *Train v. City of New York*, 420 U.S. 35, 38, 44 (1975).

195.   The Final Rule imposes requirements not authorized by the underlying federal statutes and would allow Defendants to withhold, deny, suspend, or terminate federal financial assistance for noncompliance with those requirements.

196.   The Final Rule's conditions improperly usurp Congress's spending power and amount to an unconstitutional refusal to spend money appropriated by Congress, in violation of constitutional separation of powers principles.

197.   Defendants' violation causes ongoing harm to Plaintiffs and their residents.

### SIXTH CLAIM FOR RELIEF

### (U.S. Constitution amend. I – Establishment Clause)

198.   Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

199.   Laws that compel employers to "conform their business practices to the particular religious practices of . . . employees" violate the Establishment Clause of the United States Constitution.  *Estate of Thornton v. Caldor*, 472 U.S. 703, 709 (1995).

200.   By requiring employers, including State and local governments, to accommodate their employees' religious beliefs to the exclusion of other interests, the Final Rule will impose substantial burdens on third parties – including Plaintiffs' other employees and patients – in contravention of the First Amendment.

201.   Defendants' violation causes ongoing harm to Plaintiffs and their residents.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

73

1.      Declare that the Final Rule is in excess of the Department's statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

2.      Declare that the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

3.      Declare that the Final Rule is unconstitutional;

4.      Vacate and set aside the Final Rule;

5.      Enjoin the Department and all its officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Final Rule;

6.      Stay the effective date of the Final Rule pursuant to 5 U.S.C. § 705;

7.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

8.      Grant other such relief as this Court may deem proper.

DATED:  May 21, 2019

Steven C. Wu
  *Deputy Solicitor General*
Ester Murdukhayeva
  *Assistant Solicitor General*

*Of Counsel*

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*
Matthew Colangelo
  *Chief Counsel for Federal Initiatives*
Lisa Landau, *Chief, Health Care Bureau*
Lilia Toson, *Assistant Attorney General*
Justin Deabler, *Assistant Attorney General*
Brooke Tucker, *Assistant Attorney General*
Amanda Meyer, *Assistant Attorney General*
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
Matthew.Colangelo@ag.ny.gov

*Attorneys for the State of New York*

ZACHARY W. CARTER
*Corporation Counsel of the City of New York*

By: */s/ Tonya Jenerette*
Tonya Jenerette
  Deputy Chief for Strategic Litigation
Cynthia Weaver, Senior Counsel
Otis Comorau, Assistant Corporation Counsel
100 Church Street, 20th Floor
New York, NY 10007
Phone: (212) 356-4055
tjeneret@law.nyc.gov
cweaver@law.nyc.gov
ocomorau@law.nyc.gov

*Attorneys for the City of New York*

PHILIP J. WEISER
*Attorney General of the State of Colorado*

By: */s/ Jennifer L. Weaver*
Eric R. Olson
  Solicitor General
Jennifer L. Weaver
  First Assistant Attorney General
W. Eric Kuhn
  Senior Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6548
eric.olson@coag.gov
jennifer.weaver@coag.gov
eric.kuhn@coag.gov

*Attorneys for the State of Colorado*

WILLIAM TONG
*Attorney General of Connecticut*

By: /s/ *Maura Murphy Osborne*
Maura Murphy Osborne
  Assistant Attorney General
Office of the Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Phone: (860) 808-5020
Maura.MurphyOsborne@ct.gov

*Attorneys for the State of Connecticut*


KARL A. RACINE
*Attorney General*
*District of Columbia*

By: /s/ *Robyn R. Bender*
Robyn R. Bender*
  *Deputy Attorney General*
Valerie M. Nannery*
  *Assistant Attorney General*
Office of the Attorney General for
the District of Columbia
441 4th Street, N.W., Suite 630 South
Washington, DC 20001
Phone: (202) 442-9596
Fax: (202) 730-1465
robyn.bender@dc.gov
valerie.nannery@dc.gov

