# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
STATE OF NEW YORK, CITY OF NEW YORK,        :
STATE OF COLORADO, STATE OF                 :
CONNECTICUT, STATE OF DELAWARE,             :
DISTRICT OF COLUMBIA, STATE OF              :
HAWAI'I, STATE OF ILLINOIS, STATE OF        :
MARYLAND, COMMONWEALTH OF                   :
MASSACHUSETTS, STATE OF MICHIGAN,           :
STATE OF MINNESOTA, STATE OF NEVADA,        :
STATE OF NEW JERSEY, STATE OF NEW           :
MEXICO, STATE OF OREGON,                    :
COMMONWEALTH OF PENNSYLVANIA,               :
STATE OF RHODE ISLAND, STATE OF             :
VERMONT, COMMONWEALTH OF VIRGINIA,          :   Case No. 19 Civ. 4676 (PAE)
STATE OF WISCONSIN, CITY OF CHICAGO,        :
and COOK COUNTY, ILLINOIS,                  :
                                            :
                  Plaintiffs,               :
                                            :
          v.                                :
                                            :
UNITED STATES DEPARTMENT OF HEALTH          :
AND HUMAN SERVICES; ALEX M. AZAR II, in     :
his official capacity as Secretary of the United States :
Department of Health and Human Services; and :
UNITED STATES OF AMERICA,                   :
                                            :
                  Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## MEMORANDUM OF LAW OF PROPOSED INTERVENORS DR. REGINA FROST AND CHRISTIAN MEDICAL AND DENTAL ASSOCIATIONS IN SUPPORT OF MOTION TO INTERVENE

GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

THE BECKET FUND FOR RELIGIOUS
LIBERTY
1200 New Hampshire Ave. NW, Suite 700

Washington, D.C. 20036
Telephone: 202.955.0095
Facsimile: 202.955.0090

*Attorneys for Proposed Intervenors*
*Dr. Regina Frost* and *Christian Medical and*
*Dental Associations*

# TABLE OF CONTENTS

<u>Page</u>

I.  PRELIMINARY STATEMENT ................................................................................. 1

II.  FACTUAL BACKGROUND..................................................................................... 2

    A.  Proposed Intervenors ..................................................................... 2

    B.  The Conscience Rule .......................................................................... 5

    C.  This Lawsuit...................................................................................... 11

III.  ARGUMENT.......................................................................................................... 11

    A.  Intervention Is Appropriate Under Federal Rule of Civil Procedure 24(a) .......... 11

        1.  The Proposed Intervenors' motion is timely................................................ 12

        2.  The Proposed Intervenors have legally protectable interests in this action because the 2019 Final Rule protects healthcare providers' conscience rights.................................................................................. 13

        3.  The Proposed Intervenors' interests may be impaired by the disposition of this action because Plaintiffs seek to invalidate the Conscience Rule that protects CMDA's members. .................................. 15

        4.  The Proposed Intervenors' interest in this action will not be adequately represented by the existing parties........................................... 16

    B.  Alternatively, The Proposed Intervenors Should Be Permitted To Intervene Under Rule 24(b). .................................................................. 18

IV.  CONCLUSION....................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Brennan v. N.Y.C. Bd. of Educ.*,
  260 F.3d 123 (2d Cir. 2001)....................................................................................................18

*Cal. Hosp. Ass'n v. Maxwell-Jolly*,
  2009 WL 4120725 (C.D. Cal. Nov. 23, 2009)..........................................................................17

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*,
  152 F.3d 1184 (9th Cir. 1998) .................................................................................................17

*Catanzano by Catanzano v. Wing*,
  103 F.3d 223 (2d Cir. 1996).....................................................................................................12

*Cenzon-DeCarlo v. Mount Sinai Hosp.*,
  626 F.3d 695 (2d Cir. 2010).......................................................................................................8

*Farmland Dairies v. Comm'r of N.Y. State Dep't of Agric. & Mkts.*,
  847 F.2d 1038 (2d Cir. 1988)...................................................................................................17

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
  797 F.2d 85 (2d Cir. 1986).......................................................................................................19

*Hellwege v. Tampa Family Health Ctrs.*,
  103 F. Supp. 3d 1303 (M.D. Fla. 2015) .....................................................................................9

*In re Holocaust Victim Assets Litig. v. Swiss Bankers Ass'n*,
  225 F.3d 191 (2d Cir. 2000)........................................................................................12, 18, 19

*Home Ins. Co. v. Liberty Mut. Ins. Co.*,
  1990 WL 188925 (S.D.N.Y. Nov. 20, 1990)............................................................................15

*Kleissler v. U.S. Forest Serv.*,
  157 F.3d 964 (3d Cir. 1998)......................................................................................................18

*California ex. rel. Lockyer v. United States*,
  450 F.3d 436 (9th Cir. 2006) ....................................................................................................15

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*,
  471 F.3d 377 (2d Cir. 2006).....................................................................................................12

*McNeill v. N.Y. Hous. Auth.*,
  719 F. Supp. 233 (S.D.N.Y. 1989) ...........................................................................................19

iv

*Miller v. Silbermann*,
    832 F. Supp. 663 (S.D.N.Y. 1993) ...............................................12, 13, 14, 16, 19

*N.Y Pub. Interest Research Grp., Inc. v. Regents of Univ. of State of N.Y*,
    516 F.2d 350 (2d Cir. 1975)......................................................14, 15, 16, 18

*New York v. Abraham*,
    204 F.R.D. 62 (S.D.N.Y. 2001) ................................................13, 19

*Pennsylvania v. President United States of Am.*,
    888 F.3d 52 (3d Cir. 2018).......................................................15, 17

*Sagebrush Rebellion, Inc. v. Watt*,
    713 F.2d 525 (9th Cir. 1983) ...................................................16, 18

*Sw. Ctr. for Biological Diversity v. Berg*,
    268 F.3d 810 (9th Cir. 2001) ...................................................17

*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) ...................................................15

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972)................................................................16, 17

*Wash. Electric Coop., Inc. v. Mass. Mun. Wholesale Electric Co.*,
    922 F.2d 92 (2d Cir. 1990)......................................................13

*Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*,
    782 F. Supp. 870 (S.D.N.Y. 1991) ..........................................12

*XL Specialty Ins. Co. v Lakian*,
    632 Fed. App'x 667 (2d Cir. 2015)..........................................12

**Statutes**

22 U.S.C. § 7631(d) ...............................................................................5

26 U.S.C. § 5000A(d)(2)........................................................................5

29 U.S.C. § 669(a)(5)............................................................................5

42 U.S.C. § 238n ...................................................................................5

42 U.S.C. § 280g-1(d)...........................................................................5

42 U.S.C. § 290bb-36(f) ........................................................................5

42 U.S.C. § 300a-7.................................................................................5

42 U.S.C. §§ 1320a-1 .................................................................................5

42 U.S.C. § 1320c-11 .................................................................................5

42 U.S.C. § 1395i-5 ....................................................................................5

42 U.S.C. § 1395cc(f) .................................................................................5

42 U.S.C. § 1395w-22(j)(3)(B) ...................................................................5

42 U.S.C. § 1396a(w)(3) .............................................................................5

42 U.S.C. § 1396f .......................................................................................5

42 U.S.C. § 1396s(c)(2)(B)(ii) ....................................................................5

42 U.S.C. § 1396u–2(b)(3)(B) .....................................................................5

42 U.S.C. § 1397j-1(b) ................................................................................5

42 U.S.C. § 5106i(a)(1) ...............................................................................5

42 U.S.C. § 14406 .......................................................................................5

42 U.S.C. § 18023 .......................................................................................5

42 U.S.C. § 18113 .......................................................................................5

**Rules**

Federal Rule of Civil Procedure 24 ...............................................11, 12, 13, 15, 18, 19

**Regulations**

74 Fed. Reg. 10,207 (Mar. 10, 2009) ...........................................................7

83 Fed. Reg. 3,880 (Jan. 26, 2018) ..............................................................8

*Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law*, 73 Fed. Reg. 78072-01 (Dec. 19, 2008), *codified at* 45 C.F.R. § 88 (2008) ...............6, 7, 8, 17

*Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 84 Fed. Reg. 23,170 (May 21, 2019) .............................................2, 5, 6, 7, 8, 9, 10, 11, 13, 14

*Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws*, 76 Fed. Reg. 9,968 (Feb. 23, 2011), *codified at* 45 C.F.R. § 88.2 (2011) ...........................................................................7, 8, 10

## I.       PRELIMINARY STATEMENT

The Christian Medical and Dental Associations ("CMDA") represent nearly 20,000 Christian healthcare providers committed to following Christ's example in their chosen professions by providing compassionate, top-notch medical care to all people.  CMDA's members include Proposed Intervenor Dr. Regina Frost.  Many of CMDA's members have chosen to work among the poor—including in rural areas and underserved urban centers.  Over 1,000 CMDA members are currently serving overseas, providing much-needed care to people who would otherwise lack access to medical services.  Countless others participate every year in short-term mission projects to impoverished areas of the world, typically at their own expense—often risking their own health and safety in the process.  In this way, they fulfill CMDA's Christian Physician Oath, which affirms that the physician will "love those who come to [him or her] for healing and comfort," and "will honor and care for each patient as a person made in the image of God."

CMDA members who have taken the oath also promise to "respect the sanctity of human life" and to "care for all [of their] patients, rejecting those interventions that either intentionally destroy or actively end human life, including the unborn, the weak and vulnerable, and the terminally ill."  This commitment to preserving all human life—which is shared by healthcare providers of many faiths—prevents CMDA members from participating in procedures that seek to end human life, including abortion, euthanasia, and some forms of contraception.  It can also create tension between Christian healthcare providers and their employers, many of whom choose to provide these procedures.  Absent enforceable conscience protections, CMDA members may be put to the difficult choice of unwillingly participating in procedures that violate their own deeply held beliefs, or facing discrimination (if not termination) on account of those beliefs.  No healthcare provider should be confronted with that dilemma.

To ensure that its members can continue to practice medicine without compromising their

beliefs, CMDA has long advocated for robust conscience protections. Recognizing the critical need for these protections, the Department of Health and Human Services ("HHS") promulgated the *Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 84 Fed. Reg. 23,170, 23,171 (May 21, 2019) ("2019 Final Rule" or "Conscience Rule"), a regulation that reinstates and bolsters previous conscience protections from 2008 that were rescinded in 2011.

The 2019 Final Rule clarifies the reach of federal conscience and anti-discrimination laws, encourages certain recipients of federal funds to notify individuals and entities of their rights under federal law, and strengthens the investigative and enforcement tools necessary to carry out HHS's responsibilities. As a result, the conscience rights of CMDA's members (and other adherents) are once again protected—ensuring that thousands of healthcare providers can offer medical care without fear of coercion, discrimination, or termination.

Although the Conscience Rule merely implements longstanding federal law, various states and municipalities ("Plaintiffs") have sought to enjoin the rule, alleging that it will compromise their ability to ensure patient access to all lawful procedures and products. Because neither Plaintiffs nor the government defendants can adequately represent the interests of the thousands of individuals protected by the Conscience Rule, CMDA and Dr. Frost move to intervene to defend the Rule and protect CMDA members from having to choose between caring for the sick and violating their beliefs.[1]

## II.   FACTUAL BACKGROUND

### A.   Proposed Intervenors

Founded in 1931, CMDA's mission is to educate and equip its nearly 20,000 members to glorify God by serving with professional excellence as witnesses of Christ's love and compassion

---

[1] Plaintiffs currently take no position on this motion. Defendants oppose intervention under Rule 24(a) and take no position on intervention under Rule 24(b).

to all people.  Declaration David Stevens, M.D., M.A. In Support of Motion to Intervene ("Stevens Decl.") ¶ 6.  CMDA has adopted a position statement affirming the duty of Christian healthcare providers to treat *every* patient with compassion, even if doing so puts the provider's own safety at risk.  *Id.* ¶ 11.  For example, CMDA's official policy on AIDS states that "Christian physicians and dentists, following the example of Christ, should care for HIV-infected persons even at the risk of their own lives.  We encourage all healthcare workers to do the same."  *Id.* ¶ 12.  CMDA also encourages its members to provide care to all patients:  "Because we are guided by Christ, who assisted all who sought his help regardless of sexual or social status, CMDA affirms the obligations of Christian healthcare professionals to care for all patients in need, regardless of sexual orientation, gender identification, or family makeup, with sensitivity and compassion[.]"  *Id.* ¶ 11.

Consistent with this commitment to serving all people, CMDA partners with Christian Community Health Fellowship, which operates 156 clinics in the United States that serve the neediest members of society, including the uninsured, immigrants, and children.  Stevens Decl. ¶ 14.  Over fifty percent of CMDA members responding to a 2014 survey reported offering free or steeply discounted care for the poor.  *Id.* ¶ 16.  CMDA also operates a short-term medical relief program that in 2018 alone conducted 45 one- to two-week service projects with over 1000 participants (physicians, dentists, nurses) traveling to Central and South America, the Caribbean, the Middle East, Asia, and Africa.  *Id.* ¶ 15.  Program participants served over 60,000 patients without regard to race, religion, gender, or sexual orientation—and each paid his or her own way and helped to cover the cost of medicines and supplies.  *Id*.

Although CMDA believes that healthcare providers should treat *all patients*, it holds that certain *procedures*—including abortion and euthanasia—are incompatible with the Christian faith.

3

Stevens Decl. ¶¶ 17-18.  Some CMDA members have religious objections to other procedures, including sterilization and artificial contraception.  *Id.* ¶ 19.  As CMDA recognizes, "[i]ssues of conscience arise when some aspect of medical care is in conflict with the personal beliefs and values of the patient or the healthcare professional."  *Id.* ¶ 9.  Because healthcare providers may feel pressure to provide or facilitate these procedures—notwithstanding their religious objections—CMDA has drafted The Healthcare Professional's Right of Conscience, an official position statement affirming that "[a]ll healthcare professionals have the right to refuse to participate in situations or procedures that they believe to be morally wrong and/or harmful to the patient or others."  *Id.* ¶ 10.  Where a provider exercises this right of refusal, CMDA's policy provides that the provider has "an obligation to ensure that the patient's records are transferred to the healthcare professional of the patient's choice."  *Id.*

To protect CMDA members' ability to practice medicine in accordance with their religious beliefs and medical judgment, CMDA has long advocated for legislative and regulatory action that would protect conscience rights.  Stevens Decl. ¶ 9.

Doctor Regina Frost is an OBGYN who has practiced in Michigan since graduating from Wayne State University School of Medicine in 2004.  Declaration of Regina Frost In Support of Motion to Intervene ("Frost Decl.") ¶¶ 3-4.  Dr. Frost is a Christian and has been a member of CMDA for five years.  *Id.* ¶ 5.  Her Christian faith has given her a passion to help those in need, both in the United States and overseas.  *Id.* ¶ 6.  During medical school, she served on a mobile medical team in Nyahururu, Kenya, attending to the needs of women, children, and the elderly. *Id.*  Dr. Frost has helped lead Women Physicians in Christ ("WPC"), a ministry of CMDA, since 2014.  *Id.* ¶ 7.  The mission of WPC is to build relationships among female physicians so they can encourage and support one another in the profession.  *Id.*

4

Dr. Frost is committed to treating all patients with dignity and love, without regard to race, religion, sexual orientation, or gender.  Frost Decl. ¶ 8.  As a Christian, though, she has religious objections to certain procedures, including abortion and sex reassignment surgery.  *Id.*  She informs all of her patients that she does not perform abortions.  *Id.* ¶ 8.  If her employer ever required her to perform a procedure to which she has a religious objection, she would be compelled to resign because she will not perform procedures she believes are morally wrong.  *Id.*  Dr. Frost believes that the federal government should protect healthcare providers' conscience rights to ensure that employers—including state and municipal governments—do not put physicians in the difficult position of having to choose between keeping their jobs and following their religious beliefs.  *Id.* ¶ 9.  Dr. Frost seeks to intervene solely in her individual capacity.  *Id.* ¶ 10.

## B.    The Conscience Rule

"Congress has repeatedly legislated conscience protections for individuals and institutions providing health care to the American public."[2]  2019 Final Rule, 84 Fed. Reg. at 23,171.  For example, the Church Amendments "protect those who hold religious beliefs or moral convictions regarding certain health care procedures from discrimination by entities that receive certain Federal funds, and in health service programs and research activities funded by HHS."  *Id.*

The Coats-Snowe Amendment "applies nondiscrimination requirements to the Federal government, and to State and local governments receiving Federal financial assistance," and

---

[2]  *See, e.g.*, 42 U.S.C. § 300a-7 (the Church Amendments); 42 U.S.C. § 238n (the Coats-Snowe Amendment); Consolidated Appropriations Act, 2017, Pub. L. 115–31, Div. H, Tit. V, sec. 507(d) and at Div. H, Tit. II, sec. 209 (the Weldon Amendment); 42 U.S.C. § 18113, 26 U.S.C. § 5000A(d)(2), and 42 U.S.C. §§ 18023(c)(2)(A)(i)-(iii), (b)(1)(A) and (b)(4) (ACA conscience protections); 42 U.S.C. §§ 1395w-22(j)(3)(B) and 1396u–2(b)(3)(B); 42 U.S.C. §§ 1395cc(f), 1396a(w)(3), and 14406; 22 U.S.C. § 7631(d), Consolidated Appropriations Act, 2017, Pub. L. 115–31, Div. J, Tit. VII, sec. 7018 (Helms Amendment); 42 U.S.C. §§ 1396f & 5106i(a)(1), 42 U.S.C. § 280g-1(d)), 29 U.S.C. § 669(a)(5)), 42 U.S.C. § 1396s(c)(2)(B)(ii)), and 42 U.S.C. § 290bb-36(f); and 42 U.S.C. §§ 1320a-1, 1320c-11, 1395i-5 and 1397j-1(b).

prohibits those government entities from "discriminat[ing] against any health care entity" that refuses to facilitate abortions or train its employees to perform abortions.  *Id.*  The Weldon Amendment strips federal funds from any federal agency, State, or local government that "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  *Id.* at 23,172.

The Patient Protection and Affordable Care Act ("ACA") prohibits the Federal government, as well any entity receiving federal financial assistance under the ACA, "from discriminating against an individual or institutional health care entity because of the individual or entity's objection to providing any health care items or service for the purpose of causing or assisting in causing death, such as by assisted suicide, euthanasia, or mercy killing."  84 Fed. Reg. at 23,172.  The ACA also prohibits health plans offered through a healthcare exchange from "discriminat[ing] against any individual health care provider or health care facility because of the facility or provider's unwillingness to provide, pay for, provide coverage of, or refer for abortions." *Id.*  Various appropriations bills and other statutes contain similar conscience protections for healthcare providers with religious objections to abortion, sterilization, or euthanasia.  *Id.* at 23,172-75.

To enforce federal laws protecting the conscience rights of those in the healthcare field, HHS issued a regulation in 2008 clarifying "the substantive requirements and applications of the Church, Coats-Snowe, and Weldon Amendments."  84 Fed. Reg. at 23,174; *see Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law*, 73 Fed. Reg. 78072-01 (Dec. 19, 2008), *codified at* 45 C.F.R. § 88 (2008) (the "2008 Rule").  The 2008 Rule provided that those Amendments "and the implementing regulations '[w]ere to be interpreted and implemented broadly to effectuate their

protective purposes." 84 Fed. Reg. at 23,174 (quoting the 2008 Rule).  The rule "required covered federally funded entities to provide written certification of compliance with the laws encompassed by the 2008 Rule." *Id.*  The rule also "designated HHS [Office of Civil Rights] OCR to receive complaints based on the three specified Federal conscience and anti-discrimination laws, and directed OCR to coordinate handling those complaints with the Departmental components with respect to which the covered entity received funding." *Id*.  The certification requirement, in combination with the complaint mechanism, provided HHS with a means of ensuring compliance with federal conscience protections.

In March 2009, just one month after the effective date of the 2008 Rule, HHS unexpectedly proposed to rescind the rule.  74 Fed. Reg. 10,207 (Mar. 10, 2009).  CMDA and others submitted comments "expressing concern that health care providers would be coerced into violating their consciences" if the protections afforded by the 2008 Rule were eliminated.  84 Fed. Reg. at 23,174. As CMDA and others pointed out, without the 2008 Rule, "there would be no regulatory scheme to protect the legal rights afforded to health care providers[.]" *Id*.  Commenters "identified a culture of hostility to conscience concerns in health care," and explained that "the rescission of the 2008 Rule would contribute to these problems by inappropriately politicizing, and interfering in, the practice of medicine and individual providers' judgment." *Id.* at 23,176.  "Thousands of comments from medical personnel stated their disagreement with the rescission, often stating that they had requested exemptions [from providing certain procedures] in the past and were concerned rescission would make it harder to request exemptions in the future." *Id.*

Nevertheless, HHS issued a new rule in 2011 that removed all of the substantive provisions of the 2008 Rule.  *See Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws*, 76 Fed. Reg. 9,968 (Feb. 23, 2011), *codified at* 45 C.F.R. § 88.2

(2011) ("2011 Rule").  Although the 2011 Rule continued to designate OCR "to receive complaints based on the Federal health care provider conscience protection statutes," it eliminated the certification requirement, the primary enforcement mechanism put in place by the 2008 Rule.  84 Fed. Reg. at 23,174.

The 2011 Final Rule sowed confusion about the extent and application of federal conscience and anti-discrimination laws.  In the wake of the 2011 Rule, numerous states and municipalities enacted laws infringing on the conscience rights protected by the Church, Coats-Snowe, and Weldon Amendments.  84 Fed. Reg. at 23,175-77.  These actions resulted in "an increase in lawsuits against State and local laws that plaintiffs allege[d] violate[d] conscience or unlawfully discriminate[d]."  *Id.* at 23,176.  Complaints filed with OCR alleging violations of federal law also significantly increased after the 2011 Rule, underscoring the need "for the Department to have the proper enforcement tools available to appropriately enforce all Federal conscience and anti-discrimination laws."  *Id.* at 23,175.

To remedy the deficiencies in the 2011 Rule, HHS proposed the current rule "to enhance the awareness and enforcement of Federal health care conscience and associated anti-discrimination laws, to further conscience and religious freedom, and to protect the rights of individuals and entities to abstain from certain activities related to health care services without discrimination or retaliation."  83 Fed. Reg. 3,880, 3,881 (Jan. 26, 2018).  As HHS came to recognize, "adequate governmental enforcement mechanisms are critical" because federal conscience laws "do not contain, or imply, a private right of action to seek relief from . . . violations by non-governmental covered entities."  84 Fed. Reg. at 23,178; *see Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695 (2d Cir. 2010) (holding that Church Amendment did not provide a private right of action to a nurse who alleged that private hospital forced her to assist in an abortion

over her religious objections); *Hellwege v. Tampa Family Health Ctrs.*, 103 F. Supp. 3d 1303 (M.D. Fla. 2015) (no private right of action for CMDA member who alleged she was denied ability to apply for a position as a nurse because she objected to prescribing abortifacients).

CMDA submitted comments to HHS in support of the revised rule, citing a 2009 survey of 2,865 members of faith-based medical associations conducted by the Christian Medical Association, which found that "39% of [respondents] reported having faced pressure or discrimination from administrators or faculty based on their moral, ethical, or religious beliefs." 84 Fed. Reg at 23,175. "Additionally, 32% of the survey respondents reported having been pressured to refer a patient for a procedure to which they had moral, ethical, or religious objections." *Id*. Without robust conscience protections, many of these healthcare providers may be forced out of their chosen profession.

In fact, "91% of respondents reported that they 'would rather stop practicing medicine altogether than be forced to violate [their] conscience.'" 84 Fed. Reg. at 23,175. The survey also indicated that conscience issues are affecting medical students' decisions about their medical careers—20% reported "that they would not pursue a career in obstetrics or gynecology because of perceived discrimination and coercion in that specialty against their beliefs." *Id.* at 23,175. CMDA's comment also cited a follow-up survey conducted in May 2011 of members of faith-based medical associations, which found that 82% of respondents thought "it was either 'very' or 'somewhat' likely that they personally would limit the scope of their practice of medicine if conscience rules were not in place." *Id.* at 23,181.

This evidence helped "demonstrate" to HHS "that a lack of conscience protections diminishes the availability of qualified health care providers." 84 Fed. Reg. at 23,246. The Department expressed concerned that "a certain proportion of decisions by currently practicing

health providers to leave the profession are motivated by coercion or discrimination based on providers' religious beliefs or moral convictions." *Id.* at 23,247.

To protect religious healthcare providers, HHS promulgated the Conscience Rule on May 21, 2019, recognizing that "[t]he freedoms of conscience and of religious exercise are foundational rights protected by the Constitution and numerous Federal statutes." 84 Fed. Reg. at 23,170. HHS "concluded that there is a significant need to amend the 2011 Rule to ensure knowledge of, compliance with, and enforcement of Federal conscience and anti-discrimination laws." *Id.* at 23,175. The rule made clear that OCR "has a singular and critical responsibility to provide clear and appropriate interpretation of Federal conscience and anti-discrimination laws, to engage in outreach to protected parties and covered entities, to conduct compliance reviews, to investigate alleged violations, and to vigorously enforce those laws." *Id.* at 23,178.

The 2019 Final Rule reinstated the substantive provisions of the 2008 Final Rule and defined several key terms. *See* 24 C.F.R. § 88.2 (2019). The Conscience Rule encourages recipients of federal funds to notify individuals and entities protected under federal conscience and anti-discrimination laws—such as employees, job applicants, and students—of their conscience rights. *See id.* § 88.4. Most importantly, the rule requires such entities to certify to HHS their compliance with these laws, and provides OCR with tools for enforcing compliance. *See id.* §§ 88.6 & 88.7. The rule explains that "[i]mplementation of the requirements set forth in this final rule will be conducted in the same way that OCR implements other civil rights requirements (such as the prohibition of discrimination on the basis of race, color, or national origin)," and "[e]nforcement will be based on complaints, referrals, and other information OCR may receive about potential violations, such as news reports and OCR-initiated compliance reviews and communications activities if facts suffice to support an investigation." 84 Fed. Reg. at 23,179-80.

If OCR concludes an entity is non-compliant, it will, in consultation and coordination with HHS's funding components, "assist covered entities with corrective action or compliance, or require violators to come into compliance." 84 Fed. Reg. at 23,180. If corrective action is not satisfactory or compliance is not achieved, OCR "may consider all legal options available to the Department, to overcome the effects of such discrimination or violations," including "termination of relevant funding, either in whole or in part, funding claw backs to the extent permitted by law, voluntary resolution agreements, referral to the Department of Justice (in consultation and coordination with the Department's Office of the General Counsel), or other measures." *Id.*

**C.     This Lawsuit**

On May 21, 2019, Plaintiffs—various states and municipalities—filed this lawsuit, seeking to enjoin the Conscience Rule. Plaintiffs allege that complying with the Final Rule will somehow undermine their ability to administer their health systems and deliver patient care. They ask the court to invalidate the Rule on several grounds, claiming that it violates the APA, the Establishment Clause, and the Spending Clause. On June 14, 2019, Plaintiffs filed a motion for a preliminary injunction. ECF No. 45.

## III.     ARGUMENT

**A.     Intervention Is Appropriate Under Federal Rule of Civil Procedure 24(a)**

CMDA represents nearly 20,000 healthcare providers—including Dr. Frost—protected by the Conscience Rule Plaintiffs seek to invalidate. Federal Rule of Civil Procedure 24(a)(2) ensures that where, as here, a plaintiff and defendant are litigating the scope of a third-party's rights, the affected party is afforded a seat at the table. Intervention is warranted here because (1) Proposed Intervenors' "motion is timely"; (2) it "asserts an interest relating to the property or transaction that is the subject of the action"; (3) "without intervention, disposition of the action may, as a practical matter, impair or impede [CMDA's] ability to protect its interest"; and (4) CMDA's and

11

Dr. Frost's "interest[s] [are] . . . not adequately represented by the other parties." *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir. 2006) (citing Fed. R. Civ. P. 24(a)(2)). Courts avoid a rigid construction of Rule 24 because the "test . . . is one of inclusion rather than exclusion." *XL Specialty Ins. Co. v Lakian*, 632 Fed. App'x 667, 669 (2d Cir. 2015) (quotation omitted).

### 1. The Proposed Intervenors' motion is timely.

The intervention motion—filed only a month after Plaintiffs commenced this action—is timely. In determining timeliness, courts consider "(1) how long the applicant had notice of its interest in the action before making its motion; (2) the prejudice to the existing parties resulting from this delay; (3) the prejudice to the applicant resulting from a denial of the motion; and (4) any unusual circumstance militating in favor of or against intervention." *In re Holocaust Victim Assets Litig. v. Swiss Bankers Ass'n*, 225 F.3d 191, 198 (2d Cir. 2000). All of these factors support intervention.

The Proposed Intervenors first became aware of this lawsuit on May 21, 2019, and filed this motion promptly after obtaining counsel. Intervention regularly is granted where much more time has lapsed between notice of the suit and the application for intervention. *See, Holocaust Victim Assets*, 225 F.3d at 198 (granting intervention even though motion was brought nearly three and a half years after the filing of the original complaint); *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 782 F. Supp. 870 (S.D.N.Y. 1991) (motion to intervene timely when filed almost two years after notice of interest in the suit). The notice element—"[a]mong the most important factors in a timeliness decision"—weighs heavily in favor of granting intervention here. *Catanzano by Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996) (quotation omitted); *see also Miller v. Silbermann*, 832 F. Supp. 663, 669 (S.D.N.Y. 1993) (intervention is timely so long as applicant has not "slept on [its] rights before making the motion").

Furthermore, granting intervention will not work any prejudice to the existing parties. Plaintiffs filed their motion for preliminary injunction on June 14, 2019, and Proposed Intervenors will respond to that motion according to the court-appointed schedule. Thus "the proposed intervention will not cause any delay or inconvenience" to the parties or require the court to adjust any existing deadlines. *Miller*, 832 F. Supp. at 670; *see also New York v. Abraham*, 204 F.R.D. 62, 65 (S.D.N.Y. 2001) (finding motion to intervene timely because the "litigation is in its early stages" and intervention would not disrupt the briefing schedule). The intervention motion is timely.

### 2. The Proposed Intervenors have legally protectable interests in this action because the 2019 Final Rule protects healthcare providers' conscience rights.

For an interest to be cognizable under Rule 24(a)(2), it must be "direct, substantial, and legally protectable." *Wash. Electric Coop., Inc. v. Mass. Mun. Wholesale Electric Co*., 922 F.2d 92, 97 (2d Cir. 1990). "An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." *Id*. (noting that this requirement is designed to prevent applicants from "inject[ing] collateral issues into an existing action"). CMDA and Dr. Frost easily satisfy this standard.

Many, if not most, of CMDA's nearly 20,000 members, including Dr. Frost, object on religious grounds to performing, assisting, or facilitating certain medical procedures—including abortion and euthanasia. *See* Stevens Decl. ¶¶ 17-19; Frost Decl. ¶ 8. As CMDA explained in its formal comments to the agency, many of its members have suffered adverse employment consequences for refusing to participate in such procedures. *See* 84 Fed. Reg. at 23,175 (explaining that 39% of respondents to a poll conducted by the Christian Medical Association "reported having faced pressure or discrimination from administrators or faculty based on their

13

moral, ethical, or religious beliefs"); Frost Decl. ¶ 9.

Without conscience protections, many CMDA members may be compelled to leave the practice of medicine. *See* 84 Fed. Reg. at 23,175 (explaining that "91% of respondents reported that they 'would rather stop practicing medicine altogether than be forced to violate [their] conscience'"); 84 Fed. Reg. at 23,181 n.48 ("82% of medical professionals said it was either 'very' or 'somewhat' likely that they personally would limit the scope of their practice of medicine if conscience rules were not in place."). For example, if Dr. Frost were required to perform or participate in abortions or euthanasia as a condition of retaining her employment or practicing medicine, she would be compelled to leave her job in the medical profession. Frost Decl. ¶ 8. Some religious healthcare providers already have "le[ft] the profession" because of "coercion or discrimination based on [their] religious beliefs or moral convictions." 84 Fed. Reg. at 23,247.

The Conscience Rule addresses this problem by prohibiting employers from discriminating against CMDA members and other religious healthcare providers who recuse themselves from procedures to which they object on religious grounds. The rule ensures that healthcare providers are not put to the painful choice of either suffering discrimination (and possibly termination) for following their convictions, or participating in procedures that violate their sincerely held religious beliefs. Because CMDA's members—including Doctor Frost—are the intended beneficiaries of the regulation that Plaintiffs seek to invalidate, the Proposed Intervenors have a "significant stake in the outcome of this lawsuit." *Miller*, 832 F. Supp. at 671; *see also N.Y Pub. Interest Research Grp., Inc. v. Regents of Univ. of State of N.Y*, 516 F.2d 350, 352 (2d Cir. 1975) (granting pharmacists permission to intervene in challenge to regulation prohibiting the advertisement of prescription drug prices because "any lifting of the prohibition . . . might well lead to significant

14

changes in the profession and in the way pharmacists conduct their businesses.").[3]

### 3. The Proposed Intervenors' interests may be impaired by the disposition of this action because Plaintiffs seek to invalidate the Conscience Rule that protects CMDA's members.

An applicant for intervention must show that "the disposition *may* as a practical matter impair or impede their ability to protect their interests." *N.Y. Pub. Interest Research Grp.*, 516 F.2d at 352 (emphasis added); *see also Home Ins. Co. v. Liberty Mut. Ins. Co.*, 1990 WL 188925, at *5 (S.D.N.Y. Nov. 20, 1990) (applicant "need not demonstrate that a substantial impairment of its interest *will* result") (emphasis added).  As the advisory committee has explained, "[i]f an [intervenor] would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene."  Fed. R. Civ. P. 24, advisory committee's note.

The Proposed Intervenors easily satisfy this standard as well, because Plaintiffs' requested relief—an order setting aside the Final Rule—would directly harm CMDA's members by depriving them of the conscience protections the Rule affords.  And "[i]f, as a result of this litigation," the Conscience Rule is declared invalid, intervenors "will have no alternative forum in which they might contest" that ruling.  *Lockyer*, 450 F.3d at 442; *see also N.Y. Pub. Interest Grp., Inc.*, 516 F.2d at 352 (granting intervention in part because of the "possible stare decisis effect of an adverse decision").  To protect their interest in upholding the Conscience Rule, the Proposed

---

[3] *See also Pennsylvania v. President United States of Am.*, 888 F.3d 52, 58 (3d Cir. 2018) (granting Little Sisters intervention because "their interest in preserving the religious exemption is concrete and capable of definition"); *California ex. rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) (allowing doctors to intervene to defend a statute protecting conscience rights because they would "be forced to choose between adhering to their beliefs and losing their professional licenses" if the challenged statute was "declared unconstitutional" as a "result of the litigation"); *Texas v. United States*, 805 F.3d 653, 660 (5th Cir. 2015) (holding that proposed intervenors were statute's "intended beneficiaries" and therefore had a sufficient interest to intervene in lawsuit challenging the statute).

Intervenors must be allowed to participate in *this* action—where the rule's validity is directly at issue.

### 4. The Proposed Intervenors' interest in this action will not be adequately represented by the existing parties.

An applicant seeking intervention need only show that the "representation of [its] interest '*may be*' inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (emphasis added). "[T]he burden of making that showing should be treated as minimal," *id.*, and "the weight of the responsibility for demonstrating adequate representation fall[s] on the opposing party." *Miller*, 832 F. Supp. at 672.

Here, although the Proposed Intervenors expect the federal defendants (collectively, "HHS") to defend the legality of the Conscience Rule, no party will represent adequately the particular interests of CMDA and Dr. Frost.  While Plaintiffs are entities *subject to* the rule, and Defendants are responsible for *enforcing* the rule, Doctor Frost—and CMDA's nearly 20,000 other members—are the ones *protected by* the rule.  The Proposed Intervenors are uniquely situated to provide the Court with the perspective of physicians and medical professionals who advocated for the Conscience Rule and rely on it to protect their conscience rights.  The Proposed Intervenors would thus "offer[] a necessary element to the proceedings that would be neglected" absent intervention.  *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983); *see also N.Y. Pub. Interest Research Grp.*, 516 F.2d at 352 (granting intervention because intervenors would "make a more vigorous presentation of the economic side of the argument than would the [Defendants]").

Moreover, although HHS has an interest in implementing federal statutes that protect conscience rights, it must balance that interest with others that may be adverse to the Proposed Intervenors.  As the Second Circuit has recognized, where an applicant seeks intervention to

defend a law, the government's interests "are not coterminous" with the would-be intervenor's interests, because the government "protect[s] the interest of the *state*" and "represents the whole people and a public interest, and not mere individuals and private rights." *Farmland Dairies v. Comm'r of N.Y. State Dep't of Agric. & Mkts.*, 847 F.2d 1038, 1044 (2d Cir. 1988) (quotations omitted); *see also Trbovich*, 404 U.S. at 538-39 (holding that government did not adequately represent intervenors' interest because the government's commitment to defending the public interest "transcend[ed] the narrower interest" of the intervenors).[4]

The agency's inconsistent position on the need for conscience protections also supports intervention.  HHS first promulgated robust conscience protections in 2008, but after a lawsuit was filed challenging the new rule—and less than a month after that rule's effective date—the agency reversed course and proposed to repeal the regulation it had just promulgated.  *See supra* at 6-7. Two years later, after notice and comment, the agency repealed the substantive provisions and certification requirement of the 2008 Rule.  *See supra* at 7-8.  The 2019 Final Rule represents a thoughtful return to the 2008 legal regime (with a more robust enforcement mechanism), but HHS may again weaken or alter its position during the course of this litigation, especially if there is a change in administration before this case is finally resolved.

CMDA and Doctor Frost should be allowed to intervene to ensure that the Conscience Rule

---

[4] *See also Pennsylvania*, 888 F.3d at 61 (granting Little Sisters intervention because "there is no guarantee that the government will sufficiently attend to the Little Sisters' specific interests as it attempts to uphold both [Interim Final Rules] in their entirety"); *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 823-24 (9th Cir. 2001) (private entities had right to intervene in suit defending government development program because their private economic interests were not shared by the government defendants); *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1190 (9th Cir. 1998) (private union-members' interests were not represented by state agencies defending state wage law); *Cal. Hosp. Ass'n v. Maxwell-Jolly*, 2009 WL 4120725, at *3 (C.D. Cal. Nov. 23, 2009) (private healthcare organizations were not adequately represented by California's Department of Health Care Services in suit defending legality of healthcare service reimbursement program).

is vigorously defended regardless of any future shifts in agency position.  *See Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 133 (2d Cir. 2001) (noting that although an employer "may have an interest in defending its hiring and other practices or in retaining certain incumbents in their jobs," it may have an even "stronger interest in bringing … litigation to an end by settlements involving the displacement of employees who are not parties to the action"); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 974 (3d Cir. 1998) (permitting intervention because "[a]lthough it is unlikely that intervenors' economic interest will change, it is not realistic to assume that the agency's programs will remain static or unaffected by unanticipated policy shifts").

Finally, CMDA should be permitted to intervene because it is in the best position to address Plaintiffs' criticisms of the 2009 and 2011 CMDA surveys, which HHS cited to support its conclusion that the Conscience Rule would decrease departures from the healthcare field.  *See* ECF No. 45 at 40-41.  The Proposed Intervenors can also provide additional information about the current challenges facing religious health professionals and the harmful consequences of under-enforcing conscience protections.  *See Sagebrush*, 713 F.2d at 528; *N.Y. Pub. Interest Research Grp.*, 516 F.2d at 352.  Because the Proposed Intervenors' interests may not be adequately represented by the Defendants in this action, the Court should grant the motion to intervene as of right.

**B.      Alternatively, The Proposed Intervenors Should Be Permitted To Intervene Under Rule 24(b).**

Even if this Court were to find that the Proposed Intervenors cannot intervene as of right, permissive intervention is appropriate.  "A district court may grant a motion for permissive intervention if the application is timely and if the 'applicant's claim or defense and the main action have a question of law or fact in common.'"  *Holocaust Victim Assets*, 225 F.3d at 202 (quoting Fed. R. Civ. P. 24(b)(2)).  The court must consider "whether granting permissive intervention 'will

unduly delay or prejudice the adjudication of the rights' of the existing parties," *id.*, and "whether parties seeking intervention will significantly contribute to [the] full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented," *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 89 (2d Cir. 1986). Each of these considerations supports permissive intervention.

The Proposed Intervenors' defense of the Conscience Rule has questions of law in common with the main action—namely, whether the rule violates the APA, the Establishment Clause, or the Spending Clause. CMDA does not seek to introduce new issues but only to present further arguments from its unique perspective as to why Plaintiffs' claims should fail. As noted above, this motion is timely and intervention will not affect the Court's existing deadlines or prejudice any party. Courts routinely grant motions for permissive intervention where intervenors cannot satisfy every requirement for intervention as of right. *See Abraham*, 204 F.R.D. at 66-67; *Miller*, 832 F. Supp. at 674. This is particularly true where, as here, the would-be intervenors "will greatly contribute to the Court's understanding of this case" given "their knowledge" of the issues. *Abraham*, 204 F.R.D. at 66-67; *see also McNeill v. N.Y. Hous. Auth.*, 719 F. Supp. 233, 250 (S.D.N.Y. 1989) (granting permissive intervention to low-income tenants in a suit challenging the city housing authority's policies, where proposed intervenors could elucidate the difficulties facing tenants as a result of the housing authority's policies).

As confirmed by CMDA's longstanding advocacy for conscience rights, and Doctor Frost's reliance on those rights, they are particularly knowledgeable about the issues at the heart of this case. Even if the Court concludes that the Proposed Intervenors cannot intervene as of right, it should nonetheless permit intervention under Rule 24(b).

## IV.    CONCLUSION

For the foregoing reasons, the Proposed Intervenors' motion to intervene should be granted.

Dated: June 25, 2019

New York, New York

Daniel Blomberg (*pro hac vice forthcoming*)
Nicholas Reaves (*pro hac vice forthcoming*)
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1200 New Hampshire Ave. NW, Suite 700
Washington, D.C. 20036
Telephone: 202.955.0095
Facsimile: 202.955.0090

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Allyson N. Ho*

Allyson N. Ho (*pro hac vice pending*)
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

Robert E. Dunn (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
1811 Page Mill Road
Palo Alto, California 94304
Telephone: 650.849.5300
Facsimile: 650.849.5333

Jason H. Hilborn (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.831.0539

*Attorneys for Proposed Intervenors*
*DR. REGINA FROST* and *CHRISTIAN*
*MEDICAL AND DENTAL ASSOCIATIONS*