# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.* )<br><br>*Plaintiffs,* )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF )<br>HEALTH AND HUMAN SERVICES; ALEX )<br>M. AZAR II, *in his official capacity as Secre-* )<br>*tary of the United States Department of Health* )<br>*and Human Services*; and UNITED STATES )<br>OF AMERICA, )<br><br>*Defendants,* )<br><br>DR. REGINA FROST and CHRISTIAN )<br>MEDICAL AND DENTAL )<br>ASSOCIATIONS, )<br><br>*Defendants-Intervenors.* ) | No. 1:19-cv-04676-PAE<br>(consolidated with 1:19-cv-05433-PAE;<br>1:19-cv-05435-PAE)<br><br>**MEMORANDUM OF LAW OF**<br>**DEFENDANTS-INTERVENORS DR.**<br>**REGINA FROST AND CHRISTIAN**<br>**MEDICAL AND DENTAL**<br>**ASSOCIATIONS IN SUPPORT OF**<br>**MOTION FOR SUMMARY**<br>**JUDGMENT, AND IN OPPOSITION**<br>**TO PLAINTIFFS' MOTIONS FOR**<br>**PRELIMINARY INJUNCTION** |
| PLANNED PARENTHOOD FEDERATION )<br>OF AMERICA, INC.; and PLANNED )<br>PARENTHOOD OF NORTHERN NEW )<br>ENGLAND, INC., )<br><br>*Plaintiffs,* )<br><br>v. )<br><br>ALEX M. AZAR II, *in his official capacity as* )<br>*Secretary, United States Department of Health* )<br>*and Human Services*; UNITED STATES )<br>DEPARTMENT OF HEALTH AND )<br>HUMAN SERVICES; ROGER SEVERINO, )<br>*in his official capacity as Director, Office for* )<br>*Civil Rights, United States Department of* )<br>*Health and Human Services*; and OFFICE )<br>FOR CIVIL RIGHTS, United States Depart- )<br>ment of Health and Human Services, )<br><br>*Defendants.* ) | No. 1:19-cv-05433-PAE<br>(consolidated with 1:19-cv-0476-PAE;<br>1:19-cv-05435-PAE) |

|  |  |
|---|---|
| NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION; and PUBLIC HEALTH SOLUTIONS, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALEX M. AZAR II, *in his official capacity as Secretary of the U.S. Department of Health and Human Services*; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROGER SEVERINO, *in his official capacity as Director of the Office for Civil Rights of the U.S. Department of Health and Human Services*; OFFICE FOR CIVIL RIGHTS of the U.S. Department of Health and Human Services, <br><br> *Defendants*. | No. 1:19-cv-05435-PAE <br> (consolidated with 1:19-cv-0476-PAE; 1:19-cv-05433-PAE) |

GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

THE BECKET FUND FOR RELIGIOUS
LIBERTY
1200 New Hampshire Ave. NW, Suite 700
Washington, D.C. 20036
Telephone: 202.955.0095
Facsimile: 202.955.0090

*Attorneys for Intervenors Dr. Regina Frost and Christian Medical and Dental Associations*

# TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

ARGUMENT ............................................................................................................... 4

I.      The Court Should Deny Plaintiffs' Request for a Preliminary Injunction ......................... 4

      A.      Plaintiffs Cannot Show a Likelihood of Success on the Merits ............................ 4

      B.      Plaintiffs Will Not Suffer Irreparable Harm. ...................................................... 5

      C.      A Preliminary Injunction Is Not In The Public Interest. ..................................... 10

II.     Defendants and Intervenors Are Entitled to Summary Judgment. ................................. 12

      A.      The Conscience Rule Does Not Exceed Statutory Authorization. ..................... 13

      B.      The Conscience Rule Is in Accordance with Law. ............................................. 17

      C.      The Conscience Rule Is Not Arbitrary or Capricious. ........................................ 20

      D.      The Conscience Rule Does Not Violate the Spending Clause. ........................... 27

      E.      The Rule Does Not Violate the Establishment Clause ........................................ 28

CONCLUSION .......................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Trinity Health Corp.*,
178 F. Supp. 3d 614 (E.D. Mich. 2016)..................................................................11

*Action for Bos. Cmty. Dev., Inc. v. Shalala*,
983 F. Supp. 222 (D. Mass. 1997), *aff'd*, 136 F.3d 29 (1st Cir. 1998)...................10

*American Legion v. American Humanist Assoc.*,
139 S. Ct. 2067 (2019)..............................................................................................29

*Arriaga v. Mukasey*,
521 F.3d 219 (2d Cir. 2008)......................................................................................30

*California v. Azar*,
2019 WL 1877392 (N.D. Cal. 2019) ..................................................................21, 24

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .........................................................................11, 12, 24

*California v. Azar*,
927 F.3d 1068 (9th Cir. 2019), *reh'g en banc granted sub nom. State by &
through Becerra v. Azar*, 927 F.3d 1045 (9th Cir. 2019)....................................20, 21

*Cenzon-DeCarlo*, 626 F.3d at 696 ...............................................................................11

*Chamorro v. Dignity Health*,
No. 15-549626 (Cal. Super. Ct. Dec. 28, 2015).......................................................11

*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) ...............................................................................13

*Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v.
Amos*,
483 U.S. 327 (1987)..................................................................................................29

*Covad Comm'ns Co. v. FCC*,
450 F.3d 528 (D.C. Cir. 2006) .................................................................................26

*Danquah v. University of Medicine and Dentistry of New Jersey*,
No. 2:11-cv-6377 (D.N.J. Oct. 31, 2011) ................................................................11

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018) .................................................................................19

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009) ..........................................................................5

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .....................................................................................26

*FERC v. Elec. Power Supply Ass'n*,
   136 S. Ct. 760 (2016) ...................................................................................25

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) ..........................................................................5

*Hellwege*, 103 F. Supp. 3d at 1306 .................................................................11

*Lee v. Bankers Trust Co.*,
   166 F.3d 540 (2d Cir. 1999) ........................................................................15

*Means v. U.S. Conf. of Catholic Bishops*,
   2015 WL 3970046 (W.D. Mich. June 30, 2015) .........................................11

*Mendoza v. Martell*,
   No. 2016–6–160 (Ill. 17th Jud. Cir. June 8, 2016) ...................................11

*Minton v. Dignity Health*,
   No. 17-558259 (Cal. Super. Ct. Apr. 19, 2017) .........................................11

*Moore v. Consol. Edison Co. of New York*,
   409 F.3d 506 (2d Cir. 2005) ..........................................................................4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .......................................................................................21

*Nat'l Cable & Telecomms. Ass'n v. FCC*,
   567 F.3d 659 (D.C. Cir. 2009) ...............................................................22, 26

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) .....................................................................................27

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018) .................................................................................18

*Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.*,
   534 F. Supp. 2d 16 (D.D.C. 2008) ...............................................................12

*Nat. Res. Def. Council v. Evans*,
   254 F. Supp. 2d 434 (S.D.N.Y. 2003) .........................................................23

*Oceana, Inc. v. Evans*,
   384 F. Supp. 2d 203 (D.D.C. 2005), *order clarified*, 389 F. Supp. 2d 4
   (D.D.C. 2005) ...................................................................................................23

*Pub. Citizen, Inc. v. NHTSA*,
   374 F.3d 1251 (D.C. Cir. 2004)........................................................................21

*Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*,
   31 F. Supp. 3d 571 (S.D.N.Y. 2014)...........................................................12, 13

*Roe v. Wade*,
   410 U.S. 113 (1973).........................................................................................18

*Roman Catholic Diocese of Albany v. Vullo*,
   No. 02070-16 (N.Y. Albany County S. Ct. May 4, 2016)....................................11

*Rubin v. Garvin*,
   544 F.3d 461 (2d Cir. 2008)...............................................................................30

*Rust v. Sullivan*,
   500 U.S. 173 (1991).........................................................................................20

*Sebelius v. Cloer*,
   569 U.S. 369 (2013).........................................................................................15

*Simmons v. Blodgett*,
   110 F.3d 39 (9th Cir. 1997), *as amended* (Apr. 18, 1997)....................................10

*South Dakota v. Dole*,
   483 U.S. 203 (1987).........................................................................................27

*State by & through Becerra v. Azar*,
   928 F.3d 1153 (9th Cir. 2019) .....................................................................20, 21

*Stringfellow Mem'l Hosp. v. Azar*,
   317 F. Supp. 3d 168 (D.D.C. 2018) ...................................................................26

*Estate of Thornton v. Caldor, Inc.*,
   472 U.S. 703 (1985).....................................................................................28, 29

*United States v. Powers*,
   2009 WL 2601103 (W.D.N.Y. Aug. 21, 2009), *aff'd*, 432 F. App'x 16 (2d Cir.
   2011) ..............................................................................................................30

*United States v. Wyatt*,
   408 F.3d 1257 (9th Cir. 2005) ...........................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .........................................................................................................4, 5, 10

*Zorach v. Clauson*,
   343 U.S. 306 (1952) .................................................................................................................29

**Statutes**

5 U.S.C. § 706(2)(C) ...........................................................................................................................13

42 U.S.C. § 238n(c)(2) .......................................................................................................................13

42 U.S.C. § 300a-6 .............................................................................................................................20

42 U.S.C. § 1395dd(a) ........................................................................................................................19

42 U.S.C. § 1395dd(b)(1)(A) ..............................................................................................................19

42 U.S.C. § 18023 ...............................................................................................................................17

42 U.S.C. § 18023(a)(1) ......................................................................................................................17

42 U.S.C. § 18023(b)(1)(A) ................................................................................................................17

42 U.S.C. § 18023(b)(4) ......................................................................................................................17

42 U.S.C. § 18113 ...............................................................................................................................17

42 U.S.C. § 18114 .........................................................................................................................17, 19

565 U.S. 171 (2012) ............................................................................................................................29

132 Stat. 2981 .....................................................................................................................................28

**Other Authorities**

119 Cong. Rec. 9597 (Mar. 27, 1973) ................................................................................................15

AMA Code of Medical Ethics § 2.1.1 .................................................................................................18

*Matthew* 22:39 (English Standard Version) ..........................................................................................7

National Catholic Bioethics Center, *Catholic Health Care Ethics, A Manual for
   Practitioners* 123 (Furton et al., eds., 2d ed. 2009) .......................................................................8, 18

Pontifical Council for Pastoral Assistance to Health Care Workers, *New Charter
   for Health Care Workers* ¶ 57 (2016),
   https://www.ncbcenter.org/resources/church-documents-bioethics/new-
   charter-health-care-workers/ ...........................................................................................................8

Robert Orr and Fred Chay, *Medical Ethics: A Primer For Students* (2000) .................................18

**Regulations**

*Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*,
   84 Fed. Reg. 23,170 (May 21, 2018) ............................................................................. *passim*

## PRELIMINARY STATEMENT

Since the Founding of our Nation, the right of conscience and religious liberty have enjoyed robust protections under the Constitution and federal law.  Consistent with that tradition, Congress has enacted numerous conscience and anti-discrimination laws, particularly in the field of healthcare.  These laws—including the Church, Coats-Snowe, and Weldon Amendments—require any State that takes federal funds to guard the conscience rights of healthcare professionals so they can practice their profession without violating their sincerely held beliefs.

But rights on paper are not always rights in practice.  All too often, States, local governments, and private employers have violated federal conscience laws by pressuring healthcare professionals to act against their religious beliefs.  As a result, thousands of doctors, nurses, and other professionals have suffered discrimination on account of their religious beliefs.  Those professionals include Intervenor Dr. Regina Frost and other members of Intervenor Christian Medical and Dental Association (CMDA).

To ensure that religious healthcare professionals will not be forced to choose between practicing medicine and adhering to their beliefs, the Department of Health & Human Services ("HHS" or the "Department") promulgated the regulation at issue here:  *Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 84 Fed. Reg. 23,170 (May 21, 2018) ("Conscience Rule," or "Rule").  The Rule implements and enforces federal laws protecting freedom of conscience by requiring employers to certify their compliance with federal law and providing an enforcement mechanism to protect religious healthcare professionals from discrimination.

Despite having taken federal funds for decades subject to the conditions imposed by federal conscience laws, several States and local governments ("State Plaintiffs") now claim that the

Conscience Rule implementing and enforcing those laws violates the Administrative Procedure Act ("APA"), the Spending Clause, the Establishment Clause, the Due Process Clause, and the Separation of Powers.  The State Plaintiffs are now joined by Planned Parenthood Federation of America and National Family Planning and Reproductive Health Association ("Private Plaintiffs").

Plaintiffs' claims are meritless.  The Conscience Rule fully complies with the APA, and the Rule's conscience protections do not violate any other law or constitutional provision.  The Rule simply enforces existing federal conscience requirements with which Plaintiffs should have been complying for decades.  The Court should thus grant summary judgment to Defendants and Intervenors and deny Plaintiffs' requests for preliminary injunctive relief.

Injunctive relief is especially unwarranted because Plaintiffs have not come close to showing that the Conscience Rule will cause them irreparable harm or that enjoining the Rule is in the public interest.  Plaintiffs speculate about future harm that may result if healthcare professionals sandbag their employers by failing to disclose religious objections until the last moment, or discover heretofore unknown religious objections to providing routine medical care. But such speculation cannot justify a preliminary injunction.  As for the public interest, if anything, the Conscience Rule likely *expands* access to healthcare by removing barriers to the practice of medicine.  And it unquestionably protects the fundamental right to conscience our country has recognized and zealously guarded for more than two hundred years.

## FACTUAL BACKGROUND

Since its founding in 1931, CMDA has educated and equipped its members—including Dr. Frost—to glorify God by serving with professional excellence as witnesses of Christ's love and compassion to all people.  Declaration of Dr. David Stevens ("Stevens Decl.") ¶ 6.  CMDA affirms

that it is the duty of Christian healthcare professionals to treat *every* patient with compassion, "regardless of sexual orientation, gender identification, or family makeup." *Id.* ¶ 11.[1] CMDA holds, however, that performing certain *procedures*—including abortion and euthanasia—is incompatible with the Christian faith. *Id.* ¶¶ 17-18. Some CMDA members have religious objections to other procedures, including sterilization, artificial contraception, and sex reassignment surgery. *Id.* ¶ 19; *see also* Declaration of Dr. Regina Frost ("Frost Decl.") ¶ 10.

To protect religious healthcare providers' ability to practice medicine in accord with their religious beliefs and medical judgment, Congress has repeatedly legislated conscience protections—including the Church Amendment, Coats-Snowe Amendment, Weldon Amendment, and the Patient Protection and Affordable Care Act—prohibiting recipients of federal funds from discriminating against healthcare providers who have religious objections to particular procedures, including abortion, sterilization, and euthanasia.

To ensure compliance with these federal conscience protections, HHS promulgated the Conscience Rule on May 21, 2019, recognizing that "[t]he freedoms of conscience and of religious exercise are foundational rights protected by the Constitution and numerous Federal statutes." 84 Fed. Reg. at 23,170. The Rule's "substantive requirements" reflect existing federal statutes and regulations, often in "laws [that] have existed for decades." 84 Fed. Reg. at 23,222. The Rule also encourages recipients of federal funds to notify protected individuals—including employees, job applicants, and students—of their conscience rights. *See id.* 23,270 (§ 88.5). Most importantly, the Rule requires these entities to certify their compliance with these laws to HHS, and provides the Office of Civil Rights ("OCR") with tools for enforcing compliance. *See id.* 23,269-72.

---

[1] *See also* Declaration of Erin Norman ("Norman Decl.") ¶ 13 (religious healthcare professionals nearly unanimously agree with the statement, "I care for all patients in need, regardless of sexual orientation, gender identification, or family makeup, with sensitivity and compassion, even when I cannot validate their choices.").

In promulgating the Conscience Rule, the Department considered many of the concerns raised by Plaintiffs here during the notice-and-comment process. The Conscience Rule thoughtfully responds to these concerns and describes the changes the Department made to the proposed rule to accommodate them. *See* 84 Fed. Reg. at 23,180-226, 23,246, 23,253-54. Notwithstanding these efforts, Plaintiffs seek to invalidate the Rule, and ask for a preliminary injunction.

## ARGUMENT

The Court should deny Plaintiffs' requests for a preliminary injunction because they cannot satisfy any of the requirements for such extraordinary relief. The Court should also grant summary judgment in favor of Intervenors and the Federal Defendants because the Conscience Rule does not violate the APA, any other federal statute, or the Constitution.

## I.     The Court Should Deny Plaintiffs' Request for a Preliminary Injunction.

A preliminary injunction "is an extraordinary and drastic remedy," *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005), and requires "a clear showing that the plaintiff is entitled" to it, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The Court should deny Plaintiffs' request for this relief because they have failed to "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, [or] that an injunction is in the public interest." *Id.* at 20.

### A.     Plaintiffs Cannot Show a Likelihood of Success on the Merits

As Intervenors demonstrate in Part II, *infra*, HHS and Intervenors are entitled to summary judgment on all of Plaintiffs' claims. It necessarily follows that Plaintiffs cannot satisfy the less rigorous "likely to succeed" standard.

4

**B.       Plaintiffs Will Not Suffer Irreparable Harm.**

Preliminary relief cannot be awarded if it is "based only on a *possibility* of irreparable harm." *Id.* at 22 (emphasis added).  The alleged injury must be "neither remote nor speculative, but actual and imminent." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  Remote, speculative predictions are the best Plaintiffs can offer—that is not enough.

To hear Plaintiffs tell it, the Conscience Rule thrusts them upon the "horns of [a] dilemma"—either incur massive compliance costs while "threatening patient health," or disregard the Rule and risk the loss of "billions of dollars in health care funds."  States Mot. 10-11; *see also* Private Mot. 43-45.  But Plaintiffs have failed to demonstrate any "actual or imminent" threat to patient health—because there is none—and alleged "[i]njury resulting from attempted compliance with government regulation ordinarily is not irreparable harm," *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005), especially when the regulation merely enforces longstanding federal statutes that Plaintiffs should have been complying with for decades.  Plaintiffs improperly attempt to manufacture irreparable harm by inventing religious beliefs that no one asserts, to create conundrums that do not exist, to eventually arrive at speculative injury that *might* someday occur.  That is not the stuff of irreparable harm.

*Plaintiffs' Alleged Harms Are Illusory.*   Plaintiffs speculate that "drivers, pilots, and EMTs"—whose job "is to keep a patient alive en route to a hospital"—may refuse to transport sick or injured patients because of some religious objection Plaintiffs never identify.  States Mot. 19.  Not surprisingly, Plaintiffs do not point to a single instance in which an EMT helicopter pilot or ambulance driver has *ever* refused to transport a patient because of a religious objection to a specific medical procedure.  Nor have they shown that anyone has ever sought such an accommodation under any of the federal statutes that have protected conscience rights for decades.

5

Plaintiffs also vaguely assert that the Conscience Rule will irreparably harm "states with large rural areas"—such as Hawaii—because of the supposed "risk that an employee may object to providing care without notice." States Mot. 20. But again, Plaintiffs have not identified any real-world examples (presumably because they cannot). Plaintiffs further speculate that the Conscience Rule may interfere with family members' ability to "remov[e] life-sustaining treatment, like extubating a terminally-ill patient," because a physician or nurse may object at the last minute to removing the respirator. States Mot. 21. Plaintiffs contend this will require them to incur the expense of "double-staffing" their hospitals to ensure that someone is available to remove life support. *Id*. But these decisions are typically made in consultation with an attending physician (not in an emergency setting), and Plaintiffs offer no evidence that religious healthcare professionals conceal their religious objections until the last minute. That is certainly not Dr. Frost's practice. Frost Decl. ¶ 12. If anything, the Conscience Rule removes the pressure that religious objectors might feel to hide their beliefs, thus making accommodation practicable.

The States have also submitted a raft of declarations with even more speculation about how the Rule might harm patients. This parade of horribles includes specious assertions that:

- "[U]nder the Final Rule, an employee could refuse to . . . provide janitorial services to an LGBTQIA+ person." States Ex. 44 ¶ 12.

- "[A] health care professional could refuse to test or treat based on a personal bias and judgment call against a pregnant mother." States Ex. 48 ¶ 38.

- A doctor may "object[] to performing emergency surgery on a woman bleeding out after an abortion, sterilization, or some other procedure or post-partum event[.]" States Ex. 48 ¶ 71.

- "One also can reasonably anticipate moral objections to providing health care services to women suffering from addictions to drugs or alcohol or who have been charged with a crime." States Ex. 39 ¶ 19.

- "[U]nder the Final Rule, any employee may object . . . to providing any of the innumerable mental health services . . . to the persons with mental health disorders." States Ex. 44 ¶ 12.

- The "Rule would allow medical personnel to discriminate at will and refuse service once they find out that a person may be . . . part of a particular protected class."  States Ex. 31 ¶ 24.

- The Rule would allow "[p]ediatricians [to] refus[e] to treat the children of same-gender couples," allow EMTs to "refus[e] to transport or provide emergency care to minority patients," and allow "[m]edical professionals [to] deny[] care to individuals who have had abortions[.]"  States Ex. 28 ¶ 32.

Plaintiffs have not even attempted to explain which provisions of the Conscience Rule would protect a healthcare professional who declines to clean an LGBTQIA+ person's sheets, refuses psychiatric help to a bipolar patient, or withholds healthcare from a drug-addicted woman. That is because the Rule does *not* protect such invidious discrimination.  It protects healthcare professionals who have religious objections to particular *procedures*—most importantly, abortion and euthanasia—not to particular *patients*.  Plaintiffs pejoratively equate rights of conscience, which the Rule protects, with "personal bias," which it does not.

Plaintiffs' unspoken (and unsupported) assumptions—that religious healthcare professionals will respond to the Rule by discriminating against minors, unmarried persons, those with HIV, those suffering from addiction, or patients of a different race—evidence a profound misunderstanding of the role that religious belief plays in the lives of Christian healthcare professionals committed to fulfilling Christ's command to "love your neighbor as yourself." *Matthew* 22:39 (English Standard Version); *see* Stevens Decl. ¶¶ 6, 12; Frost Decl. ¶¶ 8-9.

Because they are "guided by Christ, who assisted all who sought his help regardless of sexual or social status," Christian healthcare professionals "care for all patients in need, regardless of sexual orientation, gender identification, or family makeup, with sensitivity and compassion." Stevens Decl. ¶ 11; *see also* 84 Fed. Reg. at 23,248.  Christian doctors and nurses serve across the country in clinics that focus on the "neediest members of society, including the uninsured,

immigrants, and children." Stevens Decl. ¶ 14. They travel to remote areas throughout the world to serve patients in need, often risking their personal health and safety to do so. *Id*. ¶ 4. Indeed, CMDA instructs its members to "care for HIV-infected persons" to "the same degree" as for "patients with other life-threatening diseases"—"even at the risk of [the caregivers'] own lives." *Id*. ¶ 12. In short, Plaintiffs' suggestion that religious healthcare professionals will invoke the Conscience Rule to recklessly endanger or abandon their patients has no basis in reality.

   ***Plaintiffs Manufacture Fictional Religious Beliefs.*** In addition to falsely accusing religious healthcare providers of rank bigotry, Plaintiffs invoke religious "beliefs" that few (if any) religious believers have ever espoused. For example, Plaintiffs assert that a patient coming to the emergency room with an ectopic pregnancy might be left untreated due to supposed religious objections. States Mot. 18; *cf.* Private Mot. 33. But their source for this assertion—a single New York physician—merely asserts, without reference to any source, that "some individuals . . . believe such treatment amounts to the termination of a pregnancy." States Ex. 29 ¶ 10. But as even he admits, "the prevailing medical understanding," shared by CMDA's members, "is that medical treatment to address an ectopic pregnancy does not constitute an 'abortion.'" *Id.*; Frost Decl. ¶¶ 14-15; Stevens Decl. ¶ 20.

   Catholic ethicists have also approved "morally licit" methods of removing ectopic pregnancies. The National Catholic Bioethics Center, *Catholic Health Care Ethics, A Manual for Practitioners* 123 (Furton et al., eds., 2d ed. 2009).[2] CMDA is unaware of any medical professionals who hold Plaintiffs' imagined belief, and has reviewed the statements of faith of other

---

   [2] The Pontifical Council, established to clarify the Catholic Church's beliefs regarding health care, explains that "interventions aimed exclusively at preserving the life and health of the woman" which incidentally "result in [an] embryo's demise" can be permissible because "[t]he woman may face a serious risk to her life or suffer consequences for her future fertility, while the embryo as a rule cannot survive." Pontifical Council for Pastoral Assistance to Health Care Workers, *New Charter for Health Care Workers* ¶ 57 (2016), https://www.ncbcenter.org/resources/church-documents-bioethics/new-charter-health-care-workers/.

major denominations and confirmed that other religious traditions allow healthcare providers to treat ectopic pregnancies because of the threat they pose to the mother's life and the impossibility of saving the pregnancy. Stevens Decl. ¶¶ 20, 22.[3] Plaintiffs cannot establish irreparable harm based on a single physician's speculation about what "some" people believe.

Plaintiffs similarly assert that "some consider" treatment for a miscarriage to be "abortion," but their source for this statement was simply a list of the staff typically involved in treating a miscarriage. States Ex. 5 ¶¶ 26-29. Neither Dr. Frost, a Christian OBGYN, nor CMDA has ever taken the position that treating a miscarriage is morally wrong. Stevens Decl. ¶ 21; Frost Decl. ¶ 16. Plaintiffs fail to identify a single faith tradition that teaches that providing care for a woman going through a miscarriage is religiously objectionable. Nor is CMDA aware of any such tradition. Stevens Decl. ¶ 24. Plaintiffs have thus failed to show that *patients* will be actually or imminently harmed by the Conscience Rule.

**The Rule's definitions do not harm Plaintiffs.** Plaintiffs point to three definitions in the Conscience Rule that they allege will "dramatically expand" conscience protections and "require[e] extreme departures from existing practice": "discrimination," "health care entity," and "assist in the performance." States Mot. 16; Private Mot. 27-31. Plaintiffs assert that these new definitions will cause significant understaffing at times of need or require institutions to expend more money on staffing. But this argument assumes that medical professionals protected by the Conscience Rule would, absent the Rule, subvert their consciences and perform abortions or other procedures that violate their religious beliefs. *See* 84 Fed. Reg. at 23,252. But it is much more likely, as HHS concluded, that religious healthcare professionals confronted with increasing attacks on their conscience rights will leave the profession or their specific practice area. *Id.* At

---

[3] CMDA has learned that its view is broadly consistent with the religious beliefs of groups representing well over half of Americans. *See* Stevens Decl. ¶¶ 21-22.

minimum, this ambiguity precludes Plaintiffs from establishing irreparable harm. *See Simmons v. Blodgett*, 110 F.3d 39, 42 (9th Cir. 1997), *as amended* (Apr. 18, 1997) (when "the relevant evidence leaves a trier of fact in 'equipoise,' the party with the burden of proof loses."). In all events, the Rule's definitions are entirely consistent with the statutory requirements, which Plaintiffs have ostensibly abided by for years. *See infra* II.A.2.

      **C.**    **A Preliminary Injunction Is Not In The Public Interest.**

      Courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. They must also determine "the public consequences in employing the extraordinary remedy of injunction." *Id.* Here, Plaintiffs have failed to show that the public interest supports an injunction because, in addition to overstating their alleged harms, they ignore the harm an injunction would cause to the *beneficiaries* of the Rule, including Dr. Frost, the nearly 20,000 members of CMDA, and other religious healthcare professionals. *See Action for Bos. Cmty. Dev., Inc. v. Shalala*, 983 F. Supp. 222, 244 (D. Mass. 1997), *aff'd*, 136 F.3d 29 (1st Cir. 1998) (balance of equities and public interest weigh against enjoining government program where injunction would harm program's "intended beneficiaries").

      The vast majority of CMDA's members, including Dr. Frost, object on religious grounds to performing, assisting, or facilitating certain procedures, such as abortion and euthanasia. As CMDA explained during the rulemaking, many of its members have suffered adverse employment consequences for refusing to participate in these procedures. *See* 84 Fed. Reg. at 23,175. Without conscience protections, many CMDA members may be compelled to leave the practice of medicine altogether. *Id.*; *see also id.* at 23,181 n.48. The Department identified numerous complaints alleging that religious healthcare professionals were targeted for their beliefs or disciplined for refusing to perform or assist in the performance of procedures that violate their consciences. 84

Fed. Reg. at 23,176-79.[4]  The Department also recognized that certain advocacy organizations, taking advantage of the lack of robust enforcement of federal conscience laws, have sued *to compel* religious healthcare professionals to perform abortions and sterilizations.  84 Fed. Reg. at 23,178.

HHS issued the Conscience Rule to prevent these types of violations from continuing and to protect the religious liberty of healthcare professionals.  *See* 84 Fed. Reg. at 23,170, 23,175. "Protecting religious liberty and conscience is obviously in the public interest."  *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018).  HHS concluded that "a lack of conscience protections diminishes the availability of qualified health care providers," and that the Final Rule would "remove barriers to the entry of certain health professionals" and "delay the exit of certain health professionals from the field, by reducing discrimination or coercion."  84 Fed. Reg. at 23,246.

A recent survey conducted in partnership with CMDA confirms that religious healthcare professionals continue to face discrimination and harassment on account of their religious beliefs and need the robust protections afforded by the Conscience Rule.  Nearly a quarter of respondents have personally been discriminated against in their profession because of their religious beliefs, and another 42% have seen or known someone who has suffered discrimination because of their moral or religious beliefs.  Norman Decl. ¶ 15.  More than a third of respondents have been forced to participate in procedures that violated their consciences, or been punished for declining to perform such a procedure.  *Id.* ¶ 17.  And more than three quarters of respondents believe that discrimination against healthcare professionals on account of religious belief has increased over the

---

[4]  *See, e.g.*, *Roman Catholic Diocese of Albany v. Vullo*, No. 02070-16 (N.Y. Albany County S. Ct. May 4, 2016); *Means v. U.S. Conf. of Catholic Bishops*, 2015 WL 3970046 (W.D. Mich. June 30, 2015); *ACLU v. Trinity Health Corp.*, 178 F. Supp. 3d 614 (E.D. Mich. 2016); *Minton v. Dignity Health*, No. 17-558259 (Cal. Super. Ct. Apr. 19, 2017); *Chamorro v. Dignity Health*, No. 15-549626 (Cal. Super. Ct. Dec. 28, 2015); *Mendoza v. Martell*, No. 2016–6–160 (Ill. 17th Jud. Cir. June 8, 2016); *Cenzon-DeCarlo v. Mt. Sinai Hosp.*, 626 F.3d 695, 696 (2d Cir. 2010); *Hellwege v. Tampa Family Health Ctrs.*, 103 F. Supp. 3d 1303, 1306 (M.D. Fla. 2015); *see also* 84 Fed. Reg. at 23,176; Compl., *Danquah v. University of Medicine and Dentistry of New Jersey*, No. 2:11-cv-6377 (D.N.J. Oct. 31, 2011) (alleging that public hospital's policy required nurses to assist in abortions).

course of their careers. *Id.* ¶ 16. More than 90% of respondents "would rather stop practicing medicine altogether than be forced to violate [their] conscience[s]," *id.* ¶ 11, and the same percentage believe that "[a]ll healthcare professionals have the right to decline to participate in situations or procedures that they believe to be morally wrong and/or harmful to the patient or others," *id.* ¶ 12. Not surprisingly then, 97% of respondents think that conscience protections are necessary in healthcare. *Id.* ¶ 10.

The Conscience Rule ensures that healthcare providers are not put to the painful choice of either suffering discrimination (and possibly termination) for following their convictions, or participating in procedures that violate their sincerely held religious beliefs. Because enjoining the Rule would significantly injure the "fundamentally important" conscience rights of religious healthcare professionals, *Azar,* 911 F.3d at 582, an injunction is not in the public interest.

Plaintiffs do not even mention the harms an injunction would inflict on the beneficiaries of the Rule. Instead, they assert only that the "Department will suffer no harm" because "the relevant federal statutes will continue to apply." States Mot. 24. But the Department promulgated the Rule to "ensure" that these statutes, which states and municipalities have been violating, are "appropriately enforce[d]." 84 Fed. Reg. at 23,175. "[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct an agency to develop and enforce." *Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008).

## II.    Defendants and Intervenors Are Entitled to Summary Judgment.

"Summary judgment is appropriate" here because, "construing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and [CMDA] is entitled to judgment as a matter of law" because the Conscience Rule does not violate the APA, any other federal statute, or the Constitution. *Residents for Sane Trash Sols., Inc. v. U.S.*

*Army Corps of Eng'rs*, 31 F. Supp. 3d 571, 586 (S.D.N.Y. 2014) (citation omitted) ("[W]hether an agency action is supported by the administrative record and consistent with the APA standard of review is decided as a matter of law." (quotation omitted)).

### A.   The Conscience Rule Does Not Exceed Statutory Authorization.

The APA provides that when agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," it is unlawful and must be set aside.  5 U.S.C. § 706(2)(C).  Plaintiffs claim that the Conscience Rule violates the APA because it "redefine[es]" three terms "far beyond what Congress has permitted."  States Mot. 25; *see also* States Compl. ¶¶ 159-166; Planned Parenthood Compl. ¶ 133; National Family Compl. ¶ 148.  Defendants are entitled to summary judgment on that claim because all of the challenged definitions flow directly from the federal conscience statutes.

***Health Care Entity:***  Plaintiffs contend that the Conscience Rule violates the APA because the definition of "health care entity" the Rule adopts "[f]or purposes of the Coats-Snowe Amendment," 84 Fed. Reg. at 23,264, "includes nearly the entire health sector," States Mot. 26; *see also* States Compl. ¶ 162; National Family Compl. ¶ 150.  Plaintiffs assert that "Congress could not have intended the statute['s] text to include entire classes of entities distinct from those listed in the statutes."  States Mot. 26.  But the Coats-Snowe Amendment provides that "[t]he term 'health care entity' *includes* an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions."  42 U.S.C. § 238n(c)(2) (emphasis added).  As courts have often recognized, the term "includes" typically introduces a *non-exhaustive* list.[5]  The Department's decision to provide a more expansive list of health care

---

[5]   *See, e.g.*, *Cobell v. Norton*, 240 F.3d 1081, 1100 (D.C. Cir. 2001) ("It is hornbook law that the use of the word 'including' indicates that the specified list . . . that follows is illustrative, not exclusive."); *United States v. Wyatt*, 408 F.3d 1257, 1261 (9th Cir. 2005) ("The use of the word 'includes' suggests the list is non-exhaustive rather than exclusive.").

entities does not conflict with the broad definition in the statute.

Moreover, as the Department explained in response to comments raising these concerns, the relevant statutes have catch-all provisions.  *See* 84 Fed. Reg. at 23,194.  The Coats-Snowe Amendment has a catch-all phrase for "any other program of training in the health professions," and the Weldon Amendment and ACA have catch-all provisions for "other health care professional[s]" and "any other kind of health care facility, organization, or plan."  *Id.*  The Rule's definition of "health care entity" is thus entirely consistent with the governing statutes.  *See also* 84 Fed. Reg. at 23,194-95.

***Assist in the Performance:***   Plaintiffs assert that the definition of "assist in the performance"[6] goes "far beyond what Congress provided."  States Mot. 27.  It does not.

As Plaintiffs concede, none of the statutes implemented by the Conscience Rule defines the term "assist in the performance."  States Mot. 26-27.  Plaintiffs nevertheless contend that the Rule's inclusion of "counseling" and "referrals" as protected actions is improper because the Church, Coats-Snowe, and Weldon Amendments "prohibit discrimination only on the basis of a refusal to 'perform' or 'assist in the performance' of a particular procedure."  States Mot. 27.  HHS reasonably concluded, however, that counseling and referrals "are common and well understood forms of assistance that materially help people reach desired medical ends."  84 Fed. Reg. at 23,188.

Plaintiffs also argue the Rule's definition is somehow "contrary" to the "common meaning" of the word "assist."  States Mot. 27; Private Mot. 28.  But the definition they provide—

---

6   The Rule defines "assist in the performance" to mean "tak[ing] an action that has a specific, reasonable, and articulable connection to furthering a procedure or a part of a health service program or research activity undertaken by or with another person or entity.  This may include counseling, referral, training, or otherwise making arrangement for the procedure or a part of a health service program or research activity, depending on whether aid is provided by such actions."  84 Fed. Reg. at 23,263.

"to give support or aid"—hardly forecloses the Department's definition.  The term "support" is just as elastic as the term "assist," and this Court should not grant the extraordinary remedy of a preliminary injunction based on mere wordplay.

Plaintiffs finally resort to legislative history, asserting that Senator Church's statements on the Senate floor foreclose the Department's definition of "assist in the performance."  States Mot. 28.  But Plaintiffs misrepresent the legislative record.  The statement Plaintiffs quote responded to a concern that the proposed amendment would allow an objecting doctor or a nurse to prevent a patient from obtaining an abortion or sterilization even if that doctor or nurse "had no responsibility, directly or indirectly, with regard to the performance of that procedure."  119 Cong. Rec. 9597 (Mar. 27, 1973) (statement of Senator Long); *see id.* (cautioning that the amendment could be understood "to say that where one seeks a sterilization procedure or an abortion, it could not be performed because there might be a nurse or an attendant *somewhere in the hospital* who objected to it.") (statement of Senator Long) (emphasis added).  Senator Church was merely clarifying that the proposed amendment would not give religious healthcare professionals the power to veto procedures to which they objected.  Instead, it gave them the right to personally opt out.  The Rule's definition of "assist in the performance" is entirely consistent with Senator Church's views.  *See also* 84 Fed. Reg. at 23,192 (explaining that the Rule does not prevent an employer from "taking steps to use alternate staff or methods to provide for or further the objected-to conduct").

In all events, "statutory terms are generally interpreted in accordance with their ordinary meaning," *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013), and because "the statutory language is unambiguous," there is no need to consult legislative history to determine the meaning of the word "assist."  *Id.* at 380; *see also Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999).

***Discriminate or Discrimination:***   Plaintiffs contend that the Conscience Rule's definition of "discriminates" "exceeds the boundaries set in the statute."  States Mot. 28-29; *see also* Private Mot. 27.  But they concede that none of the statutes the Rule implements define the term.  States Mot. 28.  Plaintiffs' proposed definition—the "failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored," States Mot. 29—is consistent with the Rule's definition, which specifies the types of adverse conduct that cannot be imposed on account of a person's religious beliefs.

Plaintiffs contend that the definition "appears to require that Plaintiffs' health care entities hire someone who cannot deliver health care services that are critical to the entity's mission." States Mot. 29.  But the Rule specifically *allows* an employer to ask a prospective employee about his or her religious objections if there is a "persuasive justification" for the question.  84 Fed. Reg. at 23,263.  If having certain employees perform elective abortions is truly "critical" to an entity's "mission," the employer would have a "persuasive justification" for asking prospective employees whether they have a relevant religious objection.[7]

Plaintiffs are also wrong that the Rule's definition of "discriminate" violates the Establishment Clause because it is too inflexible.  *See infra* at 29.  The Rule expressly allows employers to offer "effective accommodations," 84 Fed. Reg. at 23,263, and HHS explicitly "recognize[d] that staffing arrangements can be acceptable accommodations in certain circumstances."  84 Fed Reg. at 23,191 (the definition of "discriminate" "recognizes the effective and timely accommodation of an employee (which may include non-retaliatory staff rotations) as not constituting discrimination").  Far from "prohibit[ing]" accommodations, States Mot. 29, the

---

[7]  The Rule also provides an exception to the general once-a-year limit on inquiring about religious beliefs where "there is a reasonable likelihood that the protected entity or individual may be asked in good faith to refer for, participate in, or assist in the performance of such conduct."  84 Fed. Reg. at 23,191.

Department has promised to "take into account the degree to which an entity ha[s] implemented policies to provide effective accommodations" to religious healthcare professionals when "determining whether any entity has engaged in discriminatory action with respect to any complaint or compliance review." 84 Fed. Reg. at 23,263. Again, Plaintiffs have failed to show that the Conscience Rule exceeds the Department's statutory authorization.

### B.   The Conscience Rule Is in Accordance with Law.

The Conscience Rule allows religious healthcare professionals to object to performing procedures that violate their religious beliefs. It also allows them to object to "counseling" about those procedures and "referr[ing]" patients for those procedures if "aid is provided by such actions." 84 Fed. Reg. at 23,263. Plaintiffs claim that these counseling and referral provisions violate the ACA, state disclosure laws, and the Emergency Medical Treatment and Labor Act ("EMTALA"). States Compl. ¶¶ 167-171; Planned Parenthood Compl. ¶¶ 134-136; National Family Compl. ¶¶ 149, 151-152, 160-162. But they are wrong on all counts.

The ACA prohibits HHS from promulgating regulations that "violate[] the principals of informed consent and the ethical standards of health care professionals." 42 U.S.C. § 18114. But the ACA also prohibits health plans offered through a healthcare exchange from "discriminat[ing] against any individual health care provider or health care facility because of the facility or provider's unwillingness to provide, pay for, provide coverage of, *or refer for* abortions." 84 Fed. Reg. at 23,172 (emphasis added); *see also* 42 U.S.C. §§ 18113, 18023(a)(1), (b)(1)(A), (b)(4). And it expressly provides that "[n]othing in this Act shall be construed to have any effect on Federal laws regarding (i) conscience protection; (ii) willingness or refusal to provide abortion; and (iii) discrimination on the basis of the willingness or refusal to provide, pay for, cover, *or refer for* abortion or to provide or participate in training to provide abortion." 42 U.S.C. § 18023 (emphasis

added).  It is clear that Congress did not intend the ACA's provision on informed consent to over-ride conscience protections or require healthcare professionals to refer for abortions.

At any rate, the Rule's counseling and referral provisions do not implicate ethical guide-lines involving informed consent.  As the American Medical Association ("AMA") recognizes, informed consent is required before a patient undergoes a "specific medical intervention."  AMA Code of Medical Ethics § 2.1.1; *see Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (informed-consent discussions are "tied to a procedure").  The Rule's counsel-ing and referral provisions—which allow a healthcare professional to refrain from counseling a patient about an abortion procedure—have nothing to do with obtaining a patient's informed con-sent to undergoing a procedure.

Plaintiffs contend that the Rule contravenes medical ethics standards by allowing religious healthcare professionals to "refuse to provide information regarding lawful medical services"—by which they mean abortion and euthanasia.  States Mot. 30; *see also* Private Mot. 48-49.  In support, they cite the AMA Code of Ethics, which deems it "ethically unacceptable" to withhold infor-mation without the patient's knowledge.  States Mot. 30-31.  Even assuming they apply here, the AMA's guidelines are not federal law, or even the exclusive source of ethical guidelines.  CMDA, for example, publishes its own guide on medical ethics and adheres to the Biblical Model of Med-ical Ethics.  Stevens Decl. ¶ 8; Robert Orr and Fred Chay, *Medical Ethics: A Primer For Students* (2000); *see also Catholic Health Care Ethics*.  Not too long ago, even the AMA agreed that no "physician, hospital, []or hospital personnel shall be required to perform *any act* violative of per-sonally-held moral principles."  *Roe v. Wade*, 410 U.S. 113, 143 n.38 (1973) (quoting AMA reso-lution) (emphasis added).  Far from violating the ACA, as Plaintiffs argue, the Conscience Rule

carries out the ACA's command by ensuring that religious healthcare professionals will not be forced to violate *their* ethical commitments.

Plaintiffs also argue that the referral and counseling provisions "violate[] the ACA Non-Interference Mandate" by creating "unreasonable barriers" to healthcare and interfering with "communications regarding a full range of treatment options." States Mot. 31-32 (citing 42 U.S.C. § 18114); Private Mot. 37-38 (same). But the Conscience Rule expressly permits providers to "inform the public of the availability of alternate staff or methods to provide or further the objected-to conduct." 84 Fed. Reg. at 23,263. Nothing in the ACA suggests that Congress meant to repeal long-standing conscience protections explicitly provided in the Church, Coats-Snow and Weldon Amendments. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (strong presumption that "repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute.").

Plaintiffs claim that the Rule "reduc[es] access to emergency care" in violation of EMTALA. States Mot. 34; States Compl. ¶ 171; *see also* Private Mot. 31-34. EMTALA requires hospitals with emergency departments to "provide for an appropriate medical screening . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). If an emergency medical condition does exist, EMTALA requires the hospital to provide further treatment "to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1)(A). Plaintiffs speculate that the Conscience Rule could authorize an EMT or paramedic to violate EMTALA by leaving a woman requiring emergency treatment for an ectopic pregnancy on the curb. States Mot. 33-34; Private Mot. 33. But as noted above, there is no reasonable basis to believe that any EMT or paramedic would have any religious objection to this type of transport. Moreover, as the Depart-

ment explained, the Rule does not allow EMTs to deny transportation services if they merely *suspect* "that an objected-to service or procedure may occur."  84 Fed. Reg. at 23,188 (observing that there must be a "specific and reasonable connection between the objected-to service or procedure and the act of transporting the patient").

Private Plaintiffs contend that the Rule is contrary to Title X because "Congress has repeatedly and expressly forbidden HHS from limiting Title X patients' access to medical information, using Title X funds for involuntary care or directive, non-neutral counseling when a patient is pregnant, or creating any other unreasonable barriers to patients' ability to make informed decisions about and gain timely access to medical care."  Private Mot. 34-35.[8]  But current regulations already *prohibit* Title X projects from providing referrals for, or engaging in activities that otherwise encourage or promote, abortion as a method of family planning.  *See* 84 Fed. Reg. at 7,788-90.  Indeed, in *Rust v. Sullivan*, 500 U.S. 173 (1991), the Court concluded that such regulations were authorized by Title X, not arbitrary and capricious, and consistent with the Constitution.  *Id.* at 183-203.  That holding is consistent with Title X's provision that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.  Plaintiffs omit any reference to this provision.

### C.    The Conscience Rule Is Not Arbitrary or Capricious.

The Department adopted the Conscience Rule to address the significant "confusion" created by the 2011 Rule "over what is and is not required under Federal conscience and anti-discrimination laws."  84 Fed. Reg. at 23,175.  After receiving and evaluating comments from a broad

---

[8]  Plaintiffs also contend that "[n]umerous courts have already recognized that withholding information about abortion from patients during the pregnancy options counseling process violates the appropriations mandate," Private Mot. 36, but those decisions were stayed by the Ninth Circuit and are currently the subject of *en banc* proceedings. *California v. Azar*, 927 F.3d 1068 (9th Cir. 2019), *reh'g en banc granted sub nom. State by & through Becerra v. Azar*, 927 F.3d 1045 (Mem) (9th Cir. 2019); *State by & through Becerra v. Azar*, 928 F.3d 1153 (Mem) (9th Cir. 2019) (en banc) (denying stay of the panel's stay of the district court injunctions).

range of perspectives, the Department made a reasoned decision to reinstate the substantive pro-visions of the 2008 Rule—including the certification requirement—and to define certain key terms clarifying the rights and obligations of those subject to the Rule.

Plaintiffs claim that the Department's decision should be set aside as arbitrary and capri-cious, States Compl. ¶¶ 175-182; Planned Parenthood Compl. ¶¶ 137-139; National Family Compl. ¶¶ 158-167, but "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[9] Although Plaintiffs complain that the Department overlooked their evidence and overstated the expected benefits of the rule, their "arbitrary-and-capricious challenge boils down to a policy disagreement" with HHS, which provides "no basis" for overturning the Rule. *Pub. Citizen, Inc. v. NHTSA*, 374 F.3d 1251, 1263 (D.C. Cir. 2004).

***The Rule's definitions are not arbitrary and capricious***.  Plaintiffs accuse HHS of "ex-pand[ing] the reach of the underlying statutes through new definitions of statutory terms" that supposedly run "counter to the evidence" and argue that such definitions "would dramatically un-dermine the safe and reliable provision of health care."  States Mot. 37; *see also* States Compl. ¶ 178; Private Mot. 17-19.  But Plaintiffs do not identify any evidence the Department overlooked, and the Department specifically responded to comments suggesting that the "Final Rule's expan-sion of the underlying statutes . . . would disrupt Plaintiffs' effective delivery of health care ser-vices to their residents."  States Mot. 37-38.

---

[9]  Plaintiffs rely heavily on the district court's decision in *California v. Azar*, 2019 WL 1877392 (N.D. Cal. 2019), one of several decisions that preliminarily enjoined a different HHS rule.  But the Ninth Circuit recently stayed those preliminary injunctions because the district courts there—like Plaintiffs here—"ignored HHS's explana-tions, reasoning, and predictions whenever they disagreed with the policy conclusions that flowed therefrom." *California v. Azar*, 927 F.3d 1068, 1079 (9th Cir. 2019).  The panel's decision has been vacated for en banc review, *State by & through Becerra*, 927 F.3d at 1046, but the stay remains in effect, *State by & through Becerra*, 928 F.3d at 1153.

As the Department explained, there was "no empirical data . . . on how previous legislative or regulatory actions to protect conscience rights have affected access to care or health outcomes." 84 Fed. Reg. at 23,180.  Nor was the Department "aware of data to determine how many [religious healthcare] providers would exercise their conscience rights and protections once this rule is finalized." *Id.*  And "[s]tudies have specifically found that there is insufficient evidence to conclude that conscience protections have negative effects on access to care." *Id.*  The Department was required only to "use[] the evidence before it to make a reasonable prediction about the likely present and future effects" of the Conscience Rule—which is precisely what it did. *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 669 (D.C. Cir. 2009).

**HHS's cost-benefit analysis was not arbitrary and capricious.**  As required by law, the Department calculated the number of entities subject to the Rule's regulations and projected the costs of complying with the Rule.  84 Fed. Reg. at 23,226-46.  The Department concluded that the Conscience Rule would "produce a net increase in access to health care, improve the quality of care that patients receive, and secure societal goods that extend beyond health care." *Id.* at 23,246; *see also id.* at 23,246-50 (describing benefits to healthcare professionals and organizations, patients, and society).  This analysis, based on the data at hand, fully satisfied the Department's obligation to consider "important aspect[s] of the problem" and offer a reasoned explanation. *State Farm*, 463 U.S. at 43.

Plaintiffs contend that the Department disregarded "extensive costs detailed in the record," and failed to "quantify the costs of the Final Rule on critical concerns, including the impact on access to care."  States Mot. 38; *see also* States Compl. ¶ 179; Private Mot. 19; National Family Compl. ¶¶ 166-167.  But the Department did not *ignore* the various comments alleging that the Rule "would drastically reduce access to health care, especially for vulnerable populations."  States

Mot. 39; *see also id.* 39 n.29 (citing comments).  Instead, the Department deemed the comments too speculative to use in a cost-benefit analysis.  84 Fed. Reg. at 23,182.

Although the Department recognized the dearth of data "establishing quantitatively how much the rule will increase and enhance access to health care services in underserved communities," it was also "not aware of data establishing the views of commenters who sa[id] the rule w[ould] reduce services in underserved communities."  *Id*.  It therefore concluded that it was "reasonable to agree with commenters who believe the rule will not decrease access to care, and may increase it."  *Id*.; *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 231 (D.D.C. 2005), *order clarified*, 389 F. Supp. 2d 4 (D.D.C. 2005) (when data is unquantifiable, the "attempt to equate an absence of data with a failure to analyze does not succeed."); *Nat. Res. Def. Council v. Evans*, 254 F. Supp. 2d 434, 443 (S.D.N.Y. 2003) (the "absence of data" is not the same as "a failure to analyze").  Plaintiffs may *disagree* with HHS's conclusions, but they cannot credibly claim it "declined to assess the Final Rule's impact on access to health care services."  States Mot. 39.[10]

Plaintiffs also contend that there was insufficient evidence in the record to support the Department's conclusion that "faith-based health care providers would likely limit the scope of their medical practice if conscience rules were not in place."  States Mot. 40.  The Department based that conclusion, in part, on a 2009 survey conducted by the Christian Medical Association finding that religious healthcare professionals would likely be forced to leave the practice of medicine

---

[10]  Plaintiffs contend that the Department ignored comments providing "specific evidence describing numerous methodological approaches the Department could have used to estimate the[] impacts" of the Rule on access to care.  States Mot. 40 n.30.  The single comment they cite, however, does not purport to provide a methodology. *See* ECF No. 43-58 (Comment Letter from Institute for Policy Integrity).  Nor have Plaintiffs identified comments providing "quantitative and qualitative evidence of the impact religious refusals have on access to care."  States Mot. 40 n.30.  The comments Plaintiffs cite provide little more than speculation about the Rule's potential costs. *See* States Mot. 39 n.29.

absent the protections afforded by the Conscience Rule.  84 Fed. Reg. at 23,246-47.  Private Plaintiffs label the survey "stale," and assert that it is "sheer speculation" rather than "logic and evidence," Private Motion 22-23, but they do not challenge the survey's methodology or its results.

HHS based its conclusion on other data as well.  For example, numerous commenters shared evidence of discrimination experienced by healthcare professionals and students based on their objecting to being forced to perform abortions.  84 Fed. Reg. at 23,228-29.  The Department looked to academic literature on the interplay between conscience rights and patients' quality of care, 84 Fed. Reg. at 23,246-47.  The Department also looked to an entirely different survey by a former Chair of Bioethics of the National Institutes of Health Center on patients' negative views on physicians who have helped other patients kill themselves.  84 Fed. Reg. at 23,253.  And it looked to studies that "found that there is insufficient evidence to conclude that conscience protections have negative effects on access to care."  84 Fed. Reg. at 23,251.

Plaintiffs criticize HHS for failing to determine whether the rescission of the 2008 rule in 2011 had "*any* effect on the scope of practice of faith-based professionals."  States Mot. 40; *see also* Private Mot. 22.  The Department did, however, document the increase in complaints filed over the past three years, and reasonably concluded that the concerns highlighted in the survey were materializing.  84 Fed. Reg. at 23,175-79.

Relying on the now-stayed district court opinion in *California*, Plaintiffs assert that the Department failed to cite evidence supporting its conclusion that the rule would "ensure knowledge of, compliance with, and enforcement of" the underlying statutes.  States Mot. 41 (citing *California*, 2019 WL 1877329, at *41); Private Mot. 22-23.  But the Department hardly needed to conduct a study to conclude that a rule requiring healthcare entities to certify their understanding of federal

conscience protections would have the effect of ensuring knowledge of federal conscience protections. And Plaintiffs' irreparable-harm allegation *presumes* that the enforcement provisions of the Conscience Rule will be more rigorous than the toothless mechanism used in the 2011 Rule.

Plaintiffs accuse HHS of understating the costs of compliance because the "number of covered entities" under the Conscience Rule are purportedly "far larger than the Department's estimate," given the "expansion of the term 'health care entity.'" States Mot. 41-42; *see also* States Compl. ¶ 179. But as the Department explained in response to the same comments Plaintiffs cite, "[t]he term 'health care entity' is used . . . to specify not which entity must comply with the statute, but which kinds of entities are *protected from discrimination*." 84 Fed. Reg. at 23,195 (emphasis added). "Thus, including an entity in the term 'health care entity' under those statutes does not expand or affect which governmental or non-governmental fund recipients must comply." *Id.*

Nor is there anything "fanciful" about the Department's estimate that covered entities or persons could "familiarize themselves with the Final Rule" and its compliance requirements in a short period of time. States Mot. 42. Even though the entire Rule is "113,000 words in length," States Mot. 42 n.34, the substantive provisions of the Rule comprise only a few sections, and any given employer is subject to only a handful of specific provisions.

In sum, Plaintiffs improperly seek to invalidate the Rule based on their disagreement with the Department's weighing of the evidence. But agency action is not arbitrary and capricious merely because a reasonable person could have reached a different conclusion—an agency need only "weigh[] competing views," select an approach "with adequate support in the record," and "intelligibly explain[] the reasons for making that choice." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 784 (2016). That is precisely what the Department did here.

***Plaintiffs' other APA challenges are similarly meritless.***  Plaintiffs contend that the Rule is arbitrary and capricious because HHS supposedly failed to acknowledge its abrupt policy reversal from the 2011 Rule.  Private Mot. at 20-21; States Mot. at 43-44; National Family Compl. ¶¶ 164-165.  But the Department extensively discussed the shortcomings of the 2011 Rule, concluding that it "created confusion over what is and is not required under Federal conscience and anti-discrimination laws."  84 Fed. Reg. at 23,175.  The Department did not abandon its "prior policy *sub silentio*," but rather offered "good reasons for [its] new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  That is all the APA requires.  *See Nat'l Cable & Telecomms. Ass'n*, 567 F.3d at 667.

Plaintiffs also claim that the Conscience Rule violated the notice-and-comment requirement by changing the definition of "discriminate," Private Mot. 24-26; Planned Parenthood Compl. ¶¶ 140-144; National Family Compl. ¶¶ 168-170, but the Conscience Rule was a "logical outgrowth" of the proposed rule.  *Covad Comm'ns Co. v. FCC*, 450 F.3d 528, 548 (D.C. Cir. 2006).  An agency is not required "to assiduously lay out every detail of a proposed rule for comment," but rather must provide "notice of either the substance of a proposed rule or a description of the subjects and issues covered by a proposed rule."  *Stringfellow Mem'l Hosp. v. Azar*, 317 F. Supp. 3d 168, 186 (D.D.C. 2018).  HHS plainly did so here.

Finally, Plaintiffs contend that the Rule violates the APA because HHS declined to incorporate the Title VII religious accommodation framework.  States Compl. ¶ 172; Private Mot. 19-20; National Family Compl. ¶ 161.  But HHS expressly considered the Title VII framework and found it inapposite because "Congress did not adopt an undue hardship exception for the protections found in Federal conscience and anti-discrimination laws that are the subject of this rule."

84 Fed. Reg. at 23,191.  Plaintiffs' disagreement with that conclusion does not render the Rule arbitrary and capricious.

### D.      The Conscience Rule Does Not Violate the Spending Clause.

The Spending Clause allows the federal government to "attach conditions to the receipt of federal funds . . . to further broad policy objectives" if the conditions are "unambiguous[]," sufficiently related to the federal program at issue, non-coercive, and do not require the States to violate the Constitution.  *South Dakota v. Dole*, 483 U.S. 203, 206-08 (1987).   Contrary to Plaintiffs' claims, States Compl. ¶¶ 183-190, the Conscience Rule satisfies these conditions.

***The Rule is not ambiguous.***   Because "the substantive requirements" enforced by the Conscience Rule "were set forth by Congress," often in "laws [that] have existed for decades," 84 Fed. Reg. at 23,222, any contention that the law imposes ambiguous retroactive conditions fails, States Mot. 46-50; States Compl. ¶¶ 186-187.   Neither HHS nor Plaintiffs have identified any successful Spending Clause challenges to the underlying laws.  84 Fed. Reg. at 23,222.  Because they have willingly accepted billions in federal funds subject to the clear conditions imposed by these federal statutes, State Plaintiffs cannot plausibly claim that those substantive agreements were unclear or unfair.

The States' argument that the Conscience Rule's definitions "alter[] the conditions to which [they] initially agreed" fails.  *See* States Mot. 47; *supra* at 13-17.  Plaintiffs knew of federal conscience protection for doctors.  Clarification that other health care workers are also covered "merely altered . . . the boundaries of the [protected] categories"—it did not "transform[]" the relevant programs so as to violate the Spending Clause.  *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583 (2012) (*NFIB*).  The objection to "OCR's enforcement process" and related record-keeping requirements, States Mot. 47, likewise rings hollow, as enforcement "will be conducted *in the same way* that OCR implements other civil rights requirements (such as the prohibition of

discrimination on the basis of race, color, or national origin).” 84 Fed. Reg. at 23,179-80 (emphasis supplied); *id.* at 23,257. Creating parity for statutorily protected conscience rights does not “so dramatically” change the law as to effectuate “a new . . . program.” *NFIB*, 567 U.S. at 584.

> ***The Rule is neither coercive nor unrelated to the Congressional enactments it enforces.***
The States’ contention that the Conscience Rule “is a gun to the head,” States Mot. 51, is belied by decades of compliance with federal statutes that have gone unchallenged while the States received billions of dollars in federal funds. Nor can the Conscience Rule violate the “nexus” requirement by threatening “all federal funds” provided through the 2019 appropriations law. States Mot. 52. In so arguing, the States reveal that their true beef is with the Weldon Amendment, which already expressly provides that those funds should not go to programs that discriminate on the basis of conscientious objections to abortion. *Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019*, Pub. L. No. 115-245 § 507(d)(1), 132 Stat. 2981, 3118. Enjoining the Conscience Rule will not narrow the scope of a condition imposed by Congress.

### E.     The Rule Does Not Violate the Establishment Clause.

Plaintiffs claim that the Conscience Rule violates the Establishment Clause because it forces them to “accommodate their employees’ religious beliefs to the exclusion of all secular interests,” States Mot. 53 (citing *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985)), and “imposes” a “significant” burden on “nonbeneficiaries,” Private Mot. 39-40 (emphasis omitted); States Compl. ¶¶ 198-201; Planned Parenthood Compl. ¶¶ 145-147; National Family Compl. ¶ 155. But the Rule does not prevent employers from asking their employees about their religious beliefs or from accommodating those beliefs in ways that do not jeopardize the employers’ mission. *See supra* at 16-17. Plaintiffs’ third-party harm arguments are make weight.

In all events, *Caldor* does not provide the proper framework for analyzing a potential

Establishment Clause violation.  "[T]he Establishment Clause *must* be interpreted by reference to historical practices and understandings," and religious accommodations for both religious organizations and individuals "fit[] within the tradition long followed" in our nation's history. *American Legion v. American Humanist Assoc.*, 139 S. Ct. 2067, 2087-88 (2019) (emphasis added) (citation omitted).  In *Hosanna-Tabor*, a unanimous Supreme Court held that historical anti-establishment interests *required* that churches be wholly exempt from employment discrimination laws with regard to their ministerial employees.  565 U.S. 171 (2012).  Such religious accommodation "follows the best of our traditions." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952).  Here, Plaintiffs do not try to reconcile their Establishment Clause argument with historical protections for conscience rights.  Nor do they explain why the Church, Coats-Snowe, and Weldon Amendments would not themselves run afoul of the Establishment Clause under their view.

Moreover, the Supreme Court has squarely rejected Plaintiffs' reading of *Caldor* and held that religious accommodations can be valid even when they "burden third parties."  States Mot. 53.  *See Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 340 (1987) (upholding federal-employment law that exempted religious organizations from general prohibition against employment discrimination on the basis of religion, even though the law "necessarily ha[d] the effect of burdening . . . employees").  *Caldor* stands for the much more modest proposition that a statute or regulation may violate the Establishment Clause if it "takes *no account* of the convenience or interests of" others and allows for "religious concerns [to] *automatically control* over all secular interests."  472 U.S. at 709 (emphases added). The Conscience Rule, which embodies Congress's previous careful balancing of the needs of patients, healthcare providers, and religious healthcare professionals, does not run afoul of that narrow prohibition.

Plaintiffs' other constitutional claims are frivolous.  Contrary to the Private Plaintiffs' assertion, the Rule does not interfere with anyone's "ability to obtain abortions."  Planned Parenthood Compl. ¶ 152; National Family Compl. ¶ 157.  Rather, like the decades-old federal conscience statutes the Rule implements, it prevents employers from *forcing* religious healthcare professionals to perform abortions.  The Constitution does not permit—much less require—such coercion.

Nor does the Conscience Rule violate the separation of powers.  The States accuse the Department of "rewrit[ing] the statutes Congress enacted," States Mot. 45; States Compl. ¶¶ 191-197, but this just repackages their flawed APA arguments.  Because the Conscience Rule "does not create substantive protections beyond those in existing law," 84 Fed. Reg. at 23,247, but simply enforces longstanding federal statutes that condition federal funds on the protection of conscience rights, it poses no threat to the separation of powers.

The Rule easily survives Plaintiffs' vagueness challenge, *see* Planned Parenthood Compl. ¶¶ 148-150; National Family Compl. ¶¶ 156, 163, because it "conveys sufficiently definite warning[s] as to the proscribed conduct when measured by common understanding and practices."  *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008).  The rule "need not spell out every possible factual scenario with 'celestial precision'" to withstand the relaxed scrutiny afforded civil regulations. *United States v. Powers*, 2009 WL 2601103, at *2 (W.D.N.Y. Aug. 21, 2009), *aff'd*, 432 F. App'x 16 (2d Cir. 2011); *see also Arriaga v. Mukasey*, 521 F.3d 219, 223 (2d Cir. 2008) ("Laws with civil consequences receive less exacting scrutiny.").

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of Defendants-Intervenors and Plaintiffs' motions for a preliminary injunction should be denied.

Dated: August 14, 2019

New York, New York


Daniel Blomberg (*pro hac vice*)
Nicholas Reaves (*pro hac vice*)
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1200 New Hampshire Ave. NW, Suite 700
Washington, D.C. 20036
Telephone: 202.955.0095
Facsimile: 202.955.0090

*Attorneys for Defendants-Intervenors DR.*
*REGINA FROST AND CHRISTIAN MEDICAL*
*AND DENTAL ASSOCIATIONS*

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Allyson N. Ho*

Allyson N. Ho (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

Robert E. Dunn (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1811 Page Mill Road
Palo Alto, California 94304
Telephone: 650.849.5300
Facsimile: 650.849.5333

Jason H. Hilborn (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant-Intervenor*
*CHRISTIAN MEDICAL AND DENTAL*
*ASSOCIATIONS*