UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, *in his official capacity as Secretary of the United States Department of Health and Human Services*; and UNITED STATES OF AMERICA,<br><br>*Defendants*,<br><br>DR. REGINA FROST and CHRISTIAN MEDICAL AND DENTAL ASSOCIATIONS,<br><br>*Defendants-Intervenors*. | No. 1:19-cv-04676-PAE<br>(consolidated with 1:19-cv-05433-PAE; 1:19-cv-05435-PAE)<br><br>**DECLARATION OF REGINA RENEE FROST, M.D., IN SUPPORT OF INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION** |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; and PLANNED PARENTHOOD OF NORTHERN NEW ENGLAND, INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>ALEX M. AZAR II, *in his official capacity as Secretary, United States Department of Health and Human Services*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROGER SEVERINO, *in his official capacity as Director, Office for Civil Rights, United States Department of Health and Human Services*; and OFFICE FOR CIVIL RIGHTS, United States Department of Health and Human Services,<br><br>*Defendants*. | No. 1:19-cv-05433-PAE<br>(consolidated with 1:19-cv-0476-PAE; 1:19-cv-05435-PAE) |

i

| | |
|---|---|
| NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION; and PUBLIC HEALTH SOLUTIONS, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALEX M. AZAR II, *in his official capacity as Secretary of the U.S. Department of Health and Human Services*; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROGER SEVERINO, *in his official capacity as Director of the Office for Civil Rights of the U.S. Department of Health and Human Services*; OFFICE FOR CIVIL RIGHTS of the U.S. Department of Health and Human Services, <br><br> *Defendants*. | No. 1:19-cv-05435-PAE <br> (consolidated with 1:19-cv-0476-PAE; 1:19-cv-05433-PAE) |

ii

1.   I, Dr. Regina Renee Frost, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

2.   I submit this Declaration in support of Defendants-Intervenors' Motion for Summary Judgment and in Opposition to Plaintiffs' Motions for Preliminary Injunction. I have personal knowledge of the facts set forth herein and if called upon to do so, would testify competently thereto under oath.

3.   I graduated from the University of Michigan with a BA in Psychology in 2000. I graduated from Wayne State University School of Medicine in 2004. I was an Obstetrics and Gynecology Resident at St. John Hospital and Medical Center in Detroit, Michigan from 2004 to 2008. During my last year of residency I was the Chief Administrative Resident.

4.   From 2008 to 2009 I worked in private practice as an OBGYN at the Medical Resources Group. From 2010 to 2013 I was part-time faculty at St. John Hospital and Medical Center. From 2010 to 2017 I was a solo-practitioner operating Compassionate Women's Healthcare. From 2018 to the present I have worked at St. John ObGyn Associates with the Ascension Medical Group. I served as a Clinical Assistant Professor for Michigan State University in the Department of Osteopathic Surgical Specialties from 2011 to 2017.

5.   I am a Christian and have been a member of the Christian Medical Association since 2014.

6.   My Christian faith has given me a passion for missions and helping those in need. For example, during medical school, I served on a mobile medical team in Nyahururu, Kenya, attending to the needs of women, children, and the elderly. I pray with my patients when appropriate and offer words of encouragement to lift their spirits.

7.   I have helped lead Women Physicians in Christ ("WPC"), a ministry of CMDA,

since 2014.  The mission of WPC is to build relationships among female physicians so that they can encourage and support one another in the profession.  I lead a Bible study for a local WPC group that I started in 2014.

8.	My work as an OBGYN, my service to those in need, and my leadership of a ministry to women physicians all flow directly from my Christian faith.  *See 1 Corinthians* 10:31 ("So whether you eat or drink or whatever you do, do it all for the glory of God.").  I sincerely believe that Christians should feed the hungry, give water to the thirsty, provide homes to strangers, clothe the needy, care for the sick, and visit prisoners.  *Matthew* 25:31-46.  By serving others, we serve and honor God.  *Id.* ("Truly I tell you, whatever you did for one of the least of these brothers and sisters of mine, you did for me.").  I believe that God is just as interested in what I do to serve others, including as a doctor, as He is in what I do on Sunday mornings at church.  *Isaiah* 58:1-12 ("Is this not the kind of fasting that I have chosen: to loose the chains of injustice and untie the cords of the yoke, to set the oppressed free and to break every yoke?").

9.	I am committed to treating every patient with dignity and love, without regard to race, religion, sexual orientiation, or gender.  That is because I believe that every person is created in the image of God, and possesses inherent dignity.  *Genesis* 1:27 ("God created man in his own image.").  And Christ commands us to love our neighbor as ourselves.  *Matthew* 22:39.

10.	As a Christian, I have religious objections to providing or participating in certain procedures, including abortion and sex reassignment surgery, which I believe to be contrary to God's will and inconsistent with my best medical judgment for my patients.

11.	These religious objections are based on the teachings of my faith.  I believe, for instance, that the unborn are persons created by God who deserve my respect.  *See, e.g., Jeremiah* 1:4-5 ("'Before I formed you in the womb I knew you, and before you were born I consecrat-

ed you; I appointed you a prophet to the nations.'"); *Psalm* 139:13-16 (noting that God "formed my inward parts . . . knitted me together in my mother's womb," and knew "the days that were formed for me, when as yet there was none of them"). I believe it would be wrong for me to personally participate in causing their death. *See, e.g., Matthew* 5:21 and 19:18 (affirming the commandments against taking innocent human life).

12. Any patient who asks about abortion is informed that I do not perform that procedure. If my employer or the government ever directed or pressured me to perform a procedure to which I have a religious objection, I would be compelled to resign or to leave the practice of medicine, because I will not perform any procedure that my faith teaches is wrong or which I believe is not in the best interests of my patient.

13. I believe that the federal government should protect healthcare providers' conscience rights to ensure that no employer, or state or municipal government, can require healthcare professionals to perform or facilitate procedures to which they have sincere religious objections, or punish healthcare professionals for refusing to perform or facilitate such procedures. I have heard from several physicians who have been terminated or faced significant opposition because of their religious beliefs, and I am concerned that one day I too could be pressured to perform a medical procedure that I find morally objectionable. I am especially concerned about that in this case, given that my home state of Michigan is a plaintiff in this lawsuit. Without the conscience protections afforded by the regulation challenged in this lawsuit—*Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 84 Fed. Reg. 23,170 (May 21, 2019) ("Conscience Rule")—I would likely be subject to discrimination or termination in such an instance on account of my religious beliefs. Invalidating the Conscience Rule would thus harm me and other healthcare professionals with religious objections to certain procedures.

3

14. As an OBGYN, I have treated many women diagnosed with ectopic pregnancies, which describes a situation where the embryo implants in the fallopian tube (or, less commonly, in other locations, such as the cervix or abdomen) rather than the uterus. Ectopic pregnancies are typically diagnosed within the first 4-8 weeks of pregnancy. Many ectopic pregnancies resolve naturally when the embryo detaches and is expelled from the body. However, ectopic pregnancies can cause the fallopian tube to rupture, which results in hemorrhaging that can threaten the mother's life. Because of this risk, the standard of care for women diagnosed with an ectopic pregnancy is to remove the embryo. If it is diagnosed early and the patient is stable, an ectopic pregnancy can be treated medically by administering methotrexate, which avoids surgery and preserves the fallopian tubes. If that is not an option, surgery is usually scheduled immediately after a woman is diagnosed, but the timing of the procedure is based on the operating room's availability and the patient's clinical status. Because this procedure is aimed at protecting the mother's health, and because an embryo cannot survive in the fallopian tubes, I do not have a religious objection to this procedure. I have performed this procedure on many of my patients after diagnosing them with an ectopic pregnancy. I am not aware of any OBGYNs that have a religious objection to removing an ectoptic pregnancy, though I understand that there may be disagreements over the most appropriate type of treatment.

15. If an ectopic pregnancy ruptures, the standard of care is immediate surgery to remove the embryo—if it remains in place—and to surgically repair the ruptured fallopian tube. Because a ruptured ectopic pregnancy is an emergency that endangers the life of the mother, and because the life of the embryo cannot be saved, I do not have a religious objection to this procedure. I have performed this procedure on my patients. I am not aware of any physician who has a religious objection to this procedure.

16. I have also treated many patients who have suffered from miscarriages. A miscarriage results in the death of the fetus by natural means. In most instances, a miscarriage will not require medical intervention because the fetal tissue will pass naturally. In some cases, however, the woman's body does not expel the fetal tissue, which puts her at risk of infection. The standard of care in this situation is a procedure to remove the fetal tissue. Because this procedure does not terminate a human life, and is aimed at protecting the mother's health, I do not have a religious objection to it. I have performed this procedure on many of my patients. I am not aware of any OBGYNs who have religious objections to treating a woman who has suffered a miscarriage.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 14 day of August, 2019.

_____
Dr. Regina Renee Frost

5