# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.* <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, *in his official capacity as Secretary of the United States Department of Health and Human Services*; and UNITED STATES OF AMERICA, <br><br> *Defendants,* <br><br> DR. REGINA FROST and CHRISTIAN MEDICAL AND DENTAL ASSOCIATIONS, <br><br> *Defendants-Intervenors.* | No. 1:19-cv-04676-PAE (consolidated with 1:19-cv-05433-PAE; 1:19-cv-05435-PAE) <br><br> **MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' CROSS-MOTIONS FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF DEFENDANTS-INTERVENORS' MOTION FOR SUMMARY JUDGMENT** |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; and PLANNED PARENTHOOD OF NORTHERN NEW ENGLAND, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> ALEX M. AZAR II, *in his official capacity as Secretary, United States Department of Health and Human Services*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROGER SEVERINO, *in his official capacity as Director, Office for Civil Rights, United States Department of Health and Human Services*; and OFFICE FOR CIVIL RIGHTS, United States Department of Health and Human Services, <br><br> *Defendants.* | No. 1:19-cv-05433-PAE (consolidated with 1:19-cv-0476-PAE; 1:19-cv-05435-PAE) |

|  |  |
|---|---|
| NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION; and PUBLIC HEALTH SOLUTIONS, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALEX M. AZAR II, *in his official capacity as Secretary of the U.S. Department of Health and Human Services*; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROGER SEVERINO, *in his official capacity as Director of the Office for Civil Rights of the U.S. Department of Health and Human Services*; OFFICE FOR CIVIL RIGHTS of the U.S. Department of Health and Human Services, <br><br> *Defendants*. | No. 1:19-cv-05435-PAE <br> (consolidated with 1:19-cv-0476-PAE; 1:19-cv-05433-PAE) |

GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

THE BECKET FUND FOR RELIGIOUS
LIBERTY
1200 New Hampshire Ave. NW, Suite 700
Washington, D.C. 20036
Telephone: 202.955.0095
Facsimile: 202.955.0090

*Attorneys for Intervenors Dr. Regina Frost and Christian Medical and Dental Associations*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 2

I.   The Conscience Rule Does Not Exceed Statutory Authorization ...................... 2

II.  The Conscience Rule Is in Accordance with Law ........................................... 9

   A.   The Conscience Rule Does Not Violate EMTALA.............................. 10

   B.   The Conscience Rule Does Not Violate Title X .................................. 11

   C.   The Conscience Rule Does Not Violate Section 1554 of the ACA...................... 12

III. The Conscience Rule Is Not Arbitrary or Capricious ...................................... 13

IV.  The Conscience Rule Is Constitutional ......................................................... 17

   A.   The Conscience Rule Does Not Violate the Separation of Powers ..................... 18

   B.   The Conscience Rule Does Not Violate the Spending Clause ............................ 18

   C.   The Rule Does Not Violate the Establishment Clause ......................................... 21

CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Am. Legion v. Am. Humanist Assoc.*,
   139 S. Ct. 2067 (2019)................................................................................................23

*Burwell v. Hobby Lobby Stores, Inc.*,
   134 S. Ct. 2751 (2014)................................................................................................25

*Christian Legal Soc'y v. Martinez*,
   561 U.S. 661 (2010)....................................................................................................23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)....................................................................................................25

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018)............................................................................................6

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*
   *v. Amos*,
   483 U.S. 327 (1987)....................................................................................................25

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
   562 U.S. 277 (2011)......................................................................................................3

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005)....................................................................................................22

*Dep't of Homeland Sec. v. MacLean*,
   135 S. Ct. 913 (2015)....................................................................................................5

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018)..................................................................................................9

*Gillette v. United States*,
   401 U.S. 437 (1971)....................................................................................................24

*Greater Balt. Ctr. for Pregnancy Concerns v. Mayor and City Council of Balt.*,
   879 F.3d 101 (4th Cir. 2018) ......................................................................................14

*Guru Nanak Sikh Soc'y of Yuba City v. Cty. of Sutter*,
   456 F.3d 978 (9th Cir. 2006) ......................................................................................25

*Hernandez v. Hartford Life & Acc. Ins.*,
   462 F. App'x 583 (6th Cir. 2012) ................................................................................16

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
    480 U.S. 136 (1987)............................................................................................22

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004)............................................................................................9

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005)............................................................................................6

*Lawson v. FMR LLC*,
    571 U.S. 429 (2014)............................................................................................9

*Magnoni v. Smith & Laquercia*,
    483 F. App'x 613 (2d Cir. 2012) ....................................................................11

*Massachusetts v. United States*,
    435 U.S. 444 (1978)............................................................................................21

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983)........................................................................................15, 16

*Nat'l Cable & Telecomms. Ass'n v. FCC*,
    567 F.3d 659 (D.C. Cir. 2009) ....................................................................15, 16

*Nat'l Fed. of Indep. Business v. Sebelius*,
    567 U.S. 519 (2012)............................................................................................19

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)...................................................................................8, 14

*Pub. Citizen, Inc. v. NHTSA*,
    374 F.3d 1251 (D.C. Cir. 2004)........................................................................15

*Shelton v. University of Medicine & Dentistry of N.J.*,
    223 F.3d 220 (3d Cir. 2000)..............................................................................10

*South Dakota v. Dole*,
    483 U.S. 203 (1987)............................................................................................21

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981)............................................................................................24

*Estate of Thornton v. Caldor, Inc.*,
    472 U.S. 703 (1985)............................................................................................22

*Warshauer v. Solis*,
    577 F.3d 1330 (11th Cir. 2009) .......................................................................16

*Wis. Cent. Ltd. v. United States*,
   138 S. Ct. 2067 (2018).................................................................................5

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)..................................................................................24

**Statutes**

5 U.S.C. § 553(b)(3) ......................................................................................6

42 U.S.C. § 238n(c)(2)....................................................................................9

42 U.S.C. § 300a-6.........................................................................................12

42 U.S.C. § 1395dd(a) ...................................................................................10

42 U.S.C. § 1395dd(b)(1)(A)..........................................................................10

42 U.S.C. § 18023......................................................................................12, 13

42 U.S.C. § 18113..........................................................................................13

42 U.S.C. § 18114..........................................................................................12

50 U.S.C. App. § 456(j) .................................................................................24

Pub L. 115-245 Div. B., § 507(d)(2)................................................................9

**Other Authorities**

119 Cong. Rec. 9,597 (1973) (Statement of Sen. Church) ..............................7

American Medical Association, *Informed Consent*, www.ama-
   assn.org/delivering-care/ethics/informed-consent ......................................8

Br. of Resp'ts, *Burwell v. Hobby Lobby Stores, Inc.*,
   2014 WL 546900 (Feb. 10, 2014)..............................................................25

Conscience in America: A Documentary History of Conscientious Objection in
   America, 1757–1967 (Lillian Schlissel, ed. 1968) ....................................24

EEOC Compliance Manual § 12-IV.C .............................................................24

James Madison, Presidential Pardon, November 20, 1816, in The Gilder Lehrman
   Institute of American History, *Conscientious Objectors: Madison Pardons
   Quakers, 1816*,
   www.gilderlehrman.org/sites/default/files/inline-pdfs/00043_FPS.pdf;................24

Mark L. Rienzi, *The Constitutional Right Not to Kill*,
62 Emory L.J. 121, 161 (2012)................................................................5, 24

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*,
103 Harv L. Rev. 1409 (1990) ........................................................................24

*OCR Issues Notice of Violation to the University of Vermont Medical Center After It Unlawfully Forced a Nurse to Assist in Abortion* (Aug. 28, 2019),
www.hhs.gov/about/news/2019/08/28/ocr-issues-notice-violation-university-vermont-medical-center-after-it-unlawfully-forced-nurse.html ............................15

*Terminally Ill Man Sues Hospital Over Aid-In-Death Medication*, Courthouse News Service (Aug. 22, 2019), www.courthousenews.com/terminally-ill-man-sues-hospital-over-aid-in-death-medication ............................................................15

**Rules**

Fed. R. Evid. 201 ............................................................................................11

Fed. R. Evid. 702 ............................................................................................15

**Regulations**

Compliance With Statutory Program Integrity Requirements,
84 Fed. Reg. 7,714 (2019) ..............................................................................12

Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law,
73 Fed. Reg. 78,072 (2008) ..............................................................................1

Protecting Statutory Conscience Rights in Health Care; Delegations of Authority,
84 Fed. Reg. 23,170 (2019) ..................................................................... *passim*

Regulation for the Enforcement of Fedreal Health Care Provider Conscience Protection Laws,
76 Fed. Reg. 9,968 (2011) ................................................................................1

## PRELIMINARY STATEMENT

The Conscience Rule implements and enforces longstanding federal conscience protections that prohibit recipients of federal funds from discriminating against religious healthcare professionals on account of their sincere religious objections to procedures, such as abortion and assisted suicide. HHS promulgated the Rule to clarify and enforce these federal conscience protections because, as Intervenors' members have experienced first-hand, threats to religious liberty and conscience rights have increased dramatically in the past several years.

In asking this Court to invalidate the Rule, Plaintiffs demonstrate why protection is necessary. Across three presidential administrations, HHS has consistently referred to the Church, Coats-Snowe, and Weldon Amendments as "conscience" laws.[1] Yet Plaintiffs derisively refer to these bipartisan efforts to protect conscience rights as the "refusal statutes," as if the statutes authorized healthcare professionals to refuse treatment to certain types of patients. States Br. 2. But the statutes do not have the purpose or effect of preventing patients from obtaining any services. Nor do they give religious employees unfettered bargaining power vis-à-vis their employers. Rather, the conscience statutes, which the Rule faithfully implements, prevent religious healthcare professionals from being driven from their profession, or from their chosen specialties, by federally funded entities merely because they cannot in good conscience participate in abortion or assisted suicide—procedures that many taxpayers also oppose on religious or moral grounds.

---

[1] *See* Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law, 73 Fed. Reg. 78,072 (2008) ("conscience protection statutes"); Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws, 76 Fed. Reg. 9,968, 9,970 (2011) ("conscience laws"); Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 84 Fed. Reg. 23,170 (2019) ("conscience and anti-discrimination laws").

Plaintiffs raise various statutory and constitutional challenges to the Rule, each predicated on the same erroneous premise that the Rule massively "expands" the scope of the underlying statutes and "transforms" the healthcare industry.  *See, e.g.*, Private Br. 9, 16, 22, 24–27, 40; States Br. 23, 37, 41.  But the Rule's definitions of key terms—including "discriminate," "assist in the performance," "refer," and "health care entity"—accord with those words' ordinary meanings and with the relevant statutory definitions.  Indeed, HHS responded to the concerns Plaintiffs and others raised during notice and comment and modified the Rule to ensure that funding recipients have ample flexibility to protect conscience rights without compromising their own missions.

Throughout their briefs, Plaintiffs assert that the Rule gives religious healthcare professionals the unilateral right to reject reasonable accommodations—forcing funding recipients to double-staff or take other costly measures.  But nothing in the Rule—or the history of HHS enforcement—remotely suggests that religious healthcare professionals can somehow use the Rule to interfere with their employers' operations or to block the provision of procedures to which they personally object.

Because the Rule faithfully implements longstanding federal conscience provisions, it is not contrary to law, arbitrary or capricious, or unconstitutional.  It is an important and lawful bulwark against anti-religious hostility in the healthcare industry—a bulwark that Plaintiffs' lawsuits prove is needed.  The Court should grant Defendants' and Intervenors' motions for summary judgment and deny Plaintiffs' cross-motions.

## ARGUMENT

### I.    The Conscience Rule Does Not Exceed Statutory Authorization.

Central to nearly all of Plaintiffs' claims is the erroneous assertion that four of the Rule's definitions impermissibly expand the scope of federal conscience protections.  Contrary to that assertion, the definitions are entirely consistent with the ordinary meaning of the terms used in the

conscience statutes.  Any "operational consequences" flowing from these definitions, States Br. 25 n.17, are attributable to Congress, not HHS.  Plaintiffs' core objection to the Rule—that it requires them to "hire and keep on staff" persons who cannot in good conscience "provide certain health services," such as abortion, Private Br. 18 n.7—is an objection to the fundamental purpose of the conscience laws, which were enacted to prevent religious healthcare professionals from being discriminated against or purged from certain fields.  *See* 84 Fed. Reg. at 23,191–92.

*Discrimination:*  Broadly speaking, the Rule defines "discriminate or discrimination" to include (1) withholding financial benefits (such as grants, contracts, certifications, etc.); (2) withholding any other type of benefit or imposing any penalty; and (3) using any method of administration that subjects protected individuals to any adverse treatment "on grounds prohibited" by the federal conscience statutes.  84 Fed. Reg. at 23,263 (§ 88.2).  Put simply, recipients of federal funds cannot take certain employment actions against protected individuals on account of their religious objections to procedures, such as abortion and assisted suicide.  The Rule's definition is perfectly consistent with the plain meaning of "discriminate" and "discrimination." *See CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 286–87 (2011) ("discriminates means to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit"; "discrimination is the failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored").

Plaintiffs contend that the Rule's definition "sweeps well beyond any reasonable understanding" of the word "discriminate," Private Br. 17, but they do not identify any part of the definition they believe is inconsistent with ordinary meaning.  And they misconstrue the Rule when they assert that "HHS considers reassignment of job functions to accommodate an employee's objections to be 'discrimination.'" *Id.* at 18.  HHS added a paragraph to the definition

specifically clarifying that offering an "effective accommodation" is *not* discrimination.  84 Fed. Reg. at 23,263 (§ 88.2).   And where a healthcare professional refuses some form of accommodation and is involuntarily reassigned, the Rule directs the Office of Civil Rights ("OCR") to "take into account the degree to which an entity had implemented policies to provide effective accommodations for the exercise of protected conduct, ... and whether or not the entity took any adverse action against a protected entity on the basis of protected conduct, beliefs, or convictions *before the provision of any accommodation*."  *Id.* (emphasis added).  The Rule thus clarifies that taking adverse action—which could include reassignment—is not necessarily discrimination if the funding recipient has made good-faith efforts to provide an accommodation.[2] OCR will consider these factors when conducting "any complaint or compliance review."  *Id.*

Plaintiffs nevertheless contend that the Rule is not "sensitive to context and circumstance" because it ostensibly requires funding recipients to provide *unreasonable* accommodations for religious healthcare professionals—*i.e.*, accommodations that impose a "sever[e] ... burden on the employer."  Private Br. 19.  But Plaintiffs again fail to point to any provision of the definition that requires that result.  Nor do they address the provision directing OCR to take into account the employer's attempts to accommodate when "determining whether any entity has engaged in discriminatory action."  84 Fed. Reg. at 23,263 (§ 88.2).

At bottom, Plaintiffs oppose the Rule because it does not allow funding recipients to unilaterally override conscience objections whenever they decide that respecting conscience rights imposes unreasonable "burdens."  Private Br. 17–18, 18 n.7, 19–21.  But the conscience statutes

---

[2] To be sure, the Rule categorically provides that a funding recipient is not guilty of discriminating if the healthcare professional *voluntarily* accepts the accommodation.  84 Fed. Reg. at 23,263 (§ 88.2).  But the Rule does not suggest that a funding recipient is always precluded from taking an adverse action—including reassignment—if the healthcare professional rejects the offered accommodation.

do not require funding recipients to respect conscience rights only when they deem it costless to do so. Any "burdens" flowing from the Rule's definition of "discriminate" are a consequence of the statutes the Rule implements—not a basis for invalidating the Rule.

Plaintiffs fault HHS for declining to adopt Title VII's "undue hardship" exception, Private Br. 20, but Congress did not include any such exception in the conscience statutes, which (unlike Title VII) address situations where individuals may be forced to participate in highly controversial and religiously significant procedures, including abortion. *See also* 84 Fed. Reg. at 23,191 (discussing additional differences); *cf.* Mark L. Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J. 121, 161 (2012) ("[C]onscientious objection to state-authorized killing is an issue that prior generations of Americans have addressed with a steady stream of positive laws designed to protect the conscientious objector."). Congress could reasonably have decided that, regardless of the burden on the employer, it is *never* acceptable to force healthcare professionals to choose between participating in procedures that violate their religious beliefs and losing their jobs. Even if HHS *could have* incorporated a "hardship exception" into the definition of "discriminate," Private Br. 21, the conscience statutes do not *require* any such exception.

HHS's decision not to include a hardship exception is supported by two interpretive canons. First, statutes are interpreted "consistent with their ordinary meaning," *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018), and the ordinary meaning of "discrimination" does not include a hardship exception. Second, Congress is presumed to be acting "intentionally when it omits language included elsewhere." *Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015). That presumption applies here because the (later-enacted) conscience laws omit Title

VII's hardship language.[3]

Finally, HHS gave adequate notice of the Rule's "discrimination" definition, *see* Private Br. 48–53, because the APA requires only notice of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The comments provided during the rulemaking objecting to the proposed definition of discrimination, States Br. 24–25, dispel any argument that the proposed rule did not "fairly apprise[]" Plaintiffs of the "subjects and issues of the rulemaking." *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 79 (2d Cir. 2018).[4]

*Assist in the Performance:* The Rule gives this term a common-sense definition: "to take an action that has a specific, reasonable, and articulable connection to furthering a procedure or a part of a health service program or research activity undertaken by or with another person or entity." 84 Fed. Reg. at 23,263 (§ 88.2). There is little daylight between that definition and Plaintiffs' preferred definition: "to give support or aid to the execution of an action," Private Br. 21, especially because the Rule clarifies that whether one "assists in the performance" generally "depend[s] on whether aid is provided" to the performed action. 84 Fed. Reg. at 23,263.

Plaintiffs object that "the Rule speaks merely of 'furthering,' or providing 'aid,'" whereas

---

[3] Plaintiffs argue that the "meaningful variation" canon does not apply here because the Supreme Court did not apply it in *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005). Private Br. 20. In *Jackson*, the Court held that Title IX's prohibition on discrimination encompasses retaliation because retaliation "is a form of 'discrimination.'" 544 U.S. at 174. It was therefore irrelevant that Title IX does not expressly mention retaliation—the meaningful variation canon could not trump the plain definitional scope of the statutory text. *Id.* at 175. But *Jackson* does not support Plaintiffs' demand for a hardship exception here because the ordinary meaning of the term "discrimination" does not encompass employer hardship.

[4] Plaintiffs' critique of paragraph (5) of the definition of "discriminate," *see* Private Br. 49, is baffling given that HHS added that paragraph—in response to comments—to "narrow[] the scope of possible bases of a violation under the rule." 84 Fed. Reg. at 23,200.

Congress, they assert, was focused on the "*execution* of an abortion or sterilization procedure." Private Br. 22. In Plaintiffs' view, a religious healthcare professional "assists in the performance" of an abortion when she hands the forceps to the abortionist, but not when she prepares the room for the abortion, schedules the abortion, or refers for the abortion. *Id.* Nothing in the language of the underlying statutes draws such a distinction. Nor does the Rule's definition conflict with the legislative history. Plaintiffs cite Senator Church's statement that the amendment was not intended to "permit a frivolous objection from someone unconnected with the procedure to be the basis *for a refusal to perform*" an abortion or other lawful procedure. Private Br. 23 (quoting 119 Cong. Rec. 9,597 (1973) (Statement of Sen. Church)). But as Intervenors have explained, and Plaintiffs do not dispute, Senator Church was responding to Senator Long's concern that the amendment might allow the objecting healthcare professional to effectively *veto the procedure* altogether. *See* Intervenors Br. 15. The Rule avoids Senator Long's concern because it does not prevent an employer from "taking steps to use alternate staff or methods to provide for or further the objected-to conduct." 84 Fed. Reg. at 23,192.

Plaintiffs contend that, by incorporating the definition of "referral" into the definition of "assist in the performance," the Rule allows religious healthcare professionals to refuse to "provid[e] information that could in some way inform a patient's decision whether to have an abortion." Private Br. 22. But HHS made clear that it "does not believe that every form of counseling, training, or referral (as defined under this rule) necessarily constitutes assistance in the performance of a procedure under this rule." 84 Fed. Reg. at 23,188–89. And the definition of "assist in the performance" "may include ... referral ... for the procedure ... depending on *whether aid is provided* by such actions." *Id*. at 23,263 (§ 88.2) (emphasis added).

***Referral or refer for:*** Plaintiffs object to the Rule's definition of "referral" or "refer for,"

7

but they do not offer a competing definition, cite a dictionary, or explain which part of the definition they find inconsistent with ordinary meaning.  Instead, they contend that the definition is "contrary to principles of informed consent and medical ethics" because it would allow a conscientious objector to refuse even to tell a patient whether "abortion is legal in her state." Private Br. 24.  But as HHS recognized, that concern is "far-fetched" because the "reasonably foreseeable outcome" of merely informing a patient about the legal status of abortion would not be to "assist" the patient in "obtaining ... a particular health care service, program, activity, or procedure."  84 Fed. Reg. at 23,264 (§ 88.2), 23,202–03.[5]

Moreover, HHS "made significant modifications to the definition of 'discrimination' that address the concerns raised by commenters concerning the definition of referral."  *Id.* at 23,200. For example, the Rule "recognizes greater latitude for accommodation procedures by employers and entities" and includes "additional exclusions and exemptions under the rule," thus "narrow[ing] the scope of possible bases of a violation under the rule."  *Id.*  Plaintiffs simply ignore HHS's good-faith efforts to address their concerns.

***Health care entity:***  The ordinary meaning of the term "health care entity" encompasses any entity in the healthcare sector.  Plaintiffs argue that the Rule's definition is unlawful because it includes entities not specifically mentioned in the underlying statutes.  But the Church, Coats-Snowe, and Weldon Amendments do not provide exhaustive definitions.  To the contrary, they

---

[5] The Rule has no bearing on "informed consent" laws, which simply require doctors to obtain their patients' informed consent *before undergoing a specific medical intervention.  See* American Medical Association, *Informed Consent*, www.ama-assn.org/delivering-care/ethics/informed-consent, accessed Sept. 18, 2019 ("informed consent occurs when communication between a patient and physician results in the *patient's authorization* or agreement to undergo a specific medical intervention." (emphasis added)); *see also Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018) ("*NIFLA*") (informed-consent discussions are "tied to a procedure").  The Rule does "not change [that] obligation."  84 Fed. Reg. at 23,189.

merely offer examples of what the term "health care entity" "includes," *see* 42 U.S.C. § 238n(c)(2); Pub L. 115-245 Div. B., § 507(d)(2), thus introducing a *non-exhaustive* list, Intervenors Br. 13–14.

The Rule's definition of "health care entity" would not turn the statute into a "free-for-all." Private Br. 28.   Including "pharmacists"—who may be asked to fill prescriptions for abortifacients—in the definition of "health care entity" for purposes of the Coats-Snowe Amendment is hardly a radical expansion of a term that specifically "includes an individual physician." 42 U.S.C. § 238n(c)(2).  And the inclusion of "plan sponsors" in the definition for the Weldon Amendment is easily encompassed within "any other kinds of health care facility, organization, or plan."  Pub L. 115-245 Div. B., § 507(d)(2).

Plaintiffs contend that the caption of the Coats-Snowe Amendment limits the definition of health care entity to "physicians."  Private Br. 26.  But "[t]he caption of a statute, [the Supreme] Court has cautioned, cannot undo or limit that which the statute's text makes plain."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004).  The Court "place[s] less weight" on captions, because they are often "but a short-hand reference to the general subject matter of the provision."  *Lawson v. FMR LLC*, 571 U.S. 429, 446 (2014) (headings were "under-inclusive[]").

Plaintiffs also rely on the legislative history.  Private Br. 26–27.  But the legislative history does not support their claims, and in all events it "is not the law."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018).  Instead, "[i]t is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute, [courts] do not inquire what the legislature meant; [they] ask only what the statute means."  *Id.*  This Court cannot invalidate the Rule based on stray comments from Senators Coats or Snowe.

## II.   The Conscience Rule Is in Accordance with Law.

The Conscience Rule does not violate EMTALA, Title X, or Section 1554 of the ACA

because it allows funding recipients to carry out their mission without disrupting patient care.

### A.     The Conscience Rule Does Not Violate EMTALA.

EMTALA requires hospitals with emergency departments to "provide for an appropriate medical screening ... to determine whether or not an emergency medical condition ... exists." 42 U.S.C. § 1395dd(a).  If an emergency medical condition does exist, EMTALA requires the hospital to provide further treatment "to stabilize the medical condition."  *Id.* § 1395dd(b)(1)(A). Plaintiffs speculate that the Conscience Rule would disrupt care and require hospitals to double-staff virtually every position to guard against a religious objection from a single individual.  Private Br. 31.  But hospitals are permitted to inquire about religious objections and use other "methods to provide or further any objected-to conduct."  84 Fed. Reg. at 23,263.  And there is scant evidence that religious objections have prevented healthcare professionals from "stabiliz[ing] … medical condition[s]."

Plaintiffs' examples of potential EMTALA violations do not hold up under scrutiny.  As HHS explained, the Rule does not allow EMTs to deny transportation services if they merely *suspect* "that an objected-to service or procedure may occur."  84 Fed. Reg. at 23,188.  Plaintiffs contend that the Rule would have stripped federal funds from the hospital in *Shelton v. University of Medicine & Dentistry of N.J.*, 223 F.3d 220 (3d Cir. 2000), which terminated a nurse who refused to participate in an emergency cesarean section.  Private Br. 31–32.  But the nurse in that case refused to engage in any discussions with her employer regarding acceptable accommodations, even though the hospital offered a specific accommodation and invited her to "identify other available nursing positions."  *Shelton*, 223 F.3d at 223.  The hospital's decision to terminate the nurse, which followed its efforts to accommodate her religious objections, would not necessarily have constituted "discrimination" under the Rule, much less led to termination of all federal funds. 84 Fed. Reg. 23,263 (§ 88.2) (HHS will examine whether an employer offered "an

10

effective accommodation" and whether it "took any adverse action" against the employee "*before* the provision of any accommodation" (emphasis added)).

Unable to demonstrate any actual conflict between the Conscience Rule and EMTALA, Plaintiffs worry that some religious healthcare professionals might deny emergency treatment to patients with ectopic pregnancies.  Private Br. 29 n.15.  But Intervenors are unaware of any faith tradition that categorically prohibits the removal of an ectopic pregnancy, nor have Plaintiffs provided any contrary evidence.  Intervenors Br. 8–9; Stevens Decl. ¶¶ 21–23.[6]  Private Plaintiffs claim that "an abortion is the typical course of treatment for an ectopic pregnancy," Private Br. 29 n.15, but the States' expert apparently disagrees, asserting that "the prevailing medical understanding … is that medical treatment to address an ectopic pregnancy does *not* constitute an 'abortion.'"  States P.I. Ex. 29 ¶ 10 (emphasis added).  Setting aside Plaintiffs' internal dispute over whether removal of an ectopic pregnancy is an "abortion," Plaintiffs cannot credibly claim that theoretical and unknown religious objections to this procedure have interfered (or will interfere) with any hospital's compliance with EMTALA, especially given that funding recipients have been subject to the conscience laws for decades.

## B.    The Conscience Rule Does Not Violate Title X.

Plaintiffs contend that the Conscience Rule violates Title X's instruction that pregnancy counseling be "nondirective."  Private Br. 35–36.  But "[n]othing in the Title X statute itself or in appropriations restrictions applicable to Title X funding requires abortion referrals, counseling, or information."  84 Fed. Reg. at 23,191.  Indeed, Title X provides that "[n]one of the funds

---

[6] Dr. Stevens is not (and did not claim to be) an expert in world religions, Private Br. 34 n.19, but the published statements of faith listed in Dr. Stevens' declaration from some of the largest religious denominations in the country are subject to judicial notice and speak for themselves.  *See* Fed. R. Evid. 201; *Magnoni v. Smith & Laquercia*, 483 F. App'x 613, 616 (2d Cir. 2012) (taking judicial notice of information available on an organization's website).

appropriated under this subchapter shall be used in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6; *see also* Intervenors Br. 20.  And HHS's new Title X regulations "remove[d] the requirement for nondirective abortion counseling and referral" "to ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning." 84 Fed. Reg. at 7,714.  The Rule's protections for healthcare professionals who decline to refer for abortions plainly do not "override" Title X, Private Br. 35, which similarly prohibits funding for abortions.

### C.       The Conscience Rule Does Not Violate Section 1554 of the ACA.

Section 1554 of the ACA prohibits HHS from promulgating a regulation that, *inter alia*, "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," or "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions." 42 U.S.C. § 18114.  In arguing that the Rule violates Section 1554, Plaintiffs erroneously assume that by declining to refer for an abortion, a religious healthcare professional creates a "barrier" to healthcare.  If that were so, the conscience statutes themselves would conflict with Section 1554— but the ACA explicitly provides that "[n]othing in this Act shall be construed to have any effect on Federal laws (i) regarding conscience protection; (ii) willingness or refusal to provide abortion; and (iii) discrimination on the willingness or refusal to provide pay for, cover, or refer for abortion or to provide or participate in training to provide abortion."  42 U.S.C. § 18023; *see also* Intervenors Br. 5–10.

Moreover, the ACA itself prohibits health plans offered through an ACA exchange from "discriminat[ing] against any individual health care provider or health care facility because of the facility or provider's unwillingness to provide, pay for, provide coverage of, *or refer for*

abortions."  84 Fed. Reg. at 23,172 (emphasis added); *see also* 42 U.S.C. §§ 18113, 18023(a)(1), (b)(1)(A), (b)(4); Intervenors Br. 17.  Plaintiffs do not explain how their strained interpretation of Section 1554 would permit *any* conscience protections, including those protections provided in the ACA.

## III.    The Conscience Rule Is Not Arbitrary or Capricious.

HHS adopted the Rule in response to the "culture of hostility to conscience concerns in health care."  84 Fed. Reg. at 23,176.  Its efforts to enforce federal conscience provisions in the face of these threats was not arbitrary or capricious.  Indeed, Plaintiffs' own filings demonstrate that HHS was justified in promulgating the Rule to eliminate "confusion" about the "scope and applicability" of the conscience laws.  *Id.* at 23,178.  For example, Plaintiffs express surprise that "an employee who schedules an abortion" would be considered to have "assist[ed] in the performance of that procedure," States Br. 25 n.17, even though scheduling an abortion satisfies Plaintiffs' own definition of "assist in the performance":  to "give support or aid to the execution of" the procedure.  Private Br. 21.  Plaintiffs also contend that the conscience laws allow funding recipients to balance their own interests with the conscience rights of their employees, *id.* at 19, and criticize the Rule for not allowing such balancing, *see* 84 Fed. Reg. at 23,191.  But the conscience statutes do not authorize funding recipients to override conscience rights whenever they unilaterally decide that the "burdens" of accommodating religious objections are substantial. States Br. 25 n.17.

Plaintiffs contend that the complaints OCR received do not substantiate the agency's conclusion that threats to religious liberty exist and are growing worse.  *Id.* 13–20.  But the complaints OCR received were only "one of the many metrics used to demonstrate the importance of this Rule."  84 Fed. Reg. at 23,229.  For example, until recently California required pro-life pregnancy centers to post government-drafted notices stating that California provides free or low-

cost abortion, along with contact information for how to obtain an abortion—the "very practice that [the pro-life pregnancy centers] are devoted to opposing." *NIFLA*, 138 S. Ct. at 2371; *see also* 84 Fed. Reg. at 23,175 n.11, 23,176 (citing *NIFLA*), 23,177 (citing similar laws in numerous other states and localities); *Greater Balt. Ctr. for Pregnancy Concerns v. Mayor and City Council of Balt.*, 879 F.3d 101 (4th Cir. 2018), *cert. denied*, 138 S. Ct. 2710 (2018).

HHS also cited:

- "[T]housands of public comments" received during earlier rulemakings describing "an environment of discrimination and coercion";

- A letter from California to insurance companies "seeking to enforce a California legal requirement that the insurers include abortion coverage in plans used by persons who objected to such coverage";

- An article in a widely circulated medical journal arguing that those who have "[q]ualms about abortion" should "not practice women's health";

- A survey conducted by CMDA indicating that large percentages of religious practitioners face discrimination or coercion;

- A decision by Nassau University Medical Center to discipline eight nurses who objected to assisting in the performance of abortions;

- Numerous lawsuits filed by nurses alleging that they had been coerced to participate in abortions or discriminated against;

- A statement by an organization "tasked with developing codes of ethics within the health professions," States Br. 31 & n.27, that conscientious objectors have a "duty" to "refer patients" for "reproductive services";

- Increased legalization of assisted suicide and lawsuits attempting to coerce objectors into participation;

- Lawsuits filed by pro-choice groups claiming that private religious entities are legally required to perform abortions and sterilizations;

- Commenters who "essentially contend[ed] that pro-life medical personnel can be placed outside of women's health"; and

- Confusion caused by OCR guidance from 2016.

84 Fed. Reg. at 23,175–79; *see also id.* at 23,228–29.[7]

As HHS explained, each of these factors "illustrate[s] the need for greater clarity concerning the scope and operation" of the conscience laws. *Id.* at 23,178. It is irrelevant for purposes of arbitrary-or-capricious review whether Plaintiffs would weigh these factors differently. *See Pub. Citizen, Inc. v. NHTSA*, 374 F.3d 1251, 1263 (D.C. Cir. 2004) ("no basis" for overturning rule when "arbitrary-and-capricious challenge boils down to a policy disagreement" with agency).

Plaintiffs previously argued that the Rule was arbitrary or capricious because HHS "fail[ed] to even acknowledge" the change from the 2011 rule. Private P.I. Br. at 20. Perhaps recognizing the indefensibility of that claim, Plaintiffs now contend that "far more than acknowledgment was required." States Br. 21. But it is "axiomatic" that an agency is "free to change its mind so long as it supplies 'a reasoned analysis.'" *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 667 (D.C. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto.*

---

[7] Recent events confirm that conscientious objectors continue to face discrimination on account of their religious beliefs. For example, OCR just issued a notice of violation to the University of Vermont's Medical Center for forcing a nurse to assist in an abortion. *See* HHS Press Office, *OCR Issues Notice of Violation to the University of Vermont Medical Center After It Unlawfully Forced a Nurse to Assist in Abortion* (Aug. 28, 2019), www.hhs.gov/about/news/2019/08/28/ocr-issues-notice-violation-university-vermont-medical-center-after-it-unlawfully-forced-nurse.html. And a Catholic health system in Colorado was recently sued for not allowing a doctor to prescribe lethal medication. Amanda Pampuro, *Terminally Ill Man Sues Hospital Over Aid-In-Death Medication*, Courthouse News Service (Aug. 22, 2019), www.courthousenews.com/terminally-ill-man-sues-hospital-over-aid-in-death-medication. CMDA's recent survey further confirms that anti-religious discrimination is a growing threat. *See* Norman Decl. ¶¶ 14–18. State Plaintiffs argue that this survey cannot be used to "uphold the Final Rule" because it was not before the agency, States Br. 52 n.46, but Defendants submitted the survey to demonstrate that the equities do not weigh in favor of a preliminary injunction. *See* Dkt. 1:19-cv-04676-PAE, ECF No. 142 at 13–14 ("[T]he Court would benefit from concrete factual submissions from the Proposed Intervenors as to the hardships occasioned by the absence of the Rule on CMDA members and Dr. Frost, much as the Court would benefit from factual submissions by plaintiffs as to the hardships occasioned by the Rule."). The results of CMDA's survey are not "opinion" testimony or based on "specialized knowledge" within the scope of Federal Rule of Evidence 702.

*Ins.*, 463 U.S. 29, 57 (1983)).  The agency need only show that "prior policies and standards are being deliberately changed, not casually ignored."  *Id.*  HHS did much more than that, explaining its departures from the 2011 rule at length.  *E.g.*, 84 Fed. Reg. at 23,175, 23,179, 23,228, 23,229, 23,254–55.  HHS's "extensive discussion of its change in approach" is "more than equal to [the] forgiving standard of review."  *Nat'l Cable & Telecomms. Ass'n*, 567 F.3d at 667.

Plaintiffs invoke the principle that an agency cannot "entirely fail[] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, but their quarrel with HHS again boils down to a mere disagreement with the Rule's definitions.  States Br. 22–36.  And the definitions *cannot* be arbitrary and capricious because it is *per se* reasonable for an agency to promulgate definitions reflecting the ordinary meaning of the terms Congress enacted, as HHS did here.  *E.g.*, *Hernandez v. Hartford Life & Acc. Ins.*, 462 F. App'x 583, 585 (6th Cir. 2012) (an interpretation of a term "in accordance with its plain and ordinary meaning" can "hardly be deemed arbitrary and capricious"); *Warshauer v. Solis*, 577 F.3d 1330, 1336 (11th Cir. 2009) (an agency's interpretation was "not arbitrary and capricious" because it was a "faithful interpretation of the plain language of the [statute]").

In all events, HHS squarely addressed every issue that Plaintiffs accuse it of "fail[ing] to consider."  *See* HHS Opp at 52–60.  And Plaintiffs repeatedly hyperbolize and distort the definitions.  For example, Plaintiffs argue that the "discrimination" definition "permits an employee to object without notice."  States Br. 30–31.  But the Rule allows a funding recipient to "require" its employees to "inform it of objections" each year; and so long as the employer has a "persuasive justification for doing so," it may "require" employees to "inform it of objections" at any time whatsoever.  84 Fed. Reg. at 23,263.  If an objection could cause catastrophe—for example, in "emergency departments, ambulance corps ... and other urgent care settings with

extremely limited staffing," States Br. 24—the employer would have "persuasive justification" to learn of such objections and ensure adequate staffing.[8]  Plaintiffs worry that the Rule requires employers to "keep [conscientious objectors] on staff," Private Br. 18 n.7, but this is a feature, not a bug:  A fundamental purpose of the conscience laws is to prevent certain fields from being "purged of pro-life personnel."  84 Fed. Reg. at 23,191–92.  Once again, Plaintiffs' complaint is with the statutes Congress enacted, not the Rule HHS promulgated.

Plaintiffs also argue that the "discrimination" definition is arbitrary and capricious because it does not contain an exception for employer hardship.  States Br. 34.  Plaintiffs would prefer a regime in which employees asked to violate their consciences "request" accommodation from their employers—the ones who gave the conscience-violating directive in the first place—who then "consider the needs of the requesting employee, other employees, and its business and customers." *Id.*  But the conscience laws do not relegate conscientious objectors to the status of "requesting employees," whose consciences are "balanc[ed]" against their employers' "business … interests." *Id.*  Congress has made the judgment to fully protect conscience rights, and HHS faithfully implemented that policy.  84 Fed. Reg. at 23,191.

Finally, Plaintiffs assert that HHS miscalculated costs by "underestimating the number of covered persons and entities," States Br. 37, but Intervenors have already explained the fundamental flaw with that argument.  Intervenors Br. 25.

## IV.   The Conscience Rule Is Constitutional.

The Rule protects the fundamental right to religious liberty enshrined in the First

---

[8] In the hypothetical and highly unlikely event that an employee springs a newfound objection on an employer at the eleventh hour after having previously expressed a willingness to participate, the Rule *requires* HHS to take these "facts and circumstances" into account.  *See* 84 Fed. Reg. at 23,192 ("discrimination" definition "*must* be read in the context of each underlying statute at issue, any other related provisions of the rule, and the facts and circumstances" (emphasis added)); *see also id.* ("[W]hether an action is regarded as adverse is subject to a standard of reasonableness.").

Amendment and enforces the conscience protections Congress passed to protect that right. Plaintiffs nevertheless contend that by enforcing these statutory rights, the Rule somehow violates the separation of powers, the Spending Clause, and the Establishment Clause. Those arguments misconstrue the Rule—as all of Plaintiffs' arguments do—and distort Supreme Court precedent.

### A.     The Conscience Rule Does Not Violate the Separation of Powers.

The conscience statutes specifically condition receipt of federal funds on compliance with federal conscience protections. In enforcing those statutes, HHS is not withholding funds "already appropriated by Congress." States Br. 38. Instead, it is carrying out Congress's stated goal of providing federal funds only to those recipients that protect the conscience rights of religious healthcare professionals. The Rule does not authorize HHS to withhold all federal funds on the basis of "any perceived violation." States Br. 38 (citing § 88.7(i)(3)((i)–(iii))). Section 88.7(i)(3) provides that if OCR determines that a recipient has failed to comply "with Federal conscience and anti-discrimination laws," OCR can take certain "actions" to "effect[]" "compliance with *these laws*." 84 Fed. Reg. 23,272 (§ 88.7(i)(3)) (emphasis added). The references to withholding funds in § 88.7(i)(3)(i)–(iii), in context, refer to funds authorized by the "laws" the recipient has violated.

### B.     The Conscience Rule Does Not Violate the Spending Clause.

Plaintiffs' Spending Clause claims—which are simply repackaged versions of their flawed APA claims—are based on the wholly false premise that the Rule creates a "new regime … out of whole cloth." States Br. 39. The Rule does not "dramatically expand[] key definitions." *Id.*; *see supra* Part I. And far from threatening to terminate HHS funds for "perceived violation[s]" of some newly invented regime, States Br. 39, the Rule carries out the specific funding conditions imposed by Congress—conditions Plaintiffs were certainly aware of when they accepted federal funds. Plaintiffs' concession that they are not challenging "Congress's authority to enact the underlying statutes," *id.*, thus dooms their Spending Clause claim. Even if the Rule were

considered an exercise of the spending power (which it is not), it would not violate the Spending Clause because it is not ambiguous, is squarely related to federal interests, and does not coerce funding recipients into violating the Establishment Clause.

**1.** The Rule does not violate the non-ambiguity principle, because it does not impose any "new conditions" on the receipt of federal funds, and Plaintiffs were certainly aware of their obligations to respect conscience rights when they accepted federal money.  States Br. 40. Plaintiffs protest they could "hardly anticipate" that HHS would promulgate a rule enforcing the various conscience provisions "scattered throughout the United States Code" to "transform" the provision of healthcare.  *Id.* at 40–41.  But that argument is doubly wrong because the Conscience Rule "generally reinstates the structure of the 2008 Rule," 84 Fed. Reg. at 23,179—making the Rule's provisions entirely foreseeable—and does not come close to "transform[ing]" the health care industry.  *See supra* Part I.

Plaintiffs analogize the Rule to the ACA's Medicaid expansion that the Supreme Court invalidated in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) ("*NFIB*").  States Br. 42–44.  But the Rule's modest provisions enforcing existing conscience protections are nothing like the massive overhaul of the Medicaid program Congress attempted in the ACA.  In *NFIB*, the Court explained that whereas the original Medicaid "program was designed to cover medical services for four particular categories of the needy: the disabled, the blind, the elderly, and needy families with dependent children," the ACA "transformed" Medicaid "into a program to meet the health care needs of the entire nonelderly population with income below 133 percent of the poverty level."  567 U.S. at 583.  The Conscience Rule effectuates no such transformation.  It neither expands the scope of statutory conscience protections, *supra* Part I, nor undermines other healthcare laws, such as EMTALA and the ACA, *supra* Part II.

19

The Rule does not threaten to strip Plaintiffs of "all HHS funds for any perceived misstep under the [Rule]." States Br. 41.  It nowhere suggests that an employer's violation of the Church Amendment will result in loss of funding unrelated to that specific appropriation.  To the contrary, Section 88.7—the provision setting out HHS's enforcement authority—makes clear that HHS will "coordinat[e] with the relevant Departmental funding component, utilize existing regulations for involuntary enforcement, such as those that apply to grants, contracts, or CMS programs," and "[i]n coordination with the relevant component or components of the Department, coordinate other appropriate remedial action as the Department deems necessary and as allowed by law and applicable regulation."  84 Fed Reg. at 23,271 (§ 88.7(a)(7)–(8)).  If OCR determines after "an investigation or compliance review" that an employer has failed to comply with "Federal conscience and anti-discrimination laws," it may "effect[]" compliance "in coordination with the relevant Department component, and pursuant to statutes and regulations which govern the administration of contracts … , grants … , and CMS funding arrangements."  *Id.* at 23,271–72 (§ 88.7(i)).  Nothing in that section gives OCR sweeping new authority to strip all HHS funds whenever a recipient violates one particular conscience provision.

Contrary to Plaintiffs' assertion, the Rule does not allow HHS to terminate funds "*during the pendency of good-faith voluntary compliance efforts.*"  States Br. 44 (citing § 88.7(i)(2)).  Section 88.7(i)(2) applies when "an investigation or compliance review indicates a *failure to comply* with Federal conscience and anti-discrimination laws."  84 Fed. Reg. 23,271 (§ 88.7(i)(2)) (emphasis added).  There is nothing heavy-handed about allowing OCR to "simultaneously pursu[e]" other enforcement actions while attempting to resolve the matter informally in

circumstances where the employer has been found to have *violated the law*. *Id.* at 23,271–72.[9]

**2.** Plaintiffs contend that the Rule violates the "relatedness" requirement because, "through the Weldon Amendment," the Rule puts at risk funds from the Labor and Education Departments. States Br. 46–47. But the relatedness requirement asks only if the conditions are "unrelated 'to the federal interest in particular national projects or programs.'" *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987) (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)). The condition on federal funds imposed by the Weldon Amendment is plainly related to the government's interest in protecting religious liberty.

Moreover, the Rule does *not* give HHS unilateral authority to strip federal funds administered by other federal departments—it requires OCR to "coordinat[e]" its enforcement efforts "with the relevant Department component." 84 Fed. Reg. 23,172 (§ 88.7(i)(3)). In some cases, the relevant Department component may include divisions within the Departments of Labor or Education. Nothing in the Rule suggests that HHS can (or will) "terminate the Labor and Education Department funds" without the cooperation of those departments.

**3.** The Rule does not require any recipient of federal funds to violate the Establishment Clause. *See infra* Part IV.C.

**C.     The Rule Does Not Violate the Establishment Clause.**

The Conscience Rule steers clear of any conceivable Establishment Clause violation because it merely accommodates the religious beliefs of healthcare professionals pursuant to long-extant federal law. As the Supreme Court has "long recognized," the government may ...

---

[9] Plaintiffs incorrectly argue that HHS may suspend "*all* HHS funding" if an employer fails to furnish the required certification. States Br. 44 (citing § 88.7(j)). Section 88.7(j) provides that if a recipient fails to furnish the certification, OCR may, "in coordination with the relevant Department component, ... effect compliance by any of the remedies provided in paragraph (i) of this section." 84 Fed. Reg. 23,272 (§ 88.7(j)). Section 88.7(i) does not authorize OCR to strip all HHS funds.

accommodate religious practices ... without violating the Establishment Clause."  *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005) (alterations in original) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987)).  Plaintiffs' Establishment Clause argument is based on a few cherry-picked quotes from *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985), and a straw-man caricature of the Conscience Rule.  Private Br. 41.  But *Caldor* does not provide the proper framework for evaluating religious accommodations, and the Conscience Rule does not run afoul of *Caldor* in any event.  *See* Intervenors Br. 28–30.

The Rule does not impose an "absolute duty" on employers to "conform their business practices to the particular religious practices of the employee."  Private Br. 41 (quoting *Caldor*, 472 U.S. at 709).  Religious employees cannot veto procedures to which they object.  On the contrary, the Rule makes clear that employers are free to "use alternate staff or methods to provide for or further the objected-to conduct."  84 Fed. Reg. at 23,192.  In response to concerns that the Rule might impose administrative burdens on employers, HHS added a paragraph clarifying that "employers may require a protected employee to inform them of objections to referring for, participating, or assisting in the performance of specific procedures ... to the extent there is a reasonable likelihood that the protected entity or individual may be asked in good faith to refer for, participate in, or assist in the performance of such conduct."  *Id.*; *see also id.* at 23,263 (§ 88.2).

HHS added another paragraph allowing employers to "inform the public of the availability of alternate staff or methods to provide or further the objected-to conduct," so long as it "does not constitute retaliation or other adverse action against the objecting individual or health care entity."  *Id.* at 23,192; *see also id.* at 23,263 (§ 88.2).  Thus, unlike *Caldor*, where the state took "no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath," 472 U.S. at 709, HHS carefully balanced the "interests of employers and entities that

22

wish to provide services allowed by their consciences; respecting the interests, privacy, and conscience of patients and customers; and respecting the conscience of employees and health care entities protected by the laws passed by Congress that are the subject of this rule," 84 Fed. Reg. at 23,192.[10]

The Rule does not unconstitutionally "advance[] religious interests."  Private Br. 43.  The portions of the Rule Plaintiffs cite merely describe ongoing threats to religious liberty and the administration's policy of robustly protecting religious liberty.  *Id.* at 43–44.  On Plaintiffs' view, the Free Exercise Clause itself would violate the Establishment Clause because it protects religious liberty—thereby "advancing religious interests."  And Plaintiffs' apparent belief that religious convictions must always yield to an employer's decision to provide abortions, assisted suicide, or any other procedure is not supported by the text of the Constitution, Supreme Court precedent, or our nation's deeply religious history.

That failure is fatal to Plaintiffs' Establishment Clause claim, because "[T]he Establishment Clause *must* be interpreted by reference to historical practices and understandings," *Am. Legion v. Am. Humanist Assoc.*, 139 S. Ct. 2067, 2087 (2019) (emphasis added), and there is a long, unbroken history in this country of accommodating religious objectors.  "[I]t is hardly

---

[10] The Rule does not authorize employees to object to procedures that are "the primary or substantial majority of the duties of the position."  Private Br. at 41 (quoting 84 Fed. Reg. at 23,192).  HHS concluded that it "need not address ... whether a covered entity could disqualify a person with religious or moral objections to covered practices if such covered practices made up the primary or substantial majority of the duties of the position" because HHS was *not aware of any instances in which individuals with religious or moral objections to such practices have sought out such jobs*."  84 Fed. Reg. at 23,192 (emphasis added).  Plaintiffs cannot invalidate the Rule based on speculation that religious healthcare professionals might covertly accept positions as abortion doctors at Planned Parenthood, only to object to performing the abortions they were hired to perform.  *Cf. Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 692 (2010) (rejecting argument that non-discrimination policy would allow "saboteurs [to] infiltrate groups to subvert their mission" as "hypothetical").  The Rule gives HHS flexibility to address that situation if it arises.

impermissible for Congress to attempt to accommodate free exercise values, in line with 'our happy tradition' of 'avoiding unnecessary clashes with the dictates of conscience." *Gillette v. United States*, 401 U.S. 437, 453 (1971) (upholding exemption from military service for conscientious objectors).[11] If Congress can elevate conscience rights over the country's interest in national security without offending the Establishment Clause, it may also decide that conscience rights trump an employer's nominal interest in deciding *which employee* will provide an abortion.

Resorting to Orwellian doublespeak, Plaintiffs assert that the Rule's conscience protections "impose particular religious practices and beliefs on Plaintiffs, their employees, and their patients." Private Br. 44. But the Rule does not require funding recipients to mount crucifixes on their walls or distribute Bibles. Nor does it prevent them from performing abortions or assisted suicide. The Rule merely prohibits employers from forcing religious healthcare professionals who object to those procedures to participate. It does not impose "religious practices" on anyone.

At most, the Rule imposes minor administrative burdens on employers who must accommodate the objections of religious healthcare professionals. Although Plaintiffs downplay

---

[11] *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv L. Rev. 1409 (1990); Mark Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J. 121 (2012) (collecting historical examples); Conscience in America: A Documentary History of Conscientious Objection in America, 1757–1967 28 (Lillian Schlissel, ed. 1968); James Madison, Presidential Pardon, November 20, 1816, in The Gilder Lehrman Institute of American History, *Conscientious Objectors: Madison Pardons Quakers, 1816* at 4, www.gilderlehrman.org/sites/default/files/inline-pdfs/00043_FPS.pdf; *id.* at 7 (reproducing original document) (religious objector to fugitive slave act pardoned); *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716–18 (1981) (protecting conscientious objector who refused to produce armaments); *Wisconsin v. Yoder*, 406 U.S. 205, 207 (1972) (protecting conscientious objectors declining to send children to school); 50 U.S.C. App. § 456(j) (protecting conscientious objectors from serving in the military); EEOC Compliance Manual § 12-IV.C. (Example 43) (July 22, 2008) (explaining that reasonable accommodations of workplace religious objections can include requiring the objecting employee to transfer objectionable tasks to co-workers).

the Supreme Court's decision in *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987), that case soundly rejected their contention that religious accommodations become unconstitutional whenever they impose burdens on third parties.  In *Amos*, the district court held that Title VII's accommodation violated the Establishment Clause because it "burden[ed] the free exercise rights of employees of religious institutions who work in nonreligious jobs," *id.* at 333, but the Supreme Court *reversed* and upheld the accommodation, *id.* at 340, notwithstanding its burdens on employees.  *Amos* confirms that the Conscience Rule is not unconstitutional even if it burdens secular employers in some way.[12]

Plaintiffs' extreme view of the Establishment Clause was also implicitly rejected in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), which held that RFRA requires the government to exempt for-profit closely held corporations from the contraception mandate when the corporations' owners have religious objections to contraception.  *Id.* at 2785.  The government argued that it was impermissible to grant "a religious accommodation that comes at the expense of [an employer's] employees."  Br. of Resp'ts, *Burwell v. Hobby Lobby Stores, Inc.*, 2014 WL 546900, at *24–25 (Feb. 10, 2014).  The Court did not deny that extending RFRA's religious accommodation might create some burdens, but it rejected the government's argument and gave petitioners the benefit of the exemption.  *Hobby Lobby*, 134 S. Ct. at 2785.

## CONCLUSION

For the foregoing reasons, the Court should GRANT Intervenors' motion for summary judgment and DENY Plaintiffs' cross-motions for summary judgment.

---

[12] The idea that religious accommodations are impermissible whenever they create third-party burdens has been used to mask hostility to religion.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 544–45 (1993) (religious ceremonies banned under guise of public health); *Guru Nanak Sikh Soc'y of Yuba City v. Cty. of Sutter*, 456 F.3d 978, 990 (9th Cir. 2006) (excluding Gurdwaras because they create traffic and development burdens).

Dated: September 19, 2019

New York, New York

Daniel Blomberg (*pro hac vice*)
Nicholas Reaves (*pro hac vice*)
THE BECKET FUND FOR RELIGIOUS
LIBERTY
1200 New Hampshire Ave. NW, Suite 700
Washington, D.C. 20036
Telephone: 202.955.0095
Facsimile: 202.955.0090

*Attorneys for Defendants-Intervenors DR.
REGINA FROST AND CHRISTIAN MEDICAL
AND DENTAL ASSOCIATIONS*

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Allyson N. Ho*

Allyson N. Ho (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

Robert E. Dunn (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1811 Page Mill Road
Palo Alto, California 94304
Telephone: 650.849.5300
Facsimile: 650.849.5333

Jason H. Hilborn (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant-Intervenor
CHRISTIAN MEDICAL AND DENTAL
ASSOCIATIONS*