*Attorneys for the District of Columbia*

KATHLEEN JENNINGS
*Attorney General of Delaware*

AARON R. GOLDSTEIN
Chief Deputy Attorney General
ILONA KIRSHON
Deputy State Solicitor

By: /s/ *David J. Lyons*
David J. Lyons*
Deputy Attorney General
Delaware Department of Justice
Phone: (302) 577-8413
Fax: (302) 577-6630
david.lyons@state.de.us

*Attorneys for the State of Delaware*


CLARE E. CONNORS
*Attorney General of the State of Hawaiʻi*

By: /s/ *Diane K. Taira*
Diane K. Taira,* Supervising Deputy
  Attorney General, Health Division
Jill T. Nagamine,* Deputy Attorney General
Andrea J. Armitage,* Deputy Attorney
General
Department of the Attorney General
State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi 96813
Phone: (808) 587-3050
Fax: (808) 587-3077
Diane.K.Taira@Hawaii.gov
Jill.T.Nagamine@Hawaii.gov
Andrea.J.Armitage@Hawaii.gov

*Attorneys for the State of Hawaiʻi*

KWAME RAOUL
*Attorney General of the State of Illinois*

By: /s/ *Sarah Gallo*
Sarah Gallo,* Assistant Attorney General
Lauren Barski,* Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, IL 60601
Phone: (312) 814-8309
sgallo@atg.state.il.us

*Attorneys for the State of Illinois*


MAURA HEALY
*Attorney General of the Commonwealth of
Massachusetts*

By: /s/ *Abigail Taylor*
Abigail Taylor*
Jon Burke*
Assistant Attorneys General
Civil Rights Division
Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA 02108
Phone: (617) 727-2200
Fax: (617) 727-5762
Abigail.Taylor@mass.gov
Jonathan.Burke@mass.gov

*Attorney for the Commonwealth of
Massachusetts*

BRIAN E. FROSH
*Attorney General of Maryland*

By: /s/ *Steve M. Sullivan*
Steve M. Sullivan
 *Solicitor General*
Kimberly S. Cammarata
Jeffrey P. Dunlap
 *Assistant Attorneys General*
200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-6325
Fax: (410) 576-6955

*Attorneys for the State of Maryland*


DANA NESSEL
*Attorney General
State of Michigan*

By: /s/ *Fadwa A. Hammoud*
Fadwa A. Hammoud* (P74185)
 Solicitor General
Toni L. Harris* (P63111)
 Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
Phone: (517) 335-7603
HammoudF1@michigan.gov
Harrist19@michigan.gov

*Attorneys for the State of Michigan*

KEITH ELLISON
*Attorney General*
*State of Minnesota*

By: */s/ Scott H. Ikeda*
Scott H. Ikeda*
  Assistant Attorney General
Atty. Reg. No. 0386771
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Phone: (651) 757-1385
Fax: (651) 282-5832
scott.ikeda@ag.state.mn.us

*Attorneys for the State of Minnesota*

GURBIR S. GREWAL
*Attorney General*
*State of New Jersey*

By: */s/ Glenn Moramarco*
Glenn Moramarco*
  *Assistant Attorney General*
Melissa Medoway,* *Deputy Attorney General*
Marie Soueid,* *Deputy Attorney General*
Deputy Attorneys General
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
Phone: (609) 376-3232
Glenn.Moramarco@law.njoag.gov
Melissa.Medoway@law.njoag.gov
Marie.Soueid@law.njoag.gov

*Attorneys for the State of New Jersey*

AARON D. FORD
*Attorney General*
*State of Nevada*

By: */s/ Heidi Parry Stern*
Heidi Parry Stern (Bar No. 8873)
  Solicitor General
Craig A. Newby (Bar No. 8591)
  Deputy Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Attorneys for the State of Nevada*

HECTOR BALDERAS
*Attorney General of New Mexico*

By: */s/ Tania Maestas*
Tania Maestas
Chief Deputy Attorney General
P.O. Drawer 1508
Santa Fe, New Mexico 87504-1508
tmaestas@nmag.gov

*Attorneys for the State of New Mexico, by and through Attorney General Hector Balderas*

ELLEN F. ROSENBLUM
*Attorney General of the State of Oregon*

By: /s/ *Brian A. de Haan*
Brian A. de Haan (NY Bar #4565396)
Elleanor H. Chin* (OR#061484)
Senior Assistant Attorneys General
Oregon Department of Justice
1162 Court Street NE
Salem Oregon 97301
Phone: (503) 947-4700
elleanor.chin@doj.state.or.us

*Attorneys for the State of Oregon*

JOSH SHAPIRO
*Attorney General of the Commonwealth of*
*Pennsylvania*

By: /s/ *Aimee D. Thomson*
Aimee D. Thomson (NY Bar #5404348)
(admission to S.D.N.Y. pending)
   Deputy Attorney General, Impact Litigation
   Section
Nikole Brock
   Deputy Attorney General, Health Care
   Section
Pennsylvania Office of Attorney General
1600 Arch St., Suite 300
Philadelphia, PA 19103
Phone: (267) 940-6696
athomson@attorneygeneral.gov

*Attorneys for the Commonwealth of*
*Pennsylvania*

PETER F. NERONHA
*Attorney General of the State of Rhode Island*

By: /s/ *Michael W. Field*
Michael W. Field
Assistant Attorney General
150 South Main Street
Providence, Rhode Island 02903
Phone: (401) 274-4400, ext. 2380
mfield@riag.ri.gov

*Attorneys for the State of Rhode Island*

THOMAS J. DONOVAN, JR.
*Attorney General of the State of Vermont*

By: /s/ *Eleanor Spottswood*
Eleanor Spottswood*
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
Phone: (802) 828-3178
eleanor.spottswood@vermont.gov

*Attorneys for the State of Vermont*

MARK R. HERRING
*Attorney General of the Commonwealth of Virginia*

By: /s/ *Toby J. Heytens*
Toby J. Heytens
  Solicitor General
Matthew R. McGuire
  Principal Deputy Solicitor General
Michelle S. Kallen
  Deputy Solicitor General
Brittany M. Jones*
  John Marshall Fellow
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Phone: (804) 786-7240
solicitorgeneral@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

KATHLEEN HILL
*Acting Corporation Counsel of the City of Chicago*

By: /s/ *Stephen Kane*
Stephen Kane,* Acting Deputy
Rebecca Hirsch, Assistant Corporation Counsel
Affirmative Litigation Division
City of Chicago Department of Law
121 N. LaSalle Street, Room 600
Chicago, IL 60602
Phone: (312) 744-8143
Rebecca.hirsch2@cityofchicago.org

*Attorneys for the City of Chicago*

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*

By: /s/ *Maura FJ Whelan*
Maura FJ Whelan*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Phone: (608) 266-3859
whelanmf@doj.state.wi.us

*Attorneys for State of Wisconsin*

KIMBERLY M. FOXX
*Cook County Illinois State's Attorney*

By: /s/ *Kimberly M. Foxx*
Kimberly M. Foxx,* Cook County State's Attorney
Amy Crawford,* Assistant State's Attorney
Deputy Bureau Chief – Civil Actions Bureau
Jessica M. Scheller,* Assistant State's Attorney
Division Chief; Advice, Business & Complex Litigation – Civil Actions Bureau
500 W. Richard J. Daley Center Place, Suite 500
Chicago, IL 60602
Phone: (312) 603-3116
Phone: (312) 603-6934
Amy.Crawford@cookcountyil.gov
Jessica.Scheller@cookcountyil.gov

*Attorneys for Cook County, Illinois*

*Motion to appear *pro hac vice* forthcoming